```
 1                  UNITED STATES BANKRUPTCY COURT

 2                       DISTRICT OF ARIZONA

 3

 4     In re:                        )
                                     )  Chapter 11 Proceedings
 5     SUMMIT FAMILY RESTAURANTS,    )
       INC.,                         )  No. 2:21-bk-02477-BKM
 6                                   )
                 Debtor.             )
 7                                   )
       _____)
 8

 9

10

11

12

13

14     VIDEOCONFERENCE RULE 2004 EXAMINATION OF ROBERT WHEATON

15                       Scottsdale, Arizona

16                         June 2, 2021

17

18

19

20

21

22

23
                                        Prepared by:
24                                      CINDY MAHONEY, RPR, RMR
                                        Certified Court Reporter
25                                      Certificate No. 50680
```

I N D E X

| WITNESS | PAGE |
|---|---|
| ROBERT WHEATON | |
|    Examination by Mr. Dawes | 4 |
|    Examination by Mr. Hawkins | 91 |

EXHIBITS MARKED

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Response to BSV Lamont JCRS LLC's Request for Documents Under Bankruptcy Rule 2004 | 13 |
| Exhibit 2 | SBA documents, SU_000001-13 | 18 |
| Exhibit 3 | Summit Family Restaurants Inc. Profit & Loss Projections (Cash Flow), SU001140 | 52 |
| Exhibit 4 | Voluntary Petition for Non-Individuals Filing for Bankruptcy | 58 |
| Exhibit 5 | Monthly Operating Report for Small Business Under Chapter 11 | 64 |
| Exhibit 6 | Shopping Center lease, JCRS Shopping Center | 70 |
| Exhibit 7 | Letter to Summit Family Restaurants from John Deacon of Broad Street Realty, Inc., with enclosures | 82 |

REQUEST

Page 93    Line 17

```
 1              THE VIDEOCONFERENCE RULE 2004 EXAMINATION OF

 2   ROBERT WHEATON commenced at 9:12 a.m. on June 2, 2021, at

 3   the law offices of Sacks Tierney, 4250 North Drinkwater

 4   Boulevard, 4th Floor, Scottsdale, Arizona, before Cindy

 5   Mahoney, RPR, RMR (via videoconference), Arizona Certified

 6   Court Reporter No. 50680.

 7

 8                           *    *    *

 9   APPEARANCES:

10      For the Debtor:
            SACKS TIERNEY P.A.
11          By: Sierra M. Minder, Esq.
                4250 North Drinkwater Boulevard
12              4th Floor
                Scottsdale, Arizona 85251
13              480-425-2600
                Sierra.minder@sackstierney.com
14

15      For BSV Lamont JCRS, LLC (via videoconference):
            FOX ROTHSCHILD LLP
16          By: Christopher J. Dawes, Esq.
                1225 17th Street
17              Suite 2200
                Denver, Colorado 80202
18              303-383-7604
                Cdawes@foxrothschild.com
19

20      For Save Casa Bonita (via videoconference):
            GUIDANT LAW FIRM
21          By: Lamar Hawkins, Esq.
                2390 East Camelback Road
22              Suite 318
                Phoenix, Arizona 85016
23              602-888-9229
                lamar@guidant.law
24
     ALSO PRESENT:  Andrew Novick (via videoconference)
25
```

```
          1      Q.   Okay.  All right.  Now, I think you just indicated
          2  that you are open for business; is that true?
          3      A.   Well, I think the -- I think a better, more
          4  specific response is that we are open for gift shop sales.
09:21:52  5  We are planning to open this week for the arcade.  We are
          6  doing promotional activities for those people who are
          7  interested in coming by.
          8               And promotional activities would be free
          9  tours of the restaurant.  It would be passing out coupons
09:22:13 10  for discounted meals when we reopen.  So promotional
         11  activities would be the third.  Plus, as I just mentioned,
         12  accepting applications.
         13      Q.   Okay.  So the -- when did the gift shop open --
         14  reopen to the public?
09:22:30 15      A.   I -- Friday, a week ago.
         16      Q.   May 28th?
         17      A.   Yes.
         18      Q.   What hours is it open now?
         19      A.   Limited hours.  10:00 a.m. to 3:00 p.m.
09:22:57 20      Q.   And have there been revenues generated from the
         21  gift shop since Friday?
         22      A.   No.  There have been a number of giveaways, but we
         23  haven't got our register system working at an acceptable
         24  level yet.  So hopefully that will be by Friday.
09:23:19 25      Q.   So no sales; just giveaways?
```

```
 1        A.   Giveaways.
 2        Q.   And the arcade, as I understood you, the arcade is
 3   not open at this juncture; correct?
 4        A.   All the games have been -- there are three levels
 5   of arcades at Casa Bonita, and two of the three levels of
 6   arcades, all the games have been serviced, all the games
 7   are functional, and all of the games will be available to
 8   walk-in customers this weekend.
 9        Q.   Okay.  So at this juncture, the arcade is not open
10   for business; correct?
11        A.   It is not open for business.
12        Q.   And the promotional activities that you mentioned,
13   how many tours have been provided in the year -- let's just
14   say this year of 2021?
15        A.   To be on the safe side, I would say less than one
16   dozen.
17        Q.   The restaurant and bar is not open for business;
18   correct?
19        A.   Correct.
20        Q.   In terms of revenues generated by the debtor, have
21   there been any since April of 2020?
22        A.   None.
23        Q.   And the employees that you brought on board, in
24   general terms -- I know you described a couple different
25   phases of your efforts to get it up and running.  One was
```

|  |  |
|---|---|
| 1 | identified in response to request number 2 that you just |
| 2 | referenced relate to the SBA loans and the EIDL loan; |
| 3 | correct? |
| 4 | A. That's correct. |
| 09:33:17  5 | Q. You also mentioned efforts to secure financing |
| 6 | from Main Street funding; is that right? |
| 7 | A. Main Street was another government sponsored loan, |
| 8 | somewhat analogous to the three that you just referenced. |
| 9 | Q. Okay. And has the debtor secured a loan through |
| 09:33:36 10 | the Main Street funding program? |
| 11 | A. We did not. We were not successful in doing so. |
| 12 | Q. Has the debtor sought out other financing? |
| 13 | A. No. |
| 14 | Q. Does it intend to seek out other financing? |
| 09:33:55 15 | A. Well, at this point, I think we have exhausted any |
| 16 | sources in the short run to secure financing. Our best |
| 17 | shot was Main Street Lending. It turned out that that |
| 18 | particular government sponsored program is not as well |
| 19 | received by the lenders as either PPP or EIDL where they |
| 09:34:30 20 | got cash for underwriting. In the Main Street, they had to |
| 21 | take a credit risk. |
| 22 | And they simply -- we contacted a large |
| 23 | number of the potential lenders. We've included an exhibit |
| 24 | of those -- some of those that we did contact. And |
| 09:34:54 25 | universally, they were unprepared to underwrite a credit |

1  America from either of these lists; I contacted them from
2  an Arizona list, if that makes sense to you.
3      Q.   When you say -- you used the term "I" and "we."
4  So on behalf of the debtor, who all did reach out to the
5  lenders you've identified?
6      A.   The majority of the contact was my contact, but I
7  did assign certain of the banks to Ron Dowdy.
8      Q.   All right.  And in any event, you were
9  unsuccessful pursuing this line of financing with any of
10 these lenders; correct?
11     A.   Unsuccessful -- well, the -- there were certain
12 lenders who would have considered financing with certain
13 security attachments associated with them that I was
14 unwilling to accept.  So -- and a specific example of that
15 would be BMO Harris.  Another example of that would be BOA
16 or Bank of America.  And I had conversations with JPMorgan
17 Chase related to the same terms and conditions, which is
18 security that we weren't prepared to give.
19     Q.   One of the forms of security would be in the way
20 of a personal guarantee from yourself, for example?
21     A.   That would be a wonderful example.
22     Q.   So that was requested by the -- these lenders and
23 rejected; correct?
24     A.   That's correct.  I will point out one other thing.
25 And I'm getting off the subject and not answering.  And

1　you discussed the concept of curing the lease with anyone
2　else?
3　　　A.　No one other than counsel.
4　　　Q.　Have you had -- Casa Bonita shuttered its doors on
5　March 16, 2020; is that right?
6　　　A.　That's correct.
7　　　Q.　Since that time, have you ever reached out to
8　communicate with any representatives of the landlord?
9　　　　　　MS. MINDER:　Objection.　Could you be more
10　specific?
11　BY MR. DAWES:
12　　　Q.　Let's start with that very general question, which
13　I think is very fair.　And let -- Mr. Wheaton, if you
14　didn't understand the question.　I'm glad to rephrase it,
15　but it was pretty straightforward.
16　　　A.　I understood the question.　The answer is, there
17　should be a whole in the correspondence that your client
18　has provided you that details all the conversations we've
19　had about repayment to the landlord.　And there has been
20　not one single deviation in that communication since we
21　shuttered the door in March of 2020.
22　　　Q.　And so these are communications you have made, you
23　have directed to the landlord; is that correct?
24　　　A.　In many cases, the landlord has communicated with
25　us, and we have provided responses to the landlord.

1     A.    In round numbers, 350,000.

2     Q.    All right.  And that does not account for any of
3  the liquidated damages to which the landlord is entitled;
4  correct?

5     A.    Correct.  Well, no.  I'm not sure they're entitled
6  to them, but it is -- does not reflect that total.

7     Q.    All right.  And of that $350,000, how does the
8  debtor intend to pay the $350,000 to the landlord?

9     A.    There is no question that over a reasonable period
10 of time, the debtor intends to pay from proceeds of
11 operations.  But technically, until we finalize the monthly
12 pro formas, I don't know if in -- just to use as an
13 example, in September of 2021, will the cash proceeds come
14 from operations or will they come from a balance that's
15 there now called PPP?  I simply don't know that answer.

16    Q.    Mr. Wheaton, with the $350,000 number that you
17 cited earlier in terms of what was owed to the landlord, is
18 that a disputed sum by the debtor?

19    A.    The debtor doesn't dispute that balance.

20    Q.    All right.  I understand that we have a legal
21 issue on the issue of liquidated damages; correct?

22    A.    Correct.

23    Q.    And is it the debtor's position that the
24 liquidated damages provision ought not be enforceable?

25    A.    I think the debtor's response is -- speaks for

```
 1  familiar with this document, sir?
 2      A.  Yes.
 3      Q.  Now, this is for the period of April 7th to 30 of
 4  2021; correct?
 5      A.  Yes.
 6      Q.  All right.  Now, it's signed by Mr. Dowdy, but did
 7  you participate in this document's preparation?
 8      A.  Yes.
 9      Q.  All right.  And we see a number of line items.
10  Number 1 is: Did the business operate during the entire
11  reporting period?  And the answer checked is yes.
12              How was it that the business was operating
13  during the reporting period?
14      A.  We still have obligations, utilities.  We provided
15  to you pro formas, so, you know, the -- not pro formas.
16  Actuals.  That's one of the questions asked in the
17  delivery.  We generated monthly P&Ls, so obviously -- we've
18  interpreted line 1 to mean, provide on an accurate basis
19  exactly what the P&L would look like for that entire
20  period.
21      Q.  Was the debtor open for business during the
22  reporting period?
23      A.  It was not.  But I don't read that interpretation
24  as what number line 1 says.
25      Q.  Item 4 asks about: Did you pay your employees on
```

Rule 2004 Examination - June 2, 2021　　68
Robert Wheaton

```
            1   of questioning, could we have another break?
            2               MR. DAWES:  Sure.
            3               THE WITNESS:  The -- yes.
            4               MR. DAWES:  Okay.  Sure.  We can take that
11:12:42    5   break.
            6          (A recess ensued.)
            7   BY MR. DAWES:
            8       Q.  So, Mr. Wheaton, I should ask you a more simple
            9   question about the PPP loan proceeds.  You may have heard
11:26:27   10   counsel and I had a colloquy during our break.
           11               Is it the debtor's intent to expend the PPP
           12   proceeds to obtain loan forgiveness from SBA?
           13       A.  Yes.
           14       Q.  Let me ask you a bit about the lease with the
11:26:48   15   landlord.
           16               What was your role in connection with the
           17   negotiation of that lease?
           18       A.  Fairly limited.
           19       Q.  Okay.  How would you describe your fairly limited
11:27:06   20   role when negotiating the lease?
           21       A.  Fairly limited means fairly limited.  I reviewed
           22   documents and made sure that it was a lease that Summit
           23   could fulfill its obligations to.
           24       Q.  Okay.  So did you talk to anyone about the lease?
11:27:47   25       A.  Other than Ron Dowdy -- I'm not sure I understand
```