**SHOPPING CENTER LEASE**

| | |
|---|---|
| Shopping Center: | JCRS SHOPPING CENTER |
| Landlord: | BSV LAMONT JCRS LLC |
| Tenant: | SUMMIT FAMILY RESTAURANTS INC. |

**INDEX TO LEASE**

| **TITLE** | **PAGE** |
|---|---|
| ARTICLE 1. | DEFINITIONS AND CERTAIN BASIC PROVISIONS | 1 |
| ARTICLE 2. | GRANTING CLAUSE | 3 |
| ARTICLE 3. | DELIVERY OF PREMISES | 3 |
| ARTICLE 4. | RENT | 5 |
| ARTICLE 5. | SALES REPORTS, RECORDS AND FINANCIAL STATEMENTS | 7 |
| ARTICLE 6. | TENANT'S RESPONSIBILITY FOR TAXES AND REAL ESTATE CHARGES | 8 |
| ARTICLE 7. | COMMON AREA | 9 |
| ARTICLE 8. | MERCHANTS' ASSOCIATION OR PROMOTIONAL FUND | 12 |
| ARTICLE 9. | USE AND CARE OF DEMISED PREMISES | 13 |
| ARTICLE 10. | MAINTENANCE AND REPAIR OF DEMISED PREMISES | 14 |
| ARTICLE 11. | ALTERATIONS | 17 |
| ARTICLE 12. | LANDLORD'S RIGHT OF ACCESS | 18 |
| ARTICLE 13. | SIGNS; STORE FRONTS | 18 |
| ARTICLE 14. | UTILITIES | 19 |
| ARTICLE 15. | INSURANCE COVERAGES | 19 |
| ARTICLE 16. | WAIVER OF LIABILITY; MUTUAL WAIVER OF SUBROGATION | 21 |
| ARTICLE 17. | DAMAGES BY CASUALTY | 21 |
| ARTICLE 18. | EMINENT DOMAIN | 22 |
| ARTICLE 19. | ASSIGNMENT AND SUBLETTING | 23 |
| ARTICLE 20. | SUBORDINATION; ATTORNMENT; ESTOPPELS | 24 |
| ARTICLE 21. | DIRECTION OF TENANT'S ENERGIES | 25 |
| ARTICLE 22. | DEFAULT BY TENANT AND REMEDIES | 26 |
| ARTICLE 23. | INTENTIONALLY DELETED | 30 |
| ARTICLE 24. | HOLDING OVER | 30 |
| ARTICLE 25. | NOTICES | 30 |
| ARTICLE 26. | COMMISSIONS; ADVICE FROM AGENT | 30 |
| ARTICLE 27. | REGULATIONS; INDEMNIFICATION | 31 |
| ARTICLE 28. | HAZARDOUS MATERIALS | 32 |
| ARTICLE 29. | INTENTIONALLY DELETED | 34 |
| ARTICLE 30. | MISCELLANEOUS | 34 |

EXHIBITS:

| EXHIBIT "A" | GUARANTY OF LEASE |
|---|---|
| EXHIBIT "B" | SHOPPING CENTER |
| EXHIBIT "C" | DEMISED PREMISES |
| EXHIBIT "D" | SHOPPING CENTER PROHIBITED USES |
| EXHIBIT "E" | CONSTRUCTION:  CRITERIA AND DESCRIPTION OF LANDLORD'S AND TENANT'S WORK |
| EXHIBIT "F" | INTENTIONALLY DELETED |
| EXHIBIT "G" | SHOPPING CENTER RULES AND REGULATIONS |
| EXHIBIT "H" | RENEWAL OPTIONS |
| EXHIBIT "I" | RESTRICTION ON SHOPPING CENTER |

**EXHIBIT**

**1**

21-13328

i

### SHOPPING CENTER LEASE

### LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease"), made as of the 12th day of September, 2014, by and between BSV LAMONT JCRS LLC, a Delaware limited liability company ("Landlord"), and SUMMIT FAMILY RESTAURANTS INC., a Delaware corporation, d/b/a "Casa Bonita" ("Tenant").

In consideration of the covenants contained herein and intending to be legally bound, Landlord and Tenant covenant and agree as follows:

### ARTICLE 1.
### DEFINITIONS AND CERTAIN BASIC PROVISIONS

1.1.    The following list sets out certain defined terms and certain financial and other information pertaining to this Lease;

(a)    "Landlord": BSV Lamont JCRS LLC, a Delaware limited liability company.

(b)    Landlord's address:   c/o Broad Street Realty, LLC, 7250 Woodmont Avenue, Suite 350, Bethesda, Maryland 20814.

(c)    "Tenant":  Summit Family Restaurants Inc., a Delaware corporation, d/b/a "Casa Bonita".

(d)    Tenant's address:   2501 North Hayden Road, Suite 103, Scottsdale, Arizona 85257.

(e)    Tenant's trade name:  Casa Bonita.

(f)    Tenant's Guarantor (attach Guaranty as Exhibit "A"):  Star Buffet, Inc., a Delaware corporation.

(g)    Intentionally Deleted.

(h)    Intentionally Deleted.

(i)    "Shopping Center":  Landlord's property located in Lakewood, Colorado, commonly known as JCRS Shopping Center, being described or shown on Exhibit "B" attached to this Lease.

(j)    "Demised Premises":  that certain store in the Shopping Center deemed to contain fifty thousand eight hundred thirty-seven (50,837) square feet of floor area, and being described or shown on the store plan attached to this Lease as Exhibit "C".

(k)    "Commencement Date": October 1, 2014.

(l)    Lease Term:  Commencing on the Commencement Date and continuing for fifteen (15) years after the Commencement Date.  The term "Lease Year" shall mean any period of one (1) year commencing on the Commencement Date of this Lease or any anniversary of such date.

(m)    Intentionally Deleted.

(n)    Minimum guaranteed rental:

| | ANNUAL RENT | MONTHLY INSTALLMENT |
|---|---|---|
| Lease Year 1 | $207,999.96 | $17,333.33 |
| Lease Year 2 | $207,999.96 | $17,333.33 |
| Lease Year 3 | $276,699.96 | $23,058.33 |
| Lease Year 4 | $281,874.00 | $23,489.50 |
| Lease Year 5 | $287,151.00 | $23,929.25 |

|  | ANNUAL RENT | MONTHLY INSTALLMENT |
|---|---|---|
| Lease Year 6 | $292,535.04 | $24,377.92 |
| Lease Year 7 | $298,025.04 | $24,835.42 |
| Lease Year 8 | $303,626.04 | $25,302.17 |
| Lease Year 9 | $309,338.04 | $25,778.17 |
| Lease Year 10 | $315,165.00 | $26,263.75 |
| Lease Year 11 | $321,108.00 | $26,759.00 |
| Lease Year 12 | $327,170.04 | $27,264.17 |
| Lease Year 13 | $333,354.00 | $27,779.50 |
| Lease Year 14 | $339,660.96 | $28,305.08 |
| Lease Year 15 | $346,094.04 | $28,841.17 |

(o)    Percentage rental rate:  (i) during the third (3rd) through sixth (6th) Lease Years, 4.5%; and (ii) during the seventh (7th) through fifteenth (15th) Lease Years, 4.75%.  See Section 4.3 for example of percentage rental.

(p)    Common area maintenance and real estate tax charge:  An amount equal to $6,195.75 per month, payable in advance, subject to adjustment as provided in Sections 6.4 and 7.5.

(q)    Intentionally Deleted.

(r)    Intentionally Deleted.

(s)    Permitted use:  the operation of a family-oriented, Mexican-themed restaurant and entertainment center,  and for no other purpose whatsoever.  Notwithstanding anything to the contrary, in no event shall the Demised Premises be operated primarily as a nightclub, bar, or tavern.

(t)    Business Hours:  from 11:00 a.m. to 9:00 p.m. on Mondays through Thursdays; 11:00 a.m. to 10:00 p.m. Fridays and Saturdays; and 11:00 a.m. to 9:00 p.m. Sundays.

(u)    Tenant's proportionate share:  twenty-six and 29/100 percent (26.29%) subject to adjustment as provided in Sections 6.2 and 7.4; provided, however, in no event shall Tenant's proportionate share be deemed to exceed thirty percent (30%).

(v)    Tenant shall have the options to extend the Lease Term for two (2) consecutive periods of five (5) years each on the terms and conditions set forth in Exhibit "H" hereto.

1.2.    The following chart is provided as an estimate of Tenant's initial monthly payment (other than payment of percentage rental) broken down into its components.  This chart, however, does not supersede the specific provisions contained elsewhere in this Lease.

| | |
|---|---|
| Initial Minimum Guaranteed Rental<br>(Section 1.1(n)) | $17,333.33 |
| Initial Common Area Maintenance Charge<br>(Sections 1.1(p), 7.4 and 7.5) and<br>Initial Payment for Real Estate Charges<br>(Article 6) | $6,195.75 |
| Total Initial Monthly Payment | $23,529.08 |

## ARTICLE 2.

## GRANTING CLAUSE

2.1.    Landlord leases the Demised Premises to Tenant, and Tenant leases the Demised Premises from Landlord, upon the terms and conditions set forth in this Lease.

2.2.    The Lease Term shall be as set forth in Section 1.1(l) of this Lease, unless sooner terminated in accordance with this Lease.

2.3.    [INTENTIONALLY OMITTED].

2.4.    [INTENTIONALLY OMITTED].

2.5.    During the period between the date of full execution and delivery of this Lease and the Commencement Date, all of the provisions of this Lease, other than the obligations of Tenant to pay rent and the obligations of Tenant under Section 9.1 hereof shall be in full force and effect.

2.6.    Tenant has had the opportunity to measure the floor area of the Demised Premises.  The parties stipulate, for all purposes under this Lease, that the Demised Premises contains 50,837 square feet of floor area.

2.7.    Landlord shall, at Landlord's sole cost and expense, substantially repair, re-asphalt, and re-stripe the front parking lot of the Shopping Center, including the installation of new lighting to the extent Landlord deems the same necessary, so that such front parking lot is in a first-tier, workmanlike condition.  In addition, Landlord shall, on or before the date that is one (1) year after the Commencement Date, install a new roof above the Demised Premises.

## ARTICLE 3.

## DELIVERY OF PREMISES

3.1.    The Demised Premises is being leased "AS IS", with Tenant accepting all defects, if any; and Landlord makes no warranty of any kind, express or implied, with respect to the Demised Premises (without limitation, Landlord makes no warranty as the habitability, fitness or suitability of the Demised Premises for a particular purpose; nor as to compliance or non-compliance of the Shopping Center and the Demised Premises with the provisions of the Americans With Disabilities Act of 1990, as amended; nor as to the absence of any toxic or otherwise hazardous substances).    This  Section  3.1  is  subject  to  any  contrary requirements under applicable law; however, in this regard Tenant acknowledges that it has been given the opportunity to inspect the Demised Premises.

3.2.    Tenant shall, on or before September 30, 2016, perform "Tenant's Work" (as hereinbelow defined) in accordance with Exhibit "E" attached hereto.  As soon as is reasonably practicable following the date of this Lease, Tenant shall submit to Landlord, for its approval, "Tenant Plans" (defined below).  "Tenant Plans" is defined to be all plans, specifications, and list of materials required to enable Landlord to accurately understand and review all Tenant's Work.  "Tenant's Work" means interior improvements to be performed by Tenant to or upon the Demised Premises, costing no less than Two Hundred Thousand Dollars ($200,000.00).  Although the scope and specificity of Tenant's Work shall be determined solely by Tenant in Tenant's sole discretion (subject, however, to the other provisions of this Lease), it is Tenant's intention that, at a minimum, Tenant's Work shall include improvements to the front entry area of the Demised Premises, the serving line of the Demised Premises, and the carpets on the lower level of the Demised Premises, and the acquisition of new games.  Tenant's Plans shall consist of design and layout work and all other architectural, structural, mechanical, plumbing and electrical plans and specifications for all of the Tenant's Work, including, but not limited to, such working drawings as are required by Landlord, in its reasonable discretion, or as are required for Tenant to obtain all necessary building and other permits and licenses.  Within fifteen (15) days after Landlord receives the Tenant's Plans, Landlord shall notify Tenant in writing as to whether it approves or disapproves the Tenant Plans.  If Landlord, in its reasonable discretion, disapproves the Tenant's Plans thus submitted, it shall state its specific objections and Tenant shall promptly thereafter resubmit plans and specifications revised to satisfy those objections.  The foregoing procedure shall continue expeditiously until Landlord finally approves a final set of Tenant's Plans (the "Final Tenant Plans"), a copy of which Final Tenant's Plans shall be initialed by Landlord and Tenant and deemed to be made a part of this Lease.

3.3.    Provided that Landlord has approved the Final Tenant Plans, Tenant has obtained all necessary building and other permits and licenses (which permits and licenses Tenant covenants to diligently pursue at its own expense), and Tenant has posted such payment and performance bonds as any "Mortgagee" (defined below) shall require (which such bonds Tenant shall promptly obtain upon request therefor by Landlord on behalf of any Mortgagee at Landlord's sole cost and expense), then, from the date of this Lease until September 30, 2016, Tenant agrees to perform all Tenant's Work, all such Tenant's Work and activities to be done at Tenant's sole and exclusive risk and cost and in accordance with the Final Tenant Plans. Tenant's Work shall be done in a first-class workmanlike manner and in accordance with all applicable "Regulations" (defined in Article 27). Tenant agrees with respect to Tenant's Work that it will (i) not damage, delay or interfere with the prosecution or completion of any work being performed by Landlord or any other person(s) in or about the Demised Premises or the rest of the Shopping Center; (ii) comply with all procedures and regulations prescribed by Landlord from time to time for coordination of Tenant's Work and activities with any other work being performed by Landlord or any other construction in the Shopping Center; and (iii) not do or permit anything to be done that might create (or hinder the cessation thereof, if extant) any work stoppage, picketing or other labor disruption or dispute which would interfere with the construction or operation of any work or activities being conducted anywhere by Landlord.

3.4.    If any governmental authority requires that a certificate of occupancy be issued with respect to the Demised Premises, Tenant shall apply for, and obtain the certificate of occupancy and promptly deliver a copy thereof to Landlord.

3.5.    Intentionally Deleted.

3.6.    Except as expressly provided for in Section 18.3 of this Lease, Tenant shall have no right to cancel this Lease, seek a diminution of, or setoff against rent, sue for damages, or assert any other contractual, legal or equitable remedy based on a claim that the size, location, layout, dimensions or construction of the Demised Premises or the Shopping Center, or any service areas, sidewalks, parking or other common area, or other facilities to be furnished by Landlord, were not completed or furnished in accordance with the terms of this Lease. By executing this Lease, Tenant shall be deemed to have certified to the Landlord and any "Mortgagee" (as hereinafter defined) that the Demised Premises and the parking area and all other portions of the Shopping Center have been completed in accordance with the requirements and terms of this Lease, and that there is not then any offset against any rent nor any violation of any of the terms of this Lease on the part of the Landlord. The foregoing provisions shall be self-operative without further instrument, letter or certificate. However, if either said Landlord or any Mortgagee shall so desire, the Tenant shall execute, within ten (10) days after demand, any instrument, letter and/or certificate containing the foregoing. In the event Tenant fails to execute any such instrument(s), letter(s) and/or certificate(s) within the ten (10)-day period, such failure shall constitute an event of default under this Lease.

3.7    Intentionally Deleted.

3.8.    Tenant has occupied the Demised Premises prior to the date of this Lease pursuant to a Lease dated November 1, 1972, between Landlord and Tenant ("Prior Lease"). Notwithstanding anything in the Prior Lease to the contrary, the Prior Lease shall terminate as of 11:59 p.m. on the date preceding the Commencement Date hereof, except that Tenant shall remain obligated to Landlord for payment of any rent, pass-through expenses, and other additional rent which have accrued, or have been incurred by Landlord, but not invoiced to or paid by Tenant as of the Commencement Date, but for which Tenant is liable under the Prior Lease, and for any indemnities set forth in the Prior Lease, and any such costs shall be deemed additional rent under this Lease. If this Lease is not consummated for any reason, then the Prior Lease shall remain in full force and effect until its expiration pursuant to its terms.

Tenant hereby waives and releases all demands, charges, claims, accounts, or causes of action of any nature against Landlord or Landlord's employees or agents, including, without limitation, both known and unknown demands, charges, claims, accounts, and causes of action that have arisen out of or in connection with the Prior Lease.

If the Prior Lease is terminated because of fire or other casualty, or for reasons other than a default of Tenant or expiration of the term thereof, then this Lease shall terminate upon the expiration date of the Prior Lease, except that any termination right of Tenant due to a casualty at or near the end of the term of the Prior Lease shall not act to terminate this Lease.

A default under the Prior Lease shall constitute an event of default under this Lease for which Landlord may exercise any of its remedies under this Lease. In the event the Prior Lease

is terminated as a result of the default of Tenant, then upon such termination of the Prior Lease, this Lease shall be terminated as if Tenant shall have committed an event of default under this Lease and Landlord shall be entitled to damages and other sums as provided in this Lease. In the event Tenant's right to possession under the Prior Lease shall be terminated as a result of the default of Tenant thereunder, then upon such termination, Tenant's right to possession under this Lease shall terminate as if Tenant committed an event of default under this Lease and Landlord shall be entitled to damages, deficiencies and other sums as provided in this Lease.

Tenant hereby represents and warrants that Tenant is, and on the Commencement Date shall be, the sole Tenant of record of the Demised Premises and no person or entity other than Tenant has or shall have any tenancy rights, title or interest in or to the Demised Premises. Tenant hereby represents and warrants that Tenant is able to, and shall convey to, Landlord all of Tenant's rights, title and interest in and to the Demised Premises, and to surrender and terminate the Prior Lease, free of all encumbrances and free from any third party claims of any tenancy right, title or interest in or to the Demised Premises.

## ARTICLE 4.

## RENT

4.1.    Rental shall accrue from the Commencement Date, and shall be payable to Landlord at Landlord's address at c/o Broad Street Realty, 7250 Woodmont Avenue, Suite 350, Bethesda, Maryland 20814, or such other address as Landlord may designate in writing to Tenant.

4.2.    Tenant shall pay to Landlord minimum guaranteed rental in monthly installments in the amounts specified in Section 1.1(n) of this Lease.  The first such monthly installment shall be due and payable on or before the Commencement Date, and subsequent installments shall be due and payable on or before the first day of each succeeding calendar month during the Lease Term.

4.3.    Commencing with the third (3rd) Lease Year of the Lease Term, in addition to the minimum guaranteed rental, Tenant shall also pay to Landlord for each Lease Year during the Lease Term percentage rental in an amount determined by (i) multiplying the total gross sales made in or from the Demised Premises during the particular Lease Year by the percentage rental rate specified in Section 1.1(o) of this Lease and then (ii) subtracting from the product thus obtained the minimum guaranteed rental paid by Tenant to Landlord for such Lease Year. The percentage rental shall be paid within forty-five (45) days after the end of each Lease Year. In no event shall the rent to be paid by Tenant and retained by Landlord for any Lease Year be less than the annual minimum guaranteed rental specified in this Lease.

By way of example only, if gross sales for the seventh (7th) Lease Year of the initial Lease Term are $10,000,000.00, then the percentage rental for such Lease Year shall be determined as follows.  The gross sales for such Lease Year (i.e., $10,000,000.00) shall be multiplied by 4.75%, resulting in a product equal to $475,000.00.  Thereafter, the minimum guaranteed rental payable for such Lease Year (i.e., $298,025.04) shall be subtracted from such product, resulting in a total percentage rental due in the amount of $176,974.96. Therefore, for such Lease Year, the combined minimum guaranteed rental (i.e., $298,025.04) and percentage rental (i.e., $176,974.96) due shall be $475,000.00 (which equals 4.75% of gross sales for such Lease Year).

By way of further example, if gross sales for the seventh (7th) Lease Year of the initial Lease Term are $5,000,000.00, then the percentage rental for such Lease Year shall be determined as follows.  The gross sales for such Lease Year (i.e., $5,000,000.00) shall be multiplied by 4.75%, resulting in a product equal to $237,500.00.  Thereafter, the minimum guaranteed rental payable for such Lease Year (i.e., $298,025.04) shall be subtracted from such product, resulting in a number that is less than zero.  Therefore, for such Lease Year, the combined minimum guaranteed rental (i.e., $298,025.04) and percentage rental (i.e., zero) due shall be $298,025.04.

4.4.    If this Lease should terminate on a date other than the last day of a Lease Year, percentage rental for such fractional part of the Lease Year preceding the termination date shall be prorated to account for the partial Lease Year.  Upon the termination of this Lease, Tenant shall make a payment of percentage rental for the final calendar month or partial calendar month of the term of this Lease determined in accordance with (and subject to) the provisions of Section 4.3 above.

4.5.    The term "gross sales," as used in Section 4.3 and elsewhere in this Lease, shall be construed to mean the entire amount of the sales price, whether for cash or otherwise (including the full purchase price of purchases in whole or in part by means of gift certificates, advertising certificates or trade-ins), of all merchandise and services sold in or from the Demised Premises, and all receipts whatsoever of all other business conducted in or from the Demised Premises, including, by way of illustration (but in no way limited to), mail, telephone, or computer on-line orders received or filled at the Demised Premises, "layaways" and other deposits (offset by such sums refunded to purchasers), orders taken (although such orders may be filled elsewhere), sales to employees, sales through vending machines, proceeds of electronic games or other devices, and sales by any sublessee, concessionaire or licensee or otherwise (as well as licensee fees, franchise fees and similar fees) in or from the Demised Premises. Each sale upon installment or credit shall be treated as a sale for the full price in the month during which the sale was made, irrespective of the time when Tenant receives payment from its customer.  No deduction shall be allowed for uncollected or uncollectible credit accounts. Gross sales shall not include, however, the following:  any sums collected and paid out for any sales or excise tax imposed by any duly constituted governmental authority; the value of merchandise exchanged between the stores of Tenant, if any, where such exchanges are made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which has theretofore been made in or from the Demised Premises or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made in or from the Demised Premises; the value of returns to shippers or manufacturers; the amount of any cash or credit refund made upon any sale when the merchandise sold, or some part thereof, is thereafter returned by purchaser and accepted by Tenant, provided that the amount of such sale was originally included in gross sales; or sales of Tenant's fixtures not in the ordinary course of Tenant's business.  Tenant's obligation to pay percentage rental shall survive termination of this Lease.

4.6.    It is understood that the minimum guaranteed rental is payable on or before the first day of each calendar month (in accordance with Section 4.2 above) and percentage rental, if any, is payable on or before the forty-fifth (45th) day following the end of each Lease Year (in accordance with Section 4.3 above), without demand, offset or deduction of any nature.  In the event any rental is not received within ten (10) days after its due date for any reason whatsoever, or if any rental payment is by check which is returned for insufficient funds, then, in addition to the past due amount, Tenant shall pay to Landlord (a) a late charge in an amount equal to two percent (2%) of the rental then due, in order to compensate Landlord for its administrative and other overhead expenses; and (b) interest on the rental then due at the maximum contractual rate which could legally be charged in the event of a loan of such rental to Tenant (but in no event to exceed 1% per month), such interest to accrue continuously on any unpaid balance due to Landlord by Tenant during the period commencing with the rental due date and terminating with the date on which Tenant makes full payment of all amounts owing to Landlord at the time of said payment.  Any such late charge or interest payment shall be payable as additional rental under this Lease, shall not be considered as deduction from percentage rental, and shall be payable immediately on demand.

4.7.    If Tenant fails in two (2) consecutive months to make rental payments within ten (10) days after due, Landlord, in order to reduce its administrative costs, may require, by giving written notice to Tenant (and in addition to any late charge or interest accruing pursuant to Section 4.6 above, as well as any other rights and remedies accruing pursuant to Article 22 or Article 23 below, or any other provision of this Lease or at law), that all future rental payments are to be made on or before the due date by cash, cashier's check, or money order and that the delivery of Tenant's personal or corporate check will no longer constitute a payment of rental as provided in this Lease.  Any acceptance of a monthly rental payment or of a personal or corporate check thereafter by Landlord shall not be construed as a subsequent waiver of said rights.

4.8.    Tenant shall pay when due any and all sales or excise taxes levied, imposed or assessed by the United States of America, the State of Colorado, or any political subdivision thereof or other taxing authority upon the minimum guaranteed rental, additional rent and all other sums payable hereunder.

4.9.    All payments required to be made by Tenant to Landlord under this Lease, other than minimum guaranteed rental, shall be deemed to be additional rent under this Lease. Minimum guaranteed rental and additional rent are sometimes collectively referred to herein as "rent" or "rental".

## ARTICLE 5.

## SALES REPORTS, RECORDS AND FINANCIAL STATEMENTS

5.1.     On or before the fifteenth (15th) day of each Lease Year quarter during the term of this Lease, Tenant shall prepare and deliver to Landlord at the place where rental is then payable a certified statement of gross sales made from the Demised Premises during the immediately preceding Lease Year quarter which shall include an itemization of all permissible deductions therefrom.  In addition, within thirty (30) days after the expiration of each Lease Year and within thirty (30) days after the termination of this Lease if this Lease should not terminate at the end of a Lease Year, Tenant shall prepare and deliver to Landlord at the place where rental is then payable a statement of gross sales made from the Demised Premises during the preceding Lease Year (or partial Lease Year), certified to be correct by an officer of Tenant (if Tenant is an entity) or an independent Certified Public Accountant which shall include an itemization of all permissible deductions therefrom.  Tenant shall furnish a similar statement for its licensees, concessionaires and subtenants, if any.  All such statements shall be in such form as the Landlord may require, and, if requested by Landlord, Tenant shall also provide to Landlord copies of cash register tapes or other sales recording materials.   Tenant acknowledges Landlord's concern for prompt, accurate sales records, inasmuch as those records not only form the basis for percentage rentals but also enable Landlord to monitor the success of the Shopping Center.   Tenant also acknowledges that its failure to submit statements of gross sales as required above will result in additional (although not readily ascertainable) expense to Landlord.   Tenant therefore agrees that if it fails to submit any statement on its due date and does not deliver to Landlord such statement within ten (10) days following delivery to Tenant of a written demand from Landlord, then notwithstanding anything to the contrary contained elsewhere in this Lease, the minimum guaranteed rental for the months for which the statement was due and for each month thereafter (until the statement is delivered) shall automatically be increased by Two Hundred Fifty Dollars ($250.00) per month, with the increase not to be considered as a deduction from percentage rental.  In addition, if Tenant fails two (2) consecutive times to deliver statements of gross sales within the times specified in the first two sentences of this Section 5.1, then for the remainder of the term of this Lease the prerequisite of a written demand from Landlord shall cease and the rental increase of the immediately preceding sentence shall be applicable for any month for which the statement of gross sales is not delivered within ten (10) days following the prescribed due date and for each month thereafter (until the statement is delivered).  The rights of Landlord under the immediately preceding sentences are cumulative with the rights prescribed in Section 5.2, Article 22, Article 23 and elsewhere in this Lease or at law.

5.2.     Tenant shall keep in the Demised Premises or at Tenant's corporate headquarters in the continental United States a permanent, accurate set of books and records of all sales of merchandise and revenue derived from business conducted in the Demised Premises, and all supporting records such as tax reports and banking records.  All such books and records shall be retained and preserved for at least twenty-four (24) months after the end of the Lease Year to which they relate, and shall be subject to inspection and audit by Landlord and its agents at all reasonable times.

5.3.     In the event that Tenant fails to deliver statements of gross sales when due hereunder two (2) consecutive times or in the event that Landlord, for reasonable cause, is not satisfied with the statements of gross sales submitted by Tenant, Landlord shall have the right to have its auditors make a special audit of all books and records, wherever located, pertaining to sales made in or from the Demised Premises.  If Tenant's statements are found to be incorrect to an extent of more than two percent (2%) over the figures submitted by Tenant, Tenant shall pay for such audit.  In addition, Tenant shall pay to Landlord, within ten (10) days after written demand, any deficiency which is established by such audit.   Moreover, at Landlord's option, it shall constitute a default by Tenant hereunder if the statements are incorrect to the extent of more than 2% over the figures submitted by Tenant.  Landlord shall have the right to terminate this Lease upon notice to Tenant if there should be more than three (3) audits during the Lease Term which reveal understatements of gross sales of more than 2%.

5.4.     In addition to the statements and reports prescribed above, Tenant shall, within ten (10) days after a request from Landlord (to be made no more than once in any calendar year), deliver to Landlord financial statements for the most recent completed fiscal year of Tenant (and of any guarantor of Tenant's obligations under this Lease, as applicable), which financial statements shall allow Landlord to verify the net worth of Tenant and any guarantor of Tenant's obligations under this Lease.

5.5.     Intentionally Deleted.

5.6.    Landlord shall use commercially reasonable good faith efforts to keep confidential all sales reports, records and financial statements supplied by Tenant. However, Landlord shall have the right to reveal such information to mortgagees, prospective purchasers, investors, and other persons having a genuine need to know (and their respective agents), and to Landlord's managerial and administrative staff, accountants, and attorneys, so long as the party to which Landlord has revealed such information has agreed in writing to keep such information confidential.

## ARTICLE 6.

## TENANT'S RESPONSIBILITY FOR TAXES AND REAL ESTATE CHARGES

6.1.    Tenant shall be liable for all taxes levied against personal property and trade fixtures placed by Tenant in the Demised Premises. If any such taxes are levied against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of personal property and trade fixtures placed by Tenant in the Demised Premises and Landlord elects to pay the taxes based on such increase, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

6.2.    Tenant shall also be liable for "Tenant's proportionate share" (as defined below) of all "real estate charges" (as defined below) related to the Shopping Center or Landlord's ownership of the Shopping Center. Tenant's obligations under this Section 6.2 shall be prorated during any partial year (i.e., the first year and the last year of the Lease Term). "Tenant's proportionate share" shall be a fraction, the numerator of which is the total floor area of the Demised Premises and the denominator of which is the total leasable floor area of all completed buildings in the Shopping Center ("Shopping Center Floor Area") at the time when the respective charge was incurred, excluding, however, areas for which any such real estate charges are directly paid by a party or parties other than Landlord. "Real estate charges" shall include ad valorem taxes, general and special assessments, parking surcharges, any tax or excise on rents, any tax or charge for governmental services (such as trash collection, street maintenance or fire protection), any tax or charge attributable to the transaction represented by this Lease, by any sublease or assignment hereunder or by any document to which Tenant is a party creating or transferring (or reflecting the creation or transfer) of any interest or an estate in the Demised Premises and any tax or charge which replaces any of such above-described "real estate charges", whether ordinary or extraordinary, foreseen or unforeseen; provided, however, that "real estate charges" shall not be deemed to include any franchise, estate, inheritance or general income tax. Real estate charges shall also include any fees, expenses or costs (including attorney's fees, expert fees and the like) incurred by Landlord in protesting or contesting any assessments levied or the tax rate.

6.3.    On or before the Commencement Date and on or before the due date of each and every bill for real estate charges received by Landlord, Landlord shall forward to Tenant a "Tax Statement" which shall contain a statement of the amount, or Landlord's estimate of the amount, due from Tenant from time to time pursuant to this Article 6. Landlord's failure to submit, or to timely submit, any Tax Statement shall not excuse Tenant from its liability for Tenant's proportionate share of real estate charges.

6.4.    Each and every month during the term of this Lease, along with its monthly installment of minimum guaranteed rental, beginning with the Commencement Date, Tenant shall pay Landlord, or such other party as Landlord may designate by written notice to Tenant, one-twelfth (1/12) of Tenant's proportionate share of the annual real estate charges as set forth in the then latest Tax Statement. However, if the Commencement Date is a day other than the first day of a calendar month, then the installment of real estate charges for the first month of the term shall be pro rated on the basis of a thirty (30)-day month. The amount payable by Tenant for real estate charges in each tax year during the term shall be subject to adjustment at such time as Landlord submits an "Actual Tax Statement" to Tenant following Landlord's having ascertained the actual amount of real estate charges due for such tax year. The adjustment, if requiring an additional payment, shall be payable by Tenant within ten (10) days after submission of the Actual Tax Statement by Landlord, and if in favor of Tenant, the adjustment shall be credited against the next accruing monthly installments of real estate charges due from Tenant. Notwithstanding the foregoing, Landlord may, upon ten (10) days' notice to Tenant, require Tenant to pay Tenant's proportionate share of real estate charges in advance at such times as the real estate charges are due and payable to the taxing authorities or in such manner as is required of Landlord by any Mortgagee, whether such payments be in lump sum or other intervals. Tenant's obligation to pay real estate charges for tax years falling within the term of this Lease shall survive termination of this Lease.

6.5.     In the event that any payment due from Tenant to Landlord pursuant to this Article 6 is not received within ten (10) days after its due date for any reason whatsoever, or if any such payment is by check which is returned for insufficient funds, then, in addition to the amount then due, Tenant shall pay to Landlord interest on the amount then due at the maximum contractual rate which could legally be charged in the event of a loan of such amount to Tenant (but in no event to exceed 1% per month), such interest to accrue continuously on any unpaid balance until paid.

See Section 7.6 below regarding cap on real estate charges and Common Area Costs.

6.6.     The Shopping Center, including the Demised Premises is, or will be subject to the terms of the following instruments which are or will be placed of record in the Office of the Clerk and Recorder of Jefferson County, Colorado:  (a) Common Area Maintenance Agreement ("CAMA"); (b) Declaration of Easements, Conditions, and Restrictions, ("Declaration") and (c) Declaration of Covenants Imposing and Implementing a Public Improvement Fee (the "PIF Covenant").  The CAMA, Declaration and PIF Covenant are collectively referred to herein as the "Property Documents." Tenant covenants to comply with the requirements of the Property Documents and not to commit, suffer or permit any violation of any of the Property Documents. This Lease shall at all times be subject and subordinate to the CAMA, Declaration and PIF Covenant and Tenant agrees that it shall execute any subordination agreement required by Landlord to evidence that this Lease is subordinate to any of the Property Documents within five (5) business days following Tenant's receipt of any such subordination agreement. Notwithstanding the foregoing, Landlord covenants and agrees that the Property Documents shall not materially adversely affect the operation of Tenant's business, materially increase Tenant's obligations under this Lease, or materially adversely affect Tenant's rights under this Lease.

6.7     Tenant acknowledges that (i) the Demised Premises and the Shopping Center are within the boundaries of the West Colfax Avenue Corridor Reinvestment Area and (ii) Landlord may enter into an agreement or agreements with the Lakewood Reinvestment Authority (the "LRA") regarding the use of tax increment financing ("TIF Financing") for the redevelopment of the Shopping Center.  Tenant agrees to comply with any reporting requirements imposed by the LRA.  If required by the LRA, Tenant shall provide a copy of its City sales tax return to the LRA within the timeframes and to the address specified by the LRA. This Lease shall at all times be subject and subordinate to any agreements between Landlord and LRA related to the TIF Financing and Tenant agrees that it shall execute any subordination agreement required by Landlord or the LRA to evidence that the Lease is subordinate to any agreements related to the TIF Financing within five (5) business days following Tenant's receipt of any such subordination agreement.

## ARTICLE 7.

## COMMON AREA

7.1.     The term "Common Area" is defined for all purposes of this Lease as that part of the Shopping Center intended for the common use of all tenants, including, among other facilities, parking areas, drive aisles, private streets and alleys, landscaped areas, curbs, perimeter walls, loading areas, sidewalks, promenades (enclosed or otherwise), lighting facilities, drinking fountains, public toilets, and the like, as well as those areas outside of the Shopping Center owned by persons other than Landlord subject to easements for parking for the benefit of some or all of the occupants of the Shopping Center, but excluding (i) streets and alleys maintained by a public authority; and (ii) areas leased to a single-purpose user (such as a bank or a fast-food restaurant) where access is restricted.  In addition, although the roof(s) of the building(s) in the Shopping Center are not literally part of the Common Area, they will be deemed to be so included for purposes of (i) Landlord's ability to prescribe rules and regulations regarding same, and (ii) their inclusion for purposes of common area maintenance reimbursements.  Landlord reserves the right to change from time to time the dimensions and location of the Common Area, as well as the dimensions, identities, locations and types of any buildings, signs or other improvements in the Shopping Center.  Landlord also reserves the right to lease kiosks and pushcarts in the Common Area, including the sidewalks outside the retail stores in the Shopping Center, provided that the locations of such kiosks and pushcarts do not materially interfere with the visibility of, and ingress to and egress from, the Demised Premises.

Notwithstanding the foregoing, Landlord shall not, in exercising its rights under this Section 7.1, reduce the number of parking spaces in the Shopping Center below that which is required by the applicable governmental authorities.  The restrictions in this grammatical paragraph shall be deemed to be null and void and of no force and effect if Tenant is in breach of its obligation to operate under Article 9 of this Lease.

7.2.    Tenant, and its employees and customers, and when duly authorized pursuant to the provisions of this Lease, its subtenants, licensees and concessionaires, shall have the nonexclusive right to use the Common Area (excluding roofs of buildings in the Shopping Center) as constituted from time to time, such use to be in common with Landlord, other tenants in the Shopping Center and other persons permitted by the Landlord to use the same, and subject to rights of governmental authorities, easements, other restrictions of record, and such reasonable rules and regulations governing use as Landlord from time to time prescribe.  For example, and without limiting the generality of Landlord's ability to establish rules and regulations governing all aspects of the Common Area, Tenant agrees as follows:

(a)    Landlord may from time to time designate specific areas within the Shopping Center or in reasonable proximity thereto in which automobiles owned by Tenant, its employees, subtenants, licensees, and concessionaires shall be parked; and in this regard, Tenant shall furnish to Landlord upon request a complete list of license numbers of all automobiles operated by Tenant, its employees, its subtenants, its licensees or its concessionaires, or their employees; and Tenant agrees that if any automobile or other vehicle owned by Tenant or any of its employees, its subtenants, its licensees or its concessionaires, or their employees, shall at any time be parked in any part of the Shopping Center other than the specified areas designated for employee parking, Tenant shall pay to Landlord as additional rent upon demand an amount equal to the daily rate or charge for such parking as established by Landlord from time to time for each day, or part thereof, that such automobile or other vehicle is so parked.  In addition, Landlord may from time to time designate specific areas within the Shopping Center or in reasonable proximity thereto in which buses transporting Tenant's customers shall be parked.

(b)    Tenant shall not solicit business within the Common Area nor take any action which would interfere with the rights of other persons to use the Common Area.

(c)    Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary to make repairs or alterations or to prevent the public from obtaining prescriptive rights.

(d)    With regard to the roof(s) of the building(s) in the Shopping Center, use of the roof(s) is reserved to Landlord, or with regard to any tenant demonstrating to Landlord's satisfaction a need to use same, to such tenant after receiving prior written consent from Landlord.  Notwithstanding the foregoing, Tenant may, upon at least twenty-four (24) hours' prior notice to Landlord, access the roof above the Demised Premises in order to (i) service the HVAC equipment serving the Demised Premises and (ii) replace light bulbs on the architectural tower attached to the Demised Premises; provided, however, that Tenant's exercise of such rights does not prejudice any roof warranty and that Tenant does not penetrate the roof above the Demised Premises without Landlord's prior written consent.

(e)    Landlord shall have the right to utilize the Common Area for promotions, exhibits, carnival type shows, rides, outdoor shows, displays, food facilities, landscaping, and other uses which, in Landlord's sole judgment, tend to attract customers or benefit tenants.

Notwithstanding the foregoing, Landlord shall not, in exercising its rights under this Section 7.2, construct, erect or install any buildings, structures or other improvements (excluding lighting standards, landscaping, curbs, benches, planters or other similar improvements) within the area marked "No Build Area" on Exhibit "B" attached to this Lease, provided, however, the foregoing shall not be deemed to prohibit the placement of temporary or seasonal kiosks, displays or promotional exhibitions within the No Build Area provided the same does not unreasonably interfere with the accessibility and/or visibility of the Demised Premises from the Common Area.  The restrictions in this grammatical paragraph shall be deemed to be null and void and of no force and effect if Tenant is in breach of its obligation to operate under Section 9.1 of this Lease.

7.3.    Landlord shall be responsible for the operation, management and maintenance of the Common Area, the manner of maintenance and the expenditures therefor to be in the sole discretion of Landlord, but to be generally in keeping with similar shopping centers within the same geographical area as the Shopping Center.  Landlord shall be the sole determinant of the type and amount of security services to be provided, if any.  Landlord shall not be liable to Tenant, and Tenant hereby waives any claim against Landlord for (i) any unauthorized or criminal entry of third parties into the Demised Premises or Shopping Center, (ii) any damage to persons or property, or (iii) any loss of property in and about the Demised Premises or Shopping Center from any unauthorized or criminal acts of third parties, regardless of any action, inaction, failure, breakdown or insufficiency of security.

7.4.     In addition to the rentals and other charges due under this Lease, Tenant shall pay to Landlord Tenant's proportionate share of the cost of removing snow and ice, and salting, the Common Area, and "Insurance Expenses" (as defined below) (collectively, "Common Area Costs").  "Insurance Expenses" shall include all premiums and other expenses incurred by Landlord for liability insurance, property insurance (plus whatever endorsements or special coverages which Landlord, in Landlord's sole discretion, may consider appropriate), rent loss insurance, earthquake insurance and any other insurance policy which may be carried by Landlord insuring the Demised Premises, the Common Area, the Shopping Center, or any improvements.  The proportionate share to be paid by Tenant of Common Area Costs shall be computed on the ratio that the total floor area of the Demised Premises bears to the total Shopping Center Floor Area (excluding, however, any areas owned and maintained by a party or parties other than Landlord who are bearing their own costs of maintenance and not participating in the sharing of Common Area maintenance costs in the balance of the Shopping Center); provided that at all times during the Lease Term, such share shall be subject to the limitations contained in Sections 1(p), 7.6, and 7.7 of this Lease.  Landlord reserves the right to make arrangements with fee owners of portions of the Shopping Center, anchor tenants (i.e., those occupying at least 20,000 contiguous square feet of floor area) and ground and out parcel lessees (for purposes hereof, collectively "Key Occupants") regarding the payment of all or any element (or portion thereof) of the aforesaid Common Area Costs.  In such instance, said costs shall be reduced by the contribution of such Key Occupants and prior to calculating Tenant's proportionate share, and in determining the denominator of the equation relative thereto, Landlord may deduct from the Shopping Center Floor Area the aggregate gross leasable floor area of the Key Occupant(s) who have made such special arrangements with the Landlord and/or are paying such element on a basis other than a proportionate share.

7.5.     Each month during the term of this Lease, along with each monthly installment of minimum guaranteed rental, beginning with the Commencement Date, Tenant shall pay to Landlord, in advance, an amount equal to one-twelfth (1/12) of Tenant's proportionate share of annual Common Area Costs.  The initial amount of the monthly payment due from Tenant for Common Area Costs shall be as set forth in Section 1.1(p).  Following the end of each and every calendar year during the term, Landlord shall submit to Tenant a "Common Area Costs Statement" prepared by Landlord showing (a) the actual Common Area Costs for the immediately preceding calendar year and Tenant's proportionate share of such actual costs ("Tenant's Prior Year Share"), and (b) Landlord's latest estimate of the annual Common Area Costs for the then current calendar year and Tenant's proportionate share of such estimated costs ("Tenant's Current Year Share").   With the next monthly installment of minimum guaranteed rental after Tenant's receipt of the Common Area Costs Statement, (i) Tenant shall pay Landlord or Landlord shall credit Tenant, as the case may be, the difference between Tenant's Prior Year Share and the total of the monthly payments made by Tenant for Common Area Costs during the immediately preceding calendar year, and (ii) the amount of the monthly payment due from Tenant for Common Area Costs shall be adjusted based upon Landlord's estimate of Tenant's Current Year Share.  In addition, if such adjusted amount is greater than the amount of the monthly payments previously made by Tenant for the then current calendar year, Tenant shall pay to Landlord the deficiency between the adjusted monthly amount and the monthly amount actually paid by Tenant for the preceding months of the then current calendar year.  Landlord's failure to forward, or to timely forward, any Common Area Costs Statement shall not excuse Tenant from its liability for Tenant's proportionate share of Common Area Costs.  In the event that any payment due from Tenant to Landlord pursuant to this Article 7 is not received within ten (10) days after its due date for any reason whatsoever, or if any such payment is by check which is returned for insufficient funds, then, in addition to the amount then due, Tenant shall pay to Landlord interest on the amount then due at the maximum contractual rate which could legally be charged in the event of a loan of such amount to Tenant (but in no event to exceed 1% per month), such interest to accrue continuously on any unpaid balance until paid.  Any delay or failure of Landlord in delivering any estimate or statement described in this Section 7.4 or in computing or billing Tenant's proportionate share of the foregoing costs shall not constitute a waiver of Landlord's right to collect the foregoing Common Area costs as provided herein or in any way impair the continuing obligations of Tenant under this Section.  Tenant's obligation to pay Common Area Costs for calendar years falling within the term of this Lease shall survive termination of this Lease.

7.6.     Notwithstanding anything to the contrary contained in this Lease, during each of the first (1st) five (5) Lease Years of the Lease Term, Tenant's proportionate share of Common Area Costs and real estate charges shall, in the aggregate, be equal to the following fixed amounts, as applicable, without regard to the actual amounts thereof that otherwise would be payable for the applicable Lease Year:

<u>Lease Year</u>          <u>Fixed Amount</u>

| | |
|---|---|
| 1 | $74,349.00 |
| 2 | $76,579.00 |
| 3 | $78,877.00 |
| 4 | $81,243.00 |
| 5 | $83,680.00 |

7.7.    Notwithstanding anything to the contrary contained in this Lease, Tenant's proportionate share of Common Area Costs payable with respect to the sixth (6th) Lease Year of the Lease Term shall not exceed an amount equal to $0.33 multiplied by the number of square feet of the Demised Premises.  Thereafter, commencing with the seventh (7th) Lease Year of the Lease Term and continuing thereafter for each other Lease Year of the Lease Term, Tenant's proportionate share of Common Area Costs shall not increase more than three percent (3%) for any one (1) Lease Year in excess of the amount payable by Tenant in the immediately preceding Lease Year; provided, however, that (a) the amount of the difference in any one calendar year between the actual percentage increase in the Common Area Costs and the three percent (3%) limit (when the increase is less than the 3% limit) may be accumulated by Landlord and carried forward to future Lease Years and used by Landlord to increase the three percent (3%) limit, and (b) the amount of any expenses uncollectible during any Lease Year because the Common Area Costs are more than the three percent (3%) limit may be accumulated by Landlord and carried forward to future Lease Year in which Common Area Costs are less than the amount permitted by the three percent (3%) limit, so long as in either event, the increase in such Lease Year when added to increases in the immediately preceding prior Lease Year shall not exceed an annual average increase of three percent (3%).   In the event of a partial Lease Year, in order to calculate the above limitation, the amounts payable by Tenant shall be projected over and increased to cover a full Lease Year.  During the first (1st) Lease Year in which any extension or renewal of the Lease Term commences, Tenant's responsibility for Common Area Costs shall be for Tenant's proportionate share of the actual Common Area Costs.  Thereafter, during each Lease Year of the extension or renewal period, the foregoing three percent (3%) cap shall apply.   It is confirmed and agreed that the provisions of this Section 7.7 shall not apply to real estate charges, but shall apply only to Common Area Costs.

By way of example, if Tenant's proportionate share of Common Area Costs payable with respect to the sixth (6th) Lease Year of the Lease Term equal $0.33 multiplied by the number of square feet of the Demised Premises, and Tenant's proportionate share of Common Area Costs payable with respect to the seventh (7th) Lease Year of the Lease Term also equal $0.33 multiplied by the number of square feet of the Demised Premises, then Tenant's proportionate share of Common Area Costs payable with respect to the eighth (8th) Lease Year of the Lease Term may equal up to (but may not exceed) $0.350097 multiplied by the number of square feet of the Demised Premises (i.e., $0.33 multiplied by 103%, which equals $0.3399; and $0.3399 multiplied by 103%, which equals $0.350097).

Further, by way of example, if Tenant's proportionate share of Common Area Costs payable with respect to the sixth (6th) Lease Year of the Lease Term equal $0.33 multiplied by the number of square feet of the Demised Premises and Tenant's proportionate share of Common Area Costs payable with respect to the seventh (7th) Lease Year of the Lease Term would, but for the cap described herein, equal $0.345 multiplied by the number of square feet of the Demised Premises, then Landlord may carry forward $0.0051 of Tenant's proportionate share of Common Area Costs (i.e., the difference between $0.345 and $0.3399, which was the seventh [7th] Lease Year cap) to Tenant's proportionate share of Common Area Costs payable with respect to the eighth (8th) Lease Year.

## ARTICLE 8.

## MERCHANTS' ASSOCIATION OR PROMOTIONAL FUND

8.1.    In the event that Landlord shall organize a merchants' association composed of a majority (based on square footage) of tenants in the Shopping Center, Tenant agrees that it will join and maintain membership in such association, will pay such dues and assessments as may be fixed and determined from time to time by the association and will comply with such other bylaws, rules and regulations as may be adopted from time to time by the association.

8.2.    In the event that Landlord shall establish a promotional fund to pay for advertising and other marketing activities of the Shopping Center (as may be directed by

Landlord from time to time), Tenant shall pay upon demand whatever sums Landlord shall reasonably designate as Tenant's proportionate contribution to the promotional fund; provided, however, that in no event shall Tenant be required to pay, pursuant to Section 8.1 hereinabove and this Section 8.2, more than Twenty-Five Thousand ($25,000.00) in total in any Lease Year.

## ARTICLE 9.

## USE AND CARE OF DEMISED PREMISES

9.1.　　Tenant shall commence business operations in the Demised Premises on or immediately after the Commencement Date and shall continuously and uninterruptedly operate its business in an efficient, high class and reputable manner so as to produce the maximum amount of sales from the Demised Premises. Tenant shall not at any time leave the Demised Premises vacant, but shall in good faith continuously throughout the Lease Term conduct and carry on in the entire Demised Premises the type of business for which the Demised Premises is leased. Tenant shall keep the Demised Premises open to the public for business with adequate personnel in attendance and with adequate stock during all Business Hours, except to the extent Tenant may be prohibited from being open for business by applicable law, ordinance or governmental regulation. If Tenant shall fail to cause its business to be operated during all Business Hours, in addition to any other remedy available to Landlord under this Lease, Tenant shall pay to Landlord, as liquidated damages for such breach, a sum equal to Two Hundred Dollars ($200.00) for each hour or portion thereof during which Tenant shall fail to so operate. Notwithstanding the foregoing, in no event shall Tenant be required to operate at the Demised Premises on Thanksgiving Day or on Christmas Day.

9.2.　　The Demised Premises may be used only for the purpose or purposes specified in Section 1.1(s) above, and only under the trade name specified in Section 1.1(e) above (or, if Section 1.1(e) is not filled in, any trade name approved in writing in advance by Landlord), and for no other purpose and under no other trade name, it being understood and acknowledged that Landlord has entered into this Lease in large part because it believes that such use and trade name will benefit the Shopping Center as a whole. Nothing contained in this Lease shall be deemed to give Tenant an express or implied exclusive use in the Shopping Center.

9.3.　　Tenant shall not, without Landlord's prior written consent, keep anything within the Demised Premises or use the Demised Premises for any purpose which increases the insurance premium cost or invalidates any insurance policy carried on the Demised Premises or other parts of the Shopping Center. All property kept, stored or maintained within the Demised Premises by Tenant shall be at Tenant's sole risk. Tenant shall use and occupy the Demised Premises in accordance with all applicable federal, state and local Regulations (as defined herein).

9.4.　　Tenant shall not conduct within the Demised Premises any fire, auction, bankruptcy, "going-out-of-business," "lost-our-lease" or similar sale; nor shall Tenant operate within the Demised Premises a "wholesale" or "factory outlet" store, a cooperative store, a "second hand" store, a "surplus" store or a store commonly referred to as a "discount house." The purpose for this restriction is the maintenance of a first-class shopping center image, not price regulation; therefore, Landlord agrees that items may be sold, and on occasion be advertised as being sold, at discounted prices as long as Tenant complies with all applicable laws and maintains an image consistent with a first-class shopping center.

9.5.　　Tenant shall not permit any objectionable noises or odors to emanate from the Demised Premises; nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside the Demised Premises or where the same can be seen or heard from the Common Areas or from outside the building; nor place any antenna, satellite dish or other similar telecommunications devices or equipment, other equipment or other projection on the exterior of the Demised Premises, except as permitted pursuant to Section 30.22 of this Lease; nor take any action which would constitute a nuisance or would disturb or endanger other tenants of the Shopping Center or unreasonably interfere with their use of their respective premises; nor permit any unlawful or immoral practice to be carried on or committed on the Demised Premises; nor do anything which would tend to injure the reputation of the Shopping Center. Without limiting the generality of the foregoing, Tenant shall comply with all applicable noise control ordinances and laws.

9.6.　　Tenant shall take good care of the Demised Premises and keep the same free from waste at all times. Tenant shall not overload the floors in the Demised Premises, nor deface or injure the Demised Premises, nor abuse or misuse the plumbing system. Tenant shall keep the Demised Premises, Common Areas, sidewalks, service-ways and loading areas adjacent to the Demised Premises neat, clean and free from dirt, rubbish, ice or snow at all

times.  Tenant shall not use or permit to be used the sidewalks or other space outside the Demised Premises for any display, sale or any other purpose other than pedestrian ingress and egress to the Demised Premises.  Tenant shall store all trash and garbage within the Demised Premises or in a trash dumpster or similar container provided by Landlord at a location specified by Landlord and Landlord shall arrange for the regular pick-up of such trash and garbage, the costs of which shall be included in the Common Area Costs.  Receiving and delivery of goods and merchandise and removal of garbage and trash shall be made only in the manner and areas prescribed by Landlord.  Tenant shall not operate an incinerator or burn trash or garbage within the Shopping Center.  Without limiting the generality of the foregoing, Tenant shall not have deliveries made to, or shipments made from, the Demised Premises on any day after 8:00 p.m. or before 8:00 a.m.

9.7.    Tenant shall maintain all display windows in a neat, attractive condition, and shall keep all display windows, exterior electric signs and exterior lighting under any canopy in front of the Demised Premises lighted from dusk until 11:00 p.m., every day, including Sundays and holidays (or any other hours established by Landlord for the Shopping Center).

9.8.    Landlord hereby reserves to itself and its successors and assigns the right (which is hereby consented to by Tenant) to change the name of the Shopping Center.

9.9.    Tenant shall procure, at its sole expense, any permits and licenses required for the transaction of Tenant's business in the Demised Premises and otherwise comply with all applicable Regulations.  In addition, if the nature of Tenant's business makes it advisable for Tenant to take any extra precautions (for example, in the case of a business which is affected by so-called "dramshop" laws, Tenant's compliance with all "dramshop" educational programs and procedures), Tenant shall take all such extra precautions.  At Landlord's request, Tenant shall deliver to Landlord copies of all such permits and licenses and proof of Tenant's compliance with all such Regulations and extra precautions.

9.10.    So long as Tenant is not in default under this Lease, Landlord covenants with Tenant that Tenant may peaceably and quietly enjoy the Demised Premises without hindrance or molestation by Landlord or anyone claiming by or through Landlord, subject, however, to the terms of this Lease and subject to all matters of record affecting the Shopping Center or the Demised Premises.

9.11.    If the permitted use of the Demised Premises, under Section 1.1(s), is as a restaurant, or for the preparation of food, Tenant shall install in the Demised Premises, and maintain in good working condition at all times, a ventilation system of at least as good quality as the ventilation system currently installed in the Demised Premises.

9.12.    Notwithstanding any other provision contained in this Lease, Tenant shall not use the Demised Premises, nor allow any permitted subtenant, licensee or concessionaire to use the Demised Premises, for any of the "Shopping Center Prohibited Uses" set forth in Exhibit "D" attached to and made a part of this Lease.

9.13.    Landlord makes no warranty as to the number or type of other tenants in the Shopping Center or that any of the other leases for premises within the Shopping Center will continue for any period of time.

9.14.    To the extent required by applicable Regulations, Tenant shall install and maintain in the Demised Premises, at its sole cost and expense, a fire alarm system meeting all of the requirements of applicable Regulations.

## ARTICLE 10.

## MAINTENANCE AND REPAIR OF DEMISED PREMISES

10.1.    Landlord shall keep the foundation, the exterior walls (except plate glass; windows, doors and other exterior openings; window and door frames, molding, closure devices, locks and hardware; special store fronts; lighting, heating, air conditioning, plumbing and other electrical, mechanical and electromotive installation, equipment and fixtures; signs, placards, decorations or other advertising media of any type; and interior painting or other treatment of exterior walls) and roof (subject to Section 7.4 above) of the Demised Premises in good repair.  Landlord, however, shall not be required to make any repairs occasioned by the act or negligence of Tenant, its agents, contractors, employees, subtenants, invitees, customers, licensees and concessionaires (including, but not limited to, roof leaks resulting from Tenant's installation of air conditioning equipment or any other roof penetration or placement); and the provisions of the previous sentence are expressly recognized to be subject to the

provisions of Article 17 and Article 18 of this Lease.  In the event that the Demised Premises should become in need of repairs required to be made by Landlord hereunder, Tenant shall give immediate written notice thereof to Landlord and Landlord shall have a reasonable time after receipt by Landlord of such written notice in which to make such repairs.  Landlord shall not be liable to Tenant for any interruption of Tenant's business or inconvenience caused due to any work performed in the Demised Premises or in the Shopping Center pursuant to Landlord's rights and obligations under this Lease, so long as the work is performed without gross negligence or willful misconduct.

10.2.    Tenant shall keep the Demised Premises in good, clean and habitable condition and shall, at its sole cost and expense, keep the Demised Premises free of insects, rodents, vermin and other pests and make all needed repairs and replacements, including replacement of cracked or broken glass, except for repairs and replacements required to be made by Landlord under the provisions of Section 10.1, Article 17 and Article 18.  Without limiting the coverage of the previous sentence, it is understood that Tenant's responsibilities therein include the repair and replacement in accordance with all applicable Regulations of all lighting, heating and air conditioning ("HVAC"), plumbing and other electrical, mechanical and electromotive installation, equipment and fixtures and also include all utility repairs in ducts, conduits, pipes and wiring, and any sewer stoppage located in, under and above the Demised Premises, regardless of when or how the defect or other cause for repair or replacement occurred or became apparent.  As to the maintenance and repair of the HVAC equipment in the Demised Premises, Tenant may self-maintain the same.  Although the same are not, and shall not be deemed to be, a part of the Demised Premises, Tenant's repair, maintenance, and replacement obligations pursuant to this Section 10.2 shall be deemed to extend to the architectural tower attached to the Demised Premises, the statue attached to such tower, any fountains adjacent to the Demised Premises, and any landscaping surrounding any such fountains.  If any repairs required to be made by Tenant hereunder are not made within ten (10) days after written notice delivered to Tenant by Landlord, or, in the event of an emergency, such shorter period of time as the exigencies of the situation may require, Landlord may, at its option, make such repairs without liability to Tenant for any loss or damage which may result to its stock or business by reason of such repairs.  In that event, Tenant shall pay to Landlord upon demand, as additional rental hereunder, the cost of such repairs plus interest at the maximum contractual rate which could legally be charged in the event of a loan of such payment to Tenant (but in no event to exceed one percent (1%) per month), such interest to accrue continuously from the date of payment by Landlord until repayment by Tenant.  At the expiration of this Lease, Tenant shall surrender the Demised Premises in good condition, excepting reasonable wear and tear and losses required to be restored by Landlord in Section 10.1, Article 17 and Article 18 of this Lease.

10.3.    Without limiting Tenant's obligations elsewhere under this Lease, Tenant shall provide the following services and maintenance at its sole cost and expense:

(a)    Tenant shall cause extermination services, including treatment for insects, spiders, rats, mice, moles and other rodents, to be provided to the Demised Premises by a reputable exterminator on a monthly basis, or more often as Landlord, in Landlord's reasonable discretion, may require, at Tenant's expense.  Tenant shall provide Landlord with a copy of its extermination contract prior to the Commencement Date.  Tenant agrees to exercise special care in its handling of garbage, waste, and refuse and will remove such materials from the Shopping Center as frequently as is necessary in order to prevent pests from entering the Demised Premises or the Shopping Center.   In the event any such pests are discovered in or about the Demised Premises, Tenant will immediately take all necessary and appropriate measures to relieve the Shopping Center of such pests.

(b)    In order to eliminate the problem of sewer back-ups and health hazards, Tenant shall install and maintain grease traps in the Demised Premises, the type and manner of installation of such grease traps being subject to Landlord's prior written approval and all governmental laws and requirements, and shall establish a quarterly cleaning program with respect thereto.  In addition to the quarterly cleaning of the grease traps, Tenant shall use "Cloroben PT" or a similar type of chemical in all drain lines, in accordance with the manufacturer's recommendations, to help dissolve any grease build-up.  Without limitation of any of the foregoing, Tenant shall do whatever is necessary in order to maintain properly the grease trap and prevent, at all times, any overflow or discharge of grease at the surface of the grease trap manhole or other access point.  The grease trap and all plumbing pipes shall be rooted and cleaned regularly and as often as necessary to prevent clogging or discharge.  In the event of any such overflow or discharge, Tenant shall be responsible for all costs of cleanup of the overflow or discharge, including all costs of removing grease, and repair, restoration or replacement of property damaged by such overflow or discharge.  Any solid fuel cooking operations (i.e., wood burning stoves) shall be inspected in accordance with all applicable

Requirements.  Any fire suppression equipment used in the cooking hood shall be inspected at least two (2) times per Lease Year and the results thereof shall be provided to Landlord.

(c)      The kitchen exhaust systems, including roofing hoods, ducts and fans used in connection with the kitchen operation, whether located in or outside of the Demised Premises, shall be maintained by Tenant in good condition so as to meet the highest standard of cleanliness and health.  Tenant shall establish a quarterly (or more frequent as conditions may warrant in Landlord's reasonable discretion) cleaning program with respect thereto. Tenant shall provide Landlord with a copy of its cleaning contract for the exhaust system prior to opening for business.  Tenant shall do whatever is necessary in order to properly maintain the exhaust system.  In the event of discharge, Tenant shall be responsible for all costs of clean-up, including all costs of repair, restoration or replacement of property damaged by such discharge.

(d)      Tenant shall store all trash and other waste in odor and vermin proof containers, such containers to be kept in temperature controlled areas not visible to members of the public.  Tenant shall, at Tenant's expense, attend to the frequent (no less than daily) disposal of such materials.  Trash removal must be done by Tenant using containers approved by Landlord and at such times and in such manner as Landlord may reasonably direct and subject to such rules and regulations in respect thereto as Landlord may, from time to time, adopt.

(e)      Tenant shall make the following items part of a continuing maintenance program in order to reduce the possibility of fire:

(i)      Cooking hood filters and/or grease extractors shall be cleaned weekly.

(ii)      The entire exhaust system shall be inspected by a properly trained, qualified, and certified company or person quarterly and any such inspection report shall be provided to Landlord.

(iii)      After inspection, if components are found to be contaminated with deposits from grease laden vapors, the entire exhaust system (hoods, grease removal devices, fans, ducts, and other included appurtenances) shall be cleaned by a properly trained and qualified company or person.  The cleaning shall be to bare metal using mechanical means (scraping, washing, steam cleaning, etc.) and not coated with chemicals or powder.

(iv)      Tenant shall install (and maintain and replace as necessary) a fire extinguishing system within the hood and duct of the cooking facility which satisfies the requirements now and hereafter established by municipal codes and Landlord's insurer and shall provide Landlord with a certificate that same has been installed.

(f)      Tenant acknowledges that the operation of a restaurant can cause odors in and about the Demised Premises. Tenant agrees that it shall install, and properly maintain in good working order throughout the Lease Term, such ventilation and other equipment as required by municipal codes and as may be necessary to relieve the Demised Premises and the adjoining and surrounding premises of any noxious odors caused by Tenant's business operation, which may include special vents to create negative pressure. Tenant shall defend, indemnify and hold Landlord harmless of and from any loss, cost or expense (including attorneys' fees) arising out of odor or other conditions in the Demised Premises. Tenant agrees to exercise special care in its handling or garbage, waste, and refuse and will remove such materials from the Shopping Center as frequently as is necessary in order to eliminate all odors.

(g)      Tenant agrees to (i) maintain all queuing which occurs due to the use of the Demised Premises, in an orderly fashion whether such queuing occurs inside or outside of the Demised Premises; and (ii) keep all crowds which may gather due to the use of the Demised Premises under control whether such crowds gather inside or outside the Demised Premises.  If Landlord determines, in its sole, but reasonable, judgment, that Tenant has not complied with the foregoing provisions of this paragraph (g), Tenant will, upon Landlord's direction and at Tenant's sole cost and expense:  (a) hire a security guard or guards, and/or (b) install temporary and removable crowd control devices in areas designated by Landlord.  Tenant agrees to follow Landlord's other reasonable directions regarding orderly queuing, crowd control, and parking for buses.

(h)      If Tenant fails to comply with any of the provisions of this Section 10.3, it shall be an event of default under this Lease, and in addition to any rights of Landlord under this Lease, at law or in equity, Landlord shall have the right to perform such work on Tenant's behalf and Tenant shall reimburse Landlord for the cost and expense thereof.

# ARTICLE 11.

## ALTERATIONS

11.1.   Tenant shall not make any alterations, additions or improvements to the Demised Premises (collectively, the "Alterations") without the prior written consent of Landlord, except for the installation of unattached, movable trade fixtures which may be installed without drilling, cutting or otherwise defacing the Demised Premises.  Tenant shall furnish complete plans and specifications to Landlord at the time it requests Landlord's consent to any Alterations if the desired Alterations (i) will affect the Shopping Center's mechanical, electrical, plumbing or life safety systems or services, or (ii) will require the filing of plans and specifications with any governmental or quasi-governmental agency or authority, or (iii) will affect the structure of the Demised Premises or the Shopping Center, or (iv) will cost in excess of Twenty-Five Thousand Dollars ($25,000.00).  Subsequent to obtaining Landlord's consent and prior to commencement of the Alterations, Tenant shall deliver to Landlord any building permit required by applicable law and a copy of the executed construction contract(s).  Tenant shall reimburse Landlord within ten (10) days after the rendition of a bill for all of Landlord's actual third-party out-of-pocket costs incurred in connection with any Alterations, including, without limitation, all engineering, outside consulting, and construction administration fees incurred by or on behalf of Landlord for the review and approval of Tenant's plans and specifications and for the monitoring of construction of the Alterations. If Landlord consents to the making of any Alteration, such Alteration shall be made by Tenant, at Tenant's sole cost, by a contractor approved in writing by Landlord.  Tenant shall require its contractor to maintain insurance in such amounts and in such form as Landlord may require.   Any construction, alteration, maintenance, repair, replacement, installation, removal or decoration undertaken by Tenant in connection with the Demised Premises shall be completed in accordance with plans and specifications which must be approved by Landlord, shall be carried out in a good, workmanlike and prompt manner, shall comply with all applicable Regulations of the authorities having jurisdiction thereof, and shall be subject to supervision by Landlord or its employees, agents or contractors.   Without limiting the generality of the immediately preceding sentence, any installation or replacement of Tenant's heating or air conditioning equipment must be effected strictly in accordance with Landlord's instructions, the Clean Air Act and all other applicable Regulations.  Without Landlord's prior written consent, Tenant shall not use any portion of the Common Areas either within or without the Shopping Center in connection with the making of any Alterations.  If the Alterations which Tenant causes to be constructed result in Landlord being required to make any alterations and/or improvements to other portions of the Shopping Center in order to comply with any applicable Regulations, then Tenant shall reimburse Landlord upon demand for all costs incurred by Landlord in making such alterations and/or improvements.   All alterations, additions, improvements and fixtures (including, without limitation, all floor coverings and all heating and air conditioning equipment but excluding Tenant's unattached, readily moveable furniture and office equipment) which may be made or installed by either party upon the Demised Premises shall remain upon and be surrendered with the Demised Premises and become the property of Landlord at the termination of this Lease, unless Landlord requests their removal, in which event Tenant shall remove the same and restore the Demised Premises to its original condition at Tenant's expense.

11.2.   All construction work done by Tenant within the Demised Premises shall be performed in a good and workmanlike manner with new materials of first-class quality, lien-free and in compliance with all governmental requirements and Regulations, and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Shopping Center.  Tenant agrees to indemnify Landlord and hold Landlord harmless against any loss, liability or damage resulting from such work.

11.3.   In the event Tenant uses a general contractor to perform construction work within the Demised Premises, Tenant shall, prior to the commencement of such work, require said general contractor to execute and deliver to Landlord a waiver and release of any and all claims against Landlord and liens against the Shopping Center to which such contractor might at any time be entitled.  The delivery of the waiver and release of lien within the time period set forth above shall be a condition precedent to Tenant's ability to enter on and begin its construction work at the Demised Premises and, if applicable, to any reimbursement from Landlord for its construction work.

11.4.   Nothing contained in this Lease shall be construed as constituting the consent or request of Landlord, express or implied, to or for the performance by any contractor, laborer, materialman or vendor of any labor or services or for the furnishing of any materials for any construction, alteration, addition, repair or demolition of or to the Demised Premises or any part thereof.  All materialmen, contractors, artisans, mechanics, laborers and any other persons now or hereafter furnishing any labor, services, materials, supplies or equipment to Tenant with

17

respect to any portion of the Demised Premises are hereby charged with notice that they must look exclusively to Tenant to obtain payment for same. Tenant and any subtenants shall have no power to do any act or make and contract which may create or be the foundation of any lien, mortgage or other encumbrance upon the reversionary or other estate of Landlord, or any interest of Landlord in the Demised Premises. NOTICE IS HEREBY GIVEN THAT LANDLORD IS NOT AND SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIALS FURNISHED OR TO BE FURNISHED TO TENANT OR TO ANYONE HOLDING THE DEMISED PREMISES OR ANY PART THEREOF, AND THAT NO MECHANIC'S OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN AND TO THE DEMISED PREMISES. If, however, because of any act or omission (or alleged act or omission) of Tenant, any mechanic's or other lien, charge or order for the payment of money or any other encumbrance shall be filed against Landlord, any Mortgagee, the Demised Premises, or any other portion of the Shopping Center (whether or not such lien, charge, order or encumbrance is valid or enforceable as such), Tenant shall (at its own cost and expense) cause the same to be discharged of record or bonded within ten (10) days after notice to Tenant of the filing thereof.

11.5.   In the event that Landlord elects to remodel all or any portion of the Shopping Center, Tenant will cooperate with such remodeling, including Tenant's tolerating temporary inconveniences (and even the temporary removal of Tenant's signs in order to facilitate such remodeling, as it may relate to the exterior of the Demised Premises).

11.6.   Tenant acknowledges that, subsequent to the Commencement Date, Landlord will be engaged in the renovation of the Shopping Center. Landlord shall use commercially reasonable efforts to minimize any interference with Tenant's operations in the Demised Premises resulting from such construction activities but Tenant agrees that any such interference shall not be deemed to be a constructive eviction of Tenant and shall not give rise to any right in Tenant to abate rent hereunder, seek damages against Landlord, or terminate this Lease.

11.7.   The provisions of this Article 11, as well as the provisions of Article 3 and Exhibit "E", shall apply to Tenant's Work.

## ARTICLE 12.

## LANDLORD'S RIGHT OF ACCESS

12.1.   Landlord shall have the right to enter upon the Demised Premises during normal business hours (except in the event of an emergency, when Landlord may enter at any time) for the purpose of inspecting the same, or of making repairs to the Demised Premises, or of making repairs, alterations or additions to adjacent premises, or of showing the Demised Premises to prospective purchasers, tenants or lenders.

12.2.   Tenant will permit Landlord to place and maintain "For Rent" or "For Lease" signs on the Demised Premises during the last one hundred eighty (180) days of the Lease Term, it being understood that such signs shall in no way affect Tenant's obligations pursuant to Section 9.4, Section 13.1 or any other provision of this Lease.

12.3.   Except as otherwise expressly provided for in this Lease, use of the roof of the building in which the Demised Premises are located is reserved to Landlord. Landlord also reserves the use of the exterior rear and side walls of such building, and the right to install, maintain, use, repair, and replace the pipes, ducts, cables, plumbing, vents, conduits, wires and other equipment in, to, through, over and under the Demised Premises as and to the extent that Landlord may now or hereafter deem to be necessary or appropriate for the proper construction, operation and maintenance of the building in which the Demised Premises are located or any other present or future portion of the Shopping Center. All such work shall be done, so far as practicable, in such manner as to avoid interference with Tenant's use of the Demised Premises.

## ARTICLE 13.

## SIGNS; STORE FRONTS

13.1.   Tenant shall not, without Landlord's prior written consent (a) make any changes to the store front, or (b) install any exterior lighting, decorations, walls, awnings, canopies or the like, or (c) erect or install any signs, window or door lettering, placards, decorations or advertising media of any type which can be viewed from the exterior of the Demised Premises. All signs, lettering, placards, decorations and advertising media (including, without limitation, the

sign required by Section 13.2 below) shall comply with all applicable laws and regulations and shall be subject to Landlord's requirements as to construction, method of attachment, size, shape, height, lighting, color and general appearance.   All signs shall be kept in good condition and in proper operating order at all times.  In no event shall Tenant affix any signs to the interior or exterior of display windows, except that Tenant may install on the interior of the front window of the Demised Premises, stenciled or affixed in such other manner as is approved in advance by Landlord, a sign stating Tenant's store hours, subject to the foregoing requirements.

13.2.   Intentionally Deleted.

13.3.   Notwithstanding the foregoing, subject to all applicable laws and regulations, Landlord hereby approves Tenant's existing signage at the Demised Premises as of the date of this Lease and Landlord hereby agrees that Landlord shall not require Tenant to alter such existing signage unless required by applicable law.

13.4.   Landlord hereby reserves the right to renovate, expand, and/or reconfigure all existing pylon and/or monument signage at the Shopping Center, and/or to add additional signage on Colfax Avenue.  Tenant shall not be responsible for the costs of fabricating any signage on any monument or pylon signs as a result of Landlord exercising Landlord's rights pursuant to the immediately preceding sentence.   Nothing herein shall be deemed to grant Tenant the right to place signage on any additional sign that may be constructed after the date hereof.

## ARTICLE 14.

## UTILITIES

14.1.   Tenant shall cooperate with Landlord in connection with the conversion (in Landlord's sole and absolute discretion) of the Demised Premises to separate meters or sub-meters to measure utility services; provided, however, that any costs to initially install any meter or sub-meter shall be borne by Landlord.

14.2.   Tenant shall arrange directly with the applicable utility company for connection of, and promptly pay on or before the due date all charges for, electricity, gas, telephone service, water and sewer service, and other utilities to the Demised Premises.  Subject to the provisions of Section 14.1 hereinabove, all meters or other measuring devices in connection with utility services shall be provided by Tenant, at Tenant's expense.  Notwithstanding anything to the contrary, the amounts payable by Tenant for non-separately-metered sewer service for the Demised Premises shall be determined using the same methodology (for example, a percentage of the bill) used to determine the amounts payable for non-separately-metered water service for the Demised Premises.  Landlord may, if it so elects, furnish one or more other utility services to Tenant, and in such event Tenant shall purchase the use of such services as are tendered by Landlord and shall pay on demand as additional rental the rates established therefor by Landlord, which shall not exceed the rates that would be charged for such service if billed directly by the public utility company.  Landlord may at any time discontinue furnishing any utility service which it has undertaken to furnish, without obligation to Tenant other than to connect the Demised Premises to the public utility, if any, furnishing such service.

14.3.   Landlord shall not be liable for any interruption whatsoever in utility services not furnished by Landlord, nor for interruptions in utility services furnished by Landlord which are due to fire, accident, strike, acts of God or other causes beyond the control of Landlord or which are necessary or useful in connection with making any alterations, repairs or improvements.

14.4.   Tenant shall not install any equipment which exceeds or overloads the capacity of the utility facilities serving the Demised Premises.

## ARTICLE 15.

## INSURANCE COVERAGES

15.1.   Landlord shall procure and maintain throughout the Lease Term, at its sole cost (but subject to Article 7 above), with respect to the Shopping Center, a policy or policies of Special Form (All Risks) property insurance and a policy or policies of liability insurance (plus whatever endorsements or special coverages Landlord, in its sole discretion, may consider appropriate), to the extent necessary to comply with Landlord's obligations pursuant to other provisions of this Lease.

15.2.    Tenant agrees to carry during the Lease Term worker's compensation insurance, employer's liability insurance, commercial general liability insurance on the Demised Premises, and, if Tenant uses vehicles, owned, leased and non-owned, in any way to carry out business on or about the Shopping Center, Tenant shall maintain motor vehicle liability insurance. Tenant shall carry workers compensation insurance as required by applicable law.  Tenant shall carry employer's liability insurance which shall be for limits of not less than $500,000 for bodily injury per accident and each disease, per employee, and a total combined limit for bodily injury in amounts not less than $1,000,000 per accident and $1,000,000 per each disease.  The commercial general liability insurance shall be for limits of not less than $2,000,000 combined single limit for death, bodily injury and property damage and $3,000,000 annual aggregate and shall contain a contractual liability endorsement and shall include products and completed operations coverage as well as personal liability coverage.  If Tenant is involved in the sale or manufacture of alcoholic beverages, the general liability insurance and umbrella or excess liability insurance shall include coverage for liquor legal liability.  Tenant agrees to name Landlord and, if Landlord requests, Landlord's mortgagee, any of Landlord's affiliates, and Landlord's property management company as additional insured(s) on Tenant's commercial general liability insurance.  The motor vehicle liability insurance shall be for limits of not less than $1,000,000 combined single limit for bodily injury and property damage.  All insurance of whatever type (except for worker's compensation insurance) shall be with companies having an A.M. Best's Key Rating Guide rating of A-VII or better or such other comparable publication if Best's is no longer published.  In addition, the insurance carrier shall be licensed to do business in the state where the Shopping Center is located.  All policies shall contain a provision that Landlord and Tenant will be given a minimum of thirty (30) days written notice by registered mail by the insurance company prior to cancellation, termination or change in insurance.  Tenant also agrees to carry a Special Form – Causes of Loss policy of property insurance, including sprinkler leakage coverage for the full replacement value covering:  all of Tenant's Work as defined in Section 3.2 hereinabove; all other alterations, additions, improvements, fixtures, signs, and equipment installed by Tenant in the Demised Premises; and all of Tenant's goods and merchandise, trade fixtures, furniture, signs, decorations, furnishings, wall covering, floor covering, draperies, equipment, and all other items and personal property of Tenant located on or within the Demised Premises.  Tenant shall also carry business interruption insurance with limits at least equal to the annual rental payments required by this Lease.  Landlord shall be added as a loss payee, as its interest may appear, in the improvements to the Demised Premises made by Tenant.  Replacement value is understood to mean the cost to replace without deduction for depreciation.  A deductible of not more than $50,000 will be permitted for the Special Form – Causes of Loss property insurance.  All insurance required to be carried by Tenant hereunder shall be primary policies and any other policies, including Landlord's policies, will serve as excess coverage.  Tenant's policy's "other insurance" provision shall be endorsed to show Tenant's policy as primary and any insurance carried by Landlord as excess and not contributory to that carried by the Tenant.  Tenant shall provide Landlord with copies of the insurance policies or certificates evidencing that the insurance is in full force and effect and indicating the terms of the insurance.  The certificates of insurance will be supplied on standard ACORD 27 and 28 forms.  Tenant shall use reasonable efforts to cause all policies and certificates of Tenant's insurance to evidence that Tenant's insurance policies required pursuant to the provisions of this Lease shall contain an endorsement prohibiting cancellation, modification or reduction of coverage without first giving the additional insureds at least thirty (30) days' prior written notice of such proposed action (the "Thirty Day Endorsement").  In the event that the policies of Tenant's insurance do not contain the Thirty Day Endorsement, then Tenant shall give all additional insureds at least thirty (30) days' prior written notice of any cancellation of coverage (or, in the case of non-payment of premium(s), at least ten [10] days' prior written notice).  The certificate shall be provided to Landlord upon the initial signing of this Lease and at each annual renewal of the policy thereafter.  Tenant further agrees to obtain certificates of insurance evidencing Commercial General Liability Insurance, including Completed Operations, Motor Vehicle Liability Insurance and Worker's Compensation Insurance and Employer's Liability Insurance in the amounts required above from any contractor or subcontractor engaged for repairs or maintenance during the Lease Term costing more than Ten Thousand Dollars ($10,000.00).  Tenant shall be responsible for the maintenance of the plate glass in or on the Demised Premises and shall carry at its expense during the Lease Term hereof Plate Glass Insurance, separately or included in the property form, with a deductible of not more than $50,000.  Tenant shall carry a boiler and machinery policy covering the heating and air conditioning units with a deductible not exceeding $50,000 and coverage included in the property form.  It is expressly understood and agreed that neither the issuance of any insurance policy required hereunder nor the foregoing minimum levels of insurance coverage shall limit the liability of Tenant for its acts or omissions as provided in this Lease.  If Tenant should fail to comply with the foregoing requirement relating to insurance, Landlord may obtain such insurance and Tenant shall pay to Landlord on demand as additional rental hereunder the premium cost thereof plus interest at the maximum contractual rate (but in no event to exceed 1% per month) from the date of payment by Landlord until repaid by Tenant.

## ARTICLE 16.

## WAIVER OF LIABILITY; MUTUAL WAIVER OF SUBROGATION

16.1.    Landlord and Landlord's agents and employees shall not be liable to Tenant, nor to Tenant's employees, agents or visitors, nor to any other person whomsoever, for any injury to person or damage to property caused by the Demised Premises or other portions of the Shopping Center becoming out of repair or by defect or failure of any structural element of the Demised Premises or of any equipment, pipes or wiring, or by broken glass, or by the backing up of drains, or by gas, water, steam, electricity, or oil leaking, escaping or flowing into the Demised Premises (except where due to Landlord's willful failure to make repairs required to be made by Landlord hereunder, after the expiration of a reasonable time after written notice to Landlord of the need for such repairs), nor shall Landlord be liable to Tenant, nor to Tenant's employees, agents or visitors, nor to any other person whomsoever, for any loss or damage that may be occasioned by or through the acts or omissions of other tenants of the Shopping Center or of any other persons whomsoever, excepting only duly authorized employees and agents of Landlord.  Landlord shall not be held responsible in any way on account of any construction, repair or reconstruction (including widening) of any private or public roadways, walkways or utility lines.

16.2.    Landlord shall not be liable to Tenant or to Tenant's employees, agents, contractors, invitees, customers, subcontractors, licensees, and concessionaires, or to any other person whomsoever, for any injury to person or damage to property on or about the Demised Premises or the Common Area caused by the negligence or misconduct of Tenant, its employees, agents, contractors, invitees, customers, subtenants, licensees or concessionaires, or of any other person entering the Shopping Center under express or implied invitation of Tenant, or arising out of the use of the Demised Premises by Tenant and the conduct of its business therein, or arising out of any breach or default by Tenant in the performance of its obligations under this Lease.  Tenant hereby agrees to indemnify Landlord and hold Landlord harmless from any loss, expense or claims arising out of such damage or injury.  Furthermore, Tenant agrees to indemnify Landlord and hold Landlord harmless from and against any and all liability, claims, demands, causes of action of any kind and nature arising or growing out of or in any way connected with Tenant's use, occupancy, management or control of the Demised Premises and Tenant's operations or activities in the Shopping Center.

16.3.    Landlord and Tenant each hereby release the other from any and all liability or responsibility to the other, or to any other party claiming through or under them by way of subrogation or otherwise, for any loss or damage to property caused by a casualty which is insurable under Special Form (All Risks) insurance; provided, however, that this release shall not be applicable to the portion of any damage which is not reimbursed by the damaged party's insurer because of the "deductible" in the damaged party's insurance coverage.  The release specified in this Section 16.3 is cumulative with any releases or exculpations which may be contained in other provisions of this Lease.  Landlord and Tenant agree that all policies of insurance obtained by them pursuant to the terms of this Lease shall contain provisions or endorsements thereto waiving the insurer's right of subrogation with respect to claims against the other, and, unless the policies permit waiver of subrogation without notice to the insurer, each shall notify its insurance companies of the existence of the waiver and indemnity provisions set forth in this Lease.

## ARTICLE 17.

## DAMAGES BY CASUALTY

17.1.    Tenant shall give immediate written notice to the Landlord of any damage caused to the Demised Premises by fire or other casualty.

17.2.    In the event that the Demised Premises shall be damaged or destroyed by fire or other casualty insured under the policy of property insurance carried by Landlord with respect to the Shopping Center and Landlord does not elect to terminate this Lease as hereinafter provided, Landlord shall proceed with reasonable diligence and at its sole cost and expense to rebuild and repair the structure of the building in which the Demised Premises are located, subject to the limitations set forth in Section 17.3 below.  In the event (a) the building in which the Demised Premises are located is destroyed or substantially damaged by a casualty not covered by Landlord's insurance, or (b) such building is destroyed or rendered untenantable to an extent in excess of fifty percent (50%) of the first floor area by a casualty covered by Landlord's insurance, or (c) the holder of a mortgage, deed of trust or other lien on such building at the time of the casualty elects, pursuant to such mortgage, deed of trust or other lien, to require the use of all or part of Landlord's insurance proceeds in satisfaction of all or part of the

indebtedness secured by the mortgage, deed of trust or other lien, or (d) the Demised Premises shall be damaged to the extent of fifty percent (50%) or more of the cost of replacement, or (e) the damage or destruction occurs within the last twenty-four (24) months of the term of this Lease, then Landlord may elect either to terminate this Lease or to proceed to rebuild and repair the Demised Premises.  Landlord shall give written notice to Tenant of such election within sixty (60) days after the occurrence of such casualty.  Unless so terminated, this Lease shall continue in full force and effect, and Landlord and Tenant shall perform their respective obligations under this Article.

17.3.   Landlord's obligation to rebuild and repair under this Article 17 shall in any event be limited to restoring the Demised Premises to substantially the condition in which the same existed prior to such casualty, exclusive of any alterations, additions, improvements, fixtures, files and the contents thereof and equipment installed by Tenant.  Tenant agrees that promptly after completion of such work by Landlord, Tenant will proceed with reasonable diligence and at Tenant's sole cost and expense to restore, repair and replace all alterations, additions, improvements, fixtures, signs and equipment installed by Tenant in the Demised Premises to substantially the same condition in which the same existed prior to the casualty.  Landlord's obligation to restore, as set forth in this Article, is subject to Landlord being able to obtain all necessary permits and approvals for the work, including, without limitation, permits and approvals required from any agency or body administering environmental laws, rule or regulations.  It is understood and agreed that the building in which the Demised Premises are located, if partially or totally damaged or destroyed, need not be restored to the same condition as existed prior to such damage or destruction, provided that such building is restored to a condition architecturally harmonious and consistent with the Demised Premises and the balance of the Shopping Center.  Landlord shall not be required to expend more for any repair, rebuilding, reconstruction, restoration, or replacement of the Demised Premises and/or the building containing the Demised Premises than the amount of insurance proceeds paid to Landlord in connection therewith.

17.4.   Tenant agrees that during any period of reconstruction or repair of the Demised Premises, it will continue the operation of its business within the Demised Premises to the extent practicable.  During the period from the occurrence of the casualty until Landlord's repairs are completed, unless the casualty was caused by the negligence or willful misconduct of Tenant, the minimum guaranteed rental shall be reduced to such extent as may be fair and reasonable under the circumstances; however, there shall be no abatement of the percentage rental and other charges provided for herein.

## ARTICLE 18.

### EMINENT DOMAIN

18.1.   If more than thirty percent (30%) of the floor area of the Demised Premises should be taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof, this Lease shall terminate and the rent shall be abated during the unexpired portion of this Lease, effective on the date physical possession is taken by the condemning authority.

18.2.   If less than thirty percent (30%) of the floor area of the Demised Premises should be taken as aforesaid, this Lease shall not terminate; however, the minimum guaranteed rental (but not percentage rental) payable hereunder during the unexpired portion of this Lease shall be reduced in proportion to the area taken, effective on the date physical possession is taken by the condemning authority.  Following such partial taking, Landlord shall make all necessary repairs or alterations to the remaining premises or, if an exhibit describing Landlord's Work is attached to this Lease, all necessary repairs within the scope of Landlord's Work as described in such exhibit, as the case may be, required to make the remaining portions of the Demises Premises an architectural whole, but in no event shall Landlord be required to expend an amount greater than the award actually received by Landlord in connection with such taking.

18.3.   If any part of the Common Area should be taken as aforesaid, this Lease shall not terminate, nor shall the rent payable hereunder be reduced, except that either Landlord or Tenant may terminate this Lease if the area of the Common Area remaining following such taking plus any additional parking area provided by Landlord in reasonable proximity to the Shopping Center shall be less than seventy percent (70%) of the area of the Common Area immediately prior to the taking.  Any election to terminate this Lease in accordance with this provision shall be evidenced by written notice of termination delivered to the other party within thirty (30) days after the date physical possession is taken by the condemning authority.

18.4.   All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Demised Premises or Common Area shall be the property of Landlord, and Tenant hereby assigns its interest in any such award to Landlord; provided, however, Tenant shall be entitled to the portion of any award made for Tenant's moving and relocation expenses and for the loss of Tenant's fixtures and other tangible personal property.

## ARTICLE 19.

## ASSIGNMENT AND SUBLETTING

19.1.   Tenant shall not assign or in any manner transfer this Lease or any estate or interest therein, or sublet the Demised Premises or any part thereof, or grant any license, concession or other right of occupancy of any portion of the Demised Premises (collectively, "Transfer") without the prior written consent of Landlord.  Landlord may grant or deny such consent in its sole, absolute, and unfettered discretion.   Notwithstanding the foregoing, Landlord's consent to an assignment of this Lease or a subletting of the entire Demised Premises shall not be unreasonably withheld, conditioned, or delayed.  In determining whether or not to grant its consent, Landlord shall be entitled to take into consideration factors such as Landlord's desired tenant mix and the reputation and net worth of the proposed transferee.  In addition, Landlord shall also be entitled to charge Tenant a reasonable fee for processing Tenant's request.  Consent by Landlord to one or more assignments or sublettings shall not operate as a waiver of Landlord's rights as to any subsequent assignments and sublettings.  In all events, Landlord can refuse to consent to an assignment or sublease if there shall exist any uncured default of Tenant or a matter which will become a default with the passage of time.

19.2.   If Tenant is a corporation, partnership, limited liability company or other entity and if at any time during the Lease Term the person or persons who own a majority of either the outstanding voting rights or the outstanding ownership interests of Tenant at the time of the execution of this Lease cease to own a majority of such voting rights or ownership interests (except as a result of transfers by devise or descent), the loss of a majority of such voting rights or ownership interests shall be deemed an assignment of this Lease by Tenant and, therefore, subject in all respects to the provisions of Section 19.1 above.  The previous sentence shall not apply, however, if at the time of the execution of this Lease, Tenant is a corporation and the outstanding voting shares of capital stock of Tenant are listed on a recognized security exchange or over-the-counter market.

19.3.   Notwithstanding anything to the contrary contained herein, and without prejudice to Landlord's right to require a written assumption from each assignee, any person or entity to whom this Lease is assigned including, without limitation, assignees pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. Paragraph 101 et seq. (the "Bankruptcy Code") shall automatically be deemed, by acceptance of such assignment or sublease or by taking actual or constructive possession of the Demised Premises,  to have assumed all obligations of Tenant arising under this Lease effective as of the earlier of the date of such assignment or sublease or the date on which the assignee or sublessee obtains possession of the Demised Premises.  In the event this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord and shall remain the exclusive property of Landlord and not constitute the property of Tenant or Tenant's estate within the meaning of the Bankruptcy Code.  All such money or other consideration not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and shall be promptly paid or delivered to Landlord.

19.4.   Notwithstanding any assignment or subletting, Tenant and any guarantor of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent herein specified and for compliance with all of its other obligations under this Lease (even if future assignments and sublettings occur subsequent to the assignment or subletting by Tenant, and regardless of whether or not Tenant's approval has been obtained for such future assignments and sublettings).  Moreover, in the event that the rental due and payable by a sublessee (or a combination of the rental payable under such sublease plus any bonus or other consideration therefor or incident thereto) exceeds the rental payable under this Lease, or if with respect to a permitted assignment, permitted license or other transfer by Tenant permitted by Landlord, the consideration payable to Tenant by the assignee, licensee or other transferee exceeds the rental payable under this Lease, then Tenant shall be bound and obligated to pay Landlord all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant from such sublessee, assignee, licensee or other transferee, as the case may be.  Finally, in the event of a subletting, it is understood and agreed that all rentals paid to Tenant by a sublessee shall be received by Tenant in trust for Landlord, to be forwarded immediately to Landlord without offset or reduction of any kind; and upon

election by Landlord such rentals shall be paid directly to Landlord as specified in Section 4.1 of this Lease (to be applied as a credit and offset to Tenant's rental obligation).

19.5.   Tenant shall not mortgage, pledge or otherwise encumber its interest in this Lease or in the Demised Premises.

19.6.   In the event of the transfer and assignment by Landlord of its interest in this Lease and in the building containing the Demised Premises to a person expressly assuming Landlord's obligations under this Lease, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to such successor in interest of the Landlord for performance of such obligations.   Any security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to such successor in interest and Landlord shall thereby be discharged of any further obligation relating thereto.

19.7.   Without limiting the generality of this Article 19, it will be reasonable for Landlord to refuse consent to any Transfer if, at the time of either Tenant's notice of the proposed Transfer or the proposed commencement date thereof (i) there shall exist an event of default or matter which will become an event of default with passage of time or the giving of notice, or both, unless cured; (ii) the proposed transferee with respect to such Transfer ("Transferee") is an entity (aa) with which Landlord is already in negotiation as evidenced by the issuance of a written proposal; (bb) which is already an occupant of the Shopping Center; (cc) which is incompatible with the character of occupancy of the Shopping Center; or (dd) which would subject the Demised Premises to a use which would (1) involve increased insurance, personnel or wear upon the Shopping Center, (2) violate any exclusive rights or other use restrictions contained in the lease of another tenant of the Shopping Center, or violate Exhibit "D" attached to this Lease, or conflict with the primary use of another tenant, (3) require any addition to (including improvements thereon) or modification of the Demised Premises, or all or any portion of the Shopping Center, or any additional action by Landlord, in order to comply with building code or other governmental requirements, or (4) increase the governmental parking requirements for the Demised Premises or the Shopping Center; (iii) the tangible net worth (exclusive of good will) of the Transferee, immediately prior to and following such Transfer, is less than Ten Million Dollars ($10,000,000.00); (iv) the Transferee has less than five (5) years' experience with respect to owning and operating the same type of business as the use described in Section 1.1(s) of this Lease; (v) the nature of the proposed Transferee's proposed or likely use of the Demised Premises would involve any increased risk of the use, release or mishandling of any Hazardous Materials (as defined in Article 28 hereinbelow); (vi) the business reputation or character of the proposed Transferee or the business reputation or character of any of its affiliates is not reasonably acceptable to Landlord; (vii) Landlord has not received assurances acceptable to Landlord in its sole discretion that all past due amounts owing from Tenant to Landlord (if any) will be paid and all other defaults on the part of Tenant (if any) will be cured prior to the effectiveness of the proposed Transfer; (viii) Landlord is not satisfied that the proposed Transferee's assets, businesses or inventory would not be subject to seizure or forfeiture under any Laws related to criminal or illegal activities; (ix) the proposed Transferee's business and occupancy of the Demised Premises would not generate at least substantially the same percentage rental as Tenant has been generating, on an average basis, during the two (2) years prior to the date of the proposed Transfer; or (x) the Transferee will not qualify as a replacement tenant under any co-tenancy or other similar provision in any other lease or agreement in or affecting Landlord or the Shopping Center.  In no event may Tenant mortgage, pledge or otherwise encumber its leasehold interest as collateral for a debt.

## ARTICLE 20.

### SUBORDINATION; ATTORNMENT; ESTOPPELS

20.1.   This Lease shall be subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter placed upon the Shopping Center or any portion of the Shopping Center which includes the Demised Premises, and to any renewals, extensions, and modifications thereof.  Tenant agrees that any mortgagee shall have the right at any time to subordinate its mortgage, deed of trust or other lien to this Lease.  If the holder of any mortgage, indenture or deed of trust or similar instrument (each a "Mortgagee") succeeds to Landlord's interest in the Demised Premises, Tenant shall, upon request of any such Mortgagee, automatically become the tenant of and attorn to and recognize such Mortgagee as the landlord under this Lease and will pay to it all rents and other amounts payable by Tenant under this Lease in accordance with the applicable terms of this Lease. Notwithstanding that the foregoing provisions of this Section are self-operative and that no further instrument need be executed to effectuate such subordination and attornment, within ten (10) days after request of Landlord or any Mortgagee, Tenant shall execute and deliver to Landlord and to such Mortgagee a

subordination and attornment agreement in recordable form confirming the foregoing and otherwise in form and substance acceptable to Landlord and such Mortgagee. In addition, Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien hereafter placed upon the Demised Premises or the Shopping Center as a whole.

Tenant's obligation to subordinate to any Mortgagee shall be conditioned upon Landlord obtaining for Tenant a non-disturbance agreement on the form subordination, non-disturbance and attornment agreement used by such Mortgagee at Tenant's sole cost and expense.

20.2.    Tenant may not exercise any remedies for default by Landlord hereunder unless and until Landlord and the holder(s) of any indebtedness secured by mortgage, deed of trust or other lien shall have received written notice of such default and a reasonable time (not less than 45 days) shall thereafter have elapsed without the default having been cured.

20.3.    Tenant agrees that it will from time to time, within ten (10) days after request by Landlord, execute and deliver to Landlord a written statement addressed to Landlord (and to a party[ies] designated by Landlord), which statement shall identify Tenant and this Lease, shall certify that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), shall confirm that Landlord is not in default as to any obligations of Landlord under this Lease (of if Landlord is in default, specifying any default), shall confirm Tenant's agreements contained above in this Article 20, and shall contain such other information or confirmations as Landlord may reasonably require. Landlord is hereby irrevocably appointed and authorized as the agent and attorney-in-fact of Tenant to execute and deliver any such written statement on Tenant's behalf if Tenant fails to do so within ten (10) days after the delivery of a written request from Landlord to Tenant.

## ARTICLE 21.

## DIRECTION OF TENANT'S ENERGIES

21.1.    Tenant acknowledges that Tenant's monetary contribution to Landlord (in the form of rentals) and Tenant's general contribution to commerce within the Shopping Center (which is also important in Landlord's determination to execute this Lease with Tenant) will be substantially reduced if, during the Lease Term, either Tenant or any person, firm or corporation directly or indirectly controlling, controlled by or under common control with Tenant shall directly or indirectly operate, manage, conduct or have any interest in any establishment within commercial proximity of the Shopping Center. Accordingly, Tenant agrees that if during the term of this Lease, either Tenant or any person, firm or corporation, directly or indirectly controlling, controlled by or under common control with Tenant (and also, in the event Tenant is a corporation, if any officer or director thereof or shareholder owning more than twenty-five percent (25%) of the outstanding stock thereof, or parent, subsidiary or related or affiliated corporation) either directly or indirectly commences operation of any store selling or otherwise sells or offers for sale any merchandise or services of the type to be sold by Tenant in the Demised Premises as provided in Section 1.1(s) hereof or similar or related items, or in any manner competes with the business provided herein to be conducted by Tenant at the Demised Premises, within a straight-line radius of twenty (20) miles of the Shopping Center, which Tenant acknowledges is a reasonable area for the purpose of this provision, then in such event, the rental payable by Tenant hereunder shall be adjusted as follows:

(a)     thereafter the minimum guaranteed rental shall be one hundred ten percent (110%) of the amount stipulated in Section 1.1(n) of this Lease; and

(b)     thereafter the percentage rental shall, in addition to the percentage rental due with respect to the Demised Premises, include twenty-five percent (25%) [increased to fifty percent (50%) if the other store is within a two-mile radius, and seventy-five percent (75%) if the other store is within a one-mile radius] of all amounts generated by sales made at or from the other store which would be "gross sales" (as defined in Section 4.5 of this Lease) if the merchandise had been sold, services rendered or business conducted at or from the Demised Premises (in lieu of at or from such other store) multiplied by the percentage rental rate and the provisions of Article 5 will likewise apply to the other store.

The above adjustment in rental reflects the estimate of the parties as to the damages which Landlord would be likely to incur by reason of the diversion of business and customer traffic from the Demised Premises and Shopping Center to such other store within such radius, as a proximate result of the establishment of such other store. This provision shall not apply to any existing store presently being operated by Tenant as of the date hereof, provided there is no

increase in the size, merchandise mix or trade name of such commercial establishment. Finally, Tenant agrees that Landlord may waive, for any reason whatsoever, all rights granted to Landlord pursuant to this Section 21.1 and may sever this Section from the remainder of this Lease (thereby keeping the remainder of this Lease unmodified and in full force and effect).

Notwithstanding the foregoing, the provisions of this Section 21.1 shall not apply to any restaurant containing fewer than ten thousand (10,000) square feet.

## ARTICLE 22.

## <u>DEFAULT BY TENANT AND REMEDIES</u>

22.1.    The following events shall be deemed to be events of default by Tenant under this Lease:

(a)      Tenant shall fail to pay any installment of rental or any other obligation under this Lease involving the payment of money and such failure shall continue for a period of five (5) days after such payment shall become due and payable after written notice thereof to Tenant; provided, however, that for each calendar year during which Landlord has already given Tenant one written notice of the failure to pay an installment of rental, no further notice shall be required (i.e., the event of default will automatically occur on the fifth (5th) day after the day upon which the rental was due).

(b)      Tenant shall fail to comply with any provision of this Lease, other than as described in subsection (a) above, and shall not cure such failure within thirty (30) days after written notice thereof to Tenant, or if such failure is not susceptible to cure within such thirty (30)-day period, provided Tenant promptly commences and diligently pursues such cure, if Tenant shall not cure such failure within an additional period not to exceed fifteen (15) days.

(c)      Tenant or any guarantor of Tenant's obligations under this Lease shall become insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

(d)      Tenant or any guarantor of Tenant's obligations under this Lease shall file a petition under any section or chapter of the federal Bankruptcy Code, as amended, or under any similar law or statute of the United States or any state thereof; or Tenant or any guarantor of Tenant's obligations under this Lease shall be adjudged bankrupt or insolvent in proceedings filed against Tenant or any guarantor of Tenant's obligations under this Lease.

(e)      A receiver or Trustee shall be appointed for the Demised Premises or for all or substantially all of the assets of Tenant or any guarantor of Tenant's obligations under this Lease.

(f)      Tenant shall desert or vacate or shall commence to desert or vacate the Demised Premises or any substantial portion of the Demised Premises or at any time prior to the last month of the Lease Term shall remove or attempt to remove, without the prior written consent of Landlord, all or a substantial amount of Tenant's goods, wares, equipment, fixtures, furniture, or other personal property.

(g)      Tenant shall do or permit to be done anything which creates a lien upon Tenant's interest in this Lease, the Demised Premises or upon all or any part of the Shopping Center.

(h)      There shall occur any transfer of a substantial portion of the assets of Tenant, or any incurrence of a material obligation by Tenant, unless such transfer or obligation is undertaken or incurred in the ordinary course of Tenant's business or in good faith for equivalent consideration, or with Landlord's consent.

(i)      There shall occur any default by any guarantors of Tenant's obligations hereunder under any guaranty of this Lease, or the attempted repudiation or revocation of any such guaranty.

(j)      Tenant fails to execute timely a subordination agreement or estoppel certificate as provided in this Lease and such failure shall continue for a period of ten (10) days after Tenant receives notice of such failure from Landlord.

22.2.    Upon the occurrence of any such event of default, Landlord shall have the option to pursue any one or more of the following remedies:

(a)     Without any further notice or demand whatsoever, Tenant shall be obligated to reimburse Landlord for the damages suffered by Landlord as a result of the event of default, plus interest on such amount at the maximum contractual rate which could legally be charged in the event of a loan of such amount to Tenant (but in no event to exceed 1% per month); and Landlord may pursue a monetary recovery from Tenant.

(b)     Without any further notice or demand whatsoever, Landlord may take any one or more of the actions permissible at law to insure performance by Tenant of Tenant's covenants and obligations under this Lease. In this regard, and without limiting the generality of the immediately preceding sentence, it is agreed that if Tenant fails to open for business as required in this Lease or, having opened for business, deserts or vacates the Demised Premises, Landlord may enter upon and take possession of such premises in order to protect them from deterioration and continue to demand from Tenant the monthly rentals and other charges provided in this Lease, without any obligation to relet. However, if Landlord does, at its sole discretion, elect to relet the Demised Premises, such action by Landlord shall not be deemed as an acceptance of Tenant's surrender of the Demised Premises unless Landlord expressly notifies Tenant of such acceptance in writing pursuant to this subsection (b). Tenant hereby acknowledges that Landlord shall otherwise be reletting as Tenant's agent and Tenant furthermore hereby agrees to pay to Landlord on demand any deficiency that may arise between the monthly rentals and other charges provided in this Lease and that actually collected by Landlord. It is further agreed in this regard that in the event of any default described in subsection (b) of Section 22.1 of this Lease, Landlord shall have the right to enter upon the Demised Premises by force if necessary without being liable for prosecution or any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for any damages resulting to the Tenant from such action. Finally, it is agreed that in the event of any default described in subsection (g) of Section 22.1 of this Lease, Landlord may pay or bond around such lien, whether or not contested by Tenant; and in such event Tenant agrees to reimburse Landlord on demand for all costs and expenses incurred in connection with any such action, with Tenant further agreeing that Landlord shall in no event be liable for any damages or claims resulting from such action.

(c)     Landlord may terminate this Lease by written notice to Tenant, in which event Tenant shall immediately surrender the Demised Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearages in rent (including any late charge or interest which may have accrued pursuant to Section 4.6 of this Lease), enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying said premises or any part therefor, by an action for summary ejectment or by force if necessary, without being liable for prosecution or any claim for damages therefor. Tenant hereby waives any statutory requirement of prior written notice for filing eviction or damage suits for nonpayment of rent. In addition, Tenant agrees to pay to Landlord on demand the amount of all loss and damage which Landlord may suffer by reason of any termination effected pursuant to this subsection (c), said loss and damage to be determined by either of the following alternative measures of damages:

(i)     Until Landlord is able, through reasonable efforts, the nature of which efforts shall be at the sole discretion of Landlord, to relet the Demised Premises under terms satisfactory to Landlord in its sole discretion, Tenant shall pay to Landlord on or before the first day of each calendar month the monthly rentals and other charges provided in this Lease. If and after the Demised Premises have been relet by Landlord, Tenant shall pay to Landlord on the twentieth (20th) day of each calendar month the difference between the monthly rentals and other charges provided in this Lease for such calendar month and that actually collected by Landlord for such month. If it is necessary for Landlord to bring suit in order to collect any deficiency, Landlord shall have a right to allow such deficiencies to accumulate and to bring an action on several or all of the accrued deficiencies at one time. Any such suit shall not prejudice in any way the right of Landlord to bring a similar action for any subsequent deficiency or deficiencies. Any amount collected by Landlord from subsequent tenants for any calendar month in excess of the monthly rentals and other charges provided in this Lease shall be credited to Tenant in reduction of Tenant's liability for any calendar month for which the amount collected by Landlord will be less than the monthly rentals and other charges provided in this Lease, but Tenant shall have no right to such excess other than the above-described credit.

(ii)     When Landlord desires, Landlord may demand a final settlement. Upon demand for a final settlement, Landlord shall have a right to, and Tenant hereby agrees to

pay, the total of all monthly rentals and other charges provided in this Lease for the remainder of the term discounted to present value at a rate of four percent (4%) per annum.

(d)     In the event that Tenant has failed to pay Rent hereunder for two (2) or more consecutive months and has failed to operate from the Demised Premises for sixty (60) or more consecutive days, require Tenant to assign to Landlord, within five (5) days after Landlord's written demand and using documents prepared by Landlord, all intellectual property rights in, to, and with respect to the business conducted by Tenant at the Demised Premises.

If Landlord elects to exercise the remedy prescribed in subsection 22.2(b) above, this election shall in no way prejudice Landlord's right at any time thereafter to cancel said election in favor of the remedy prescribed in subsection 22.2(c) above, provided that, at the time of such cancellation, Tenant is still in default. Similarly, if Landlord elects to compute damages in the manner prescribed by subsection 22.2(c)(i) above, this election shall in no way prejudice Landlord's right at any time thereafter to demand a final settlement in accordance with subsection 22.2(c)(ii) above. Pursuit of any of the above remedies shall not preclude pursuit of any other remedies prescribed in other sections of this Lease and any other remedies provided by law. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default.

22.3.     It is expressly agreed that in determining "the monthly rentals and other charges provided in this Lease," as that term is used throughout subsections 22.2(c)(i) and 22.2(c)(ii) above, there shall be added to the minimum guaranteed rental (as specified in Section 1.1(n) of this Lease) a sum equal to the charges for maintenance of the Common Area (as specified in Sections 1.1(p) and Article 7 of this Lease), the payments for taxes and real estate charges (as specified in Article 6 of this Lease) plus one twenty-fourth (1/24) of the total of all percentage rentals required to be paid by Tenant (pursuant to Section 4.4 of this Lease) because of gross sales during the two (2) full calendar years immediately preceding the date Landlord initiated action pursuant to said subsections (or, if two full calendar years have not then elapsed, to the corresponding fraction of all percentage rentals required to be paid because of gross sales during the period commencing with the Commencement Date of this Lease and concluding with the date on which Landlord initiated such action).

22.4.     It is further agreed that, in addition to payments required pursuant to subsections 22.2(b) and 22.2(c) above, Tenant shall compensate Landlord for all expenses incurred by Landlord in repossession (including, among other expenses, any increase in insurance premiums caused by the vacancy of the Demised Premises), all expenses incurred by Landlord in reletting (including, among other expenses, repairs, remodeling, replacements, advertisements and brokerage fees), all concessions granted to a new tenant upon reletting (including, among other concessions, renewal options), all losses incurred by Landlord as a direct or indirect result of Tenant's default (including, among other losses, any adverse reaction by Landlord's mortgagee or by other tenants or potential tenants of the Shopping Center) and a reasonable allowance for Landlord's administrative efforts, salaries and overhead attributable directly or indirectly to Tenant's default and Landlord's pursuing the rights and remedies provided herein and under applicable law.

22.5.     Landlord may restrain or enjoin any breach or threatened breach of any covenant, duty or obligation of Tenant herein contained without the necessity of proving the inadequacy of any legal remedy or irreparable harm. The remedies of Landlord hereunder shall be deemed cumulative and not exclusive of each other.

22.6.     If on account of any breach or default by Tenant in its obligations hereunder, Landlord shall employ an attorney to present, enforce or defend any of Landlord's rights or remedies hereunder, Tenant agrees to pay any reasonable attorneys' fees incurred by Landlord in such connection.

22.7.     In the event that any one or more provisions of this Article 22 authorizes Landlord to enter the Demised Premises, Landlord is entitled and is hereby authorized, without any notice to Tenant, to enter upon the Demised Premises by use of a duplicate key, a master key, a locksmith's entry procedures or any other means not involving personal confrontation, and to alter or change the door locks on all entry doors of the Demised Premises, thereby permanently excluding Tenant. In such event Landlord shall not be obligated to place any written notice on the Demised Premises explaining Landlord's action; moreover, if a reason for Landlord's action is the failure of Tenant to pay any one or more rentals when due pursuant to this Lease, Landlord shall not be required to provide the new key (if any) to Tenant until and unless all rental defaults of Tenant have been fully cured.

22.8.     Intentionally Deleted.

22.9.   In the event of any default described in subsection (d) of Section 22.1 of this Lease, any assumption and assignment must conform with the requirements of the Bankruptcy Code which provides, in part, that the Landlord must be provided with adequate assurances (i) of the source of rent and other consideration due under this Lease; (ii) that the financial condition and operating performance of any proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of Tenant and its guarantors, if any, as of the date of execution of this Lease; (iii) that any percentage rent due under this Lease will not decline substantially; (iv) that any assumption or assignment is subject to all of the provisions of this Lease (including, but not limited to, restrictions as to use) and will not breach any such provision contained in any other lease, financing agreement or other agreement relating to the Shopping Center; and (v) that any assumption or assignment will not disrupt any tenant mix or balance in the Shopping Center.

(a)   In order to provide Landlord with the assurances contemplated by the Bankruptcy Code, Tenant must fulfill the following obligations, in addition to any other reasonable obligations that Landlord may require, before any assumption of this Lease is effective: (i) all defaults under subsection (a) of Section 22.1 of this Lease must be cured within ten (10) days after the date of assumption; (ii) all other defaults under Section 22.1 of this Lease other than under subsection (d) of Section 22.1 must be cured within fifteen (15) days after the date of assumption; (iii) all actual monetary losses incurred by Landlord (including, but not limited to, reasonable attorneys' fees) must be paid to Landlord within ten (10) days after the date of assumption; and (iv) Landlord must receive within ten (10) days after the date of assumption a security deposit in the amount of six (6) months minimum guaranteed rent (using the minimum guaranteed rent in effect for the first full month immediately following the assumption) and an advance prepayment of minimum guaranteed rent in the amount of three (3) months minimum guaranteed rent (using the minimum guaranteed rent in effect for the first full month immediately following the assumption), both sums to be held by Landlord in accordance with Section 22.8 above and deemed to be rent under this Lease for the purposes of the Bankruptcy Code as amended and from time to time in effect.

(b)   In the event this Lease is assumed in accordance with the requirements of the Bankruptcy Code and this Lease, and is subsequently assigned, then, in addition to any other reasonable obligations that Landlord may require and in order to provide Landlord with the assurances contemplated by the Bankruptcy Code, Landlord shall be provided with (i) a financial statement of the proposed assignee prepared in accordance with generally accepted accounting principles consistently applied, though on a cash basis, which reveals a net worth in an amount sufficient, in Landlord's reasonable judgment, to assure the future performance by the proposed assignee of Tenant's obligations under this Lease; or (ii) a written guaranty by one or more guarantors with financial ability sufficient to assure the future performance of Tenant's obligations under this Lease, such guaranty to be in form and content satisfactory to Landlord and to cover the performance of all of Tenant's obligations under this Lease.

22.10.   Tenant hereby waives any and all rights of redemption or restoration of the operation of this Lease conferred by any present or future law, statute or otherwise upon the expiration or sooner termination of the term of this Lease, the entry of final unappealable judgment for recovery of possession through any action or proceeding, or Landlord's obtaining possession of the Demised Premises under the terms of this Lease.   If an event of default occurs, Tenant hereby waives its rights to receive any notice of default, as well as any period of and right to cure said default, as may be required by State or local law, and Tenants' rights in that regard shall be solely as provided in this Lease.

22.11.   If Tenant shall fail to comply fully with any of its obligations under this Lease, then, in addition to Landlord's other rights and remedies under this Lease and at law and in equity, Landlord shall have the right, but not the duty, to cure such breach at Tenant's expense. Tenant agrees to reimburse to Landlord, within thirty (30) days after Landlord submits a statement of the amount due, as additional rental, all costs and expenses incurred by Landlord to cure any such breach, plus ten percent (10%) thereof for Landlord's overhead.

## ARTICLE 23.

## INTENTIONALLY DELETED

## ARTICLE 24.

## HOLDING OVER

24.1.   In the event Tenant remains in possession of the Demised Premises after the expiration of this Lease and without the execution of a new lease, it shall be deemed to be occupying said premises as a tenant from month to month at a rental equal to one hundred fifty percent (150%) of the rental (including any percentage rental) herein provided and otherwise subject to all the conditions, provisions and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy.   Neither any provision hereof nor acceptance by Landlord of rent after such expiration or earlier termination shall be deemed a consent to a holdover hereunder or result in a renewal of this Lease or an extension of the Lease Term. Notwithstanding any provision to the contrary contained herein, Landlord expressly reserves the right to require Tenant to surrender possession of the Demised Premises upon the expiration of the term of this Lease or upon the earlier termination hereof, the right to reenter the Demised Premises, and the right to assert any remedy at law or in equity to evict Tenant and collect damages in connection with any such holding over.   Tenant shall indemnify, defend and hold Landlord harmless from and against any and all claims, demands, actions, losses, damages, obligations, costs and expenses, including, without limitation, attorneys' fees, incurred or suffered by Landlord by reason of Tenant's failure to surrender the Demised Premises on the expiration or earlier termination of this Lease in accordance with the provisions of this Lease.  In the event Tenant holds over, either with or without the consent of Landlord, Tenant hereby waives its rights to receive any prior written notice to quit and vacate the Demised Premises as may be required by State or local law.

## ARTICLE 25.

## NOTICES

25.1.   Wherever any notice is required or permitted hereunder, such notice shall be in writing.   Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered when actually received by the designated addressee or, if earlier and regardless of whether actually received or not, when deposited in the United States mail, postage prepaid, certified mail, return receipt requested, addressed to the parties hereto at the respective addresses set out in Section 1.1 above (or at Landlord's option, to Tenant at the Demised Premises), or at such other addresses as they have theretofore specified by written notice.

25.2.   If and when included within the term "Landlord" as used in this instrument there are more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such notice specifying some individual at some specific address for the receipt of notices and payments to the Landlord; if and when included within the term "Tenant" as used in this instrument there are more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such a notice specifying some individual at some specific address for the receipt of notices and payment to Tenant.  All parties included within the terms "Landlord" and "Tenant," respectively, shall be bound by notice and payments given in accordance with the provisions of this Article to the same effect as if each had received such notice or payment.  In addition, Tenant agrees that actions by Landlord and notices to Tenant hereunder may be taken or given by Landlord's attorney, property manager or other agent.

## ARTICLE 26.

## COMMISSIONS; ADVICE FROM AGENT

26.1.   Tenant and Landlord warrant that they have had no dealings with any broker or agent in connection with this Lease.  Landlord and Tenant covenant to pay, hold harmless and indemnify each other from and against any and all cost, expense or liability for any compensation, commissions or charges claimed by any broker or agent utilized by the indemnitor with respect to this Lease or the negotiation hereof.

# ARTICLE 27.

## REGULATIONS; INDEMNIFICATION

27.1.   Tenant agrees, at its own cost and expense, to promptly comply with all laws, ordinances, rules, orders, and regulations of governmental authorities and all requirements of insurance underwriters and any other organization exercising similar functions (as amended from time to time, "Regulations") as they relate to the Demised Premises and the uses being conducted by Tenant in the Demised Premises. The Regulations include, without limitation, zoning and building codes, the Americans With Disabilities Act of 1990, the Occupational Safety and Health Act, and the Clean Air Act and regulations issued thereunder.   This obligation, however, shall not be construed to require Tenant to comply with any Regulations which require structural changes in the Demised Premises or to the Shopping Center.  Tenant will not cause or permit to be caused, any act or practice, by negligence, omission or otherwise, that would adversely affect the environment or do anything or permit anything to be done that would violate any of the Regulations.  Moreover, Tenant shall have no claim against Landlord by reason of any changes Landlord may make in the Shopping Center or the Demised Premises pursuant to Regulations or any charges imposed upon Tenant, Tenant's customers or other invitees pursuant to same.

27.2.   [INTENTIONALLY OMITTED.]

27.3.   Tenant acknowledges that it will be wholly responsible for any accommodations or alterations which need to be made to the Demised Premises to accommodate disabled employees and customers of Tenant, including without limitation, the requirements under the Americans with Disabilities Act of 1990, as amended, and similar laws and requirements in the State of Colorado. Any alterations made to the Demised Premises in order to comply with either statute must be made solely at Tenant's expense and in compliance with all terms and requirements of this Lease.  Landlord agrees to make reasonable efforts to ensure that the Common Area is in compliance with the applicable disability access laws as of the date hereof. If a complaint is received by Landlord from either a private or government complaint regarding disability access to the Common Area of the Shopping Center, Landlord reserves the right to mediate, contest, comply with or otherwise respond to such complaint as Landlord deems to be reasonably prudent under the circumstances. If Landlord decides to make alterations to the Common Area of the Shopping Center in response to any such complaints or in response to legal requirements Landlord considers to be applicable to the Common Area of the Shopping Center, the cost of such alterations shall be included in Common Area Costs under this Lease. Landlord and Tenant agree that so long as the governmental entity or entities charged with enforcing such statutes have not expressly required Landlord to take specific action to effectuate compliance with such statutes, Landlord shall be conclusively deemed to be in compliance with such statutes.  Tenant agrees to provide Landlord with written notice should Tenant become aware of a violation of such statutes with respect to the Common Area.  In the event Landlord is required to take action to effectuate compliance with such statutes, Landlord shall have a reasonable period of time to make the improvements and alterations necessary to effectuate such compliance, which period of time shall be extended by any time necessary to cause any necessary improvements and alterations to be made.

27.4.   Tenant shall indemnify, defend and hold harmless Landlord, Landlord's members, any subsidiary or affiliate of Landlord and the officers, directors, shareholders, partners, members, employees, managers, independent contractors, attorneys and agents of any of the foregoing (collectively, the "Indemnitees") from and against any and all claims, demands, causes of action, judgments, costs and expenses, and all losses and damages (including consequential and punitive damages) arising from Tenant's use of the Demised Premises or from the conduct of its business or from any activity, work, or other acts or things done, permitted or suffered by Tenant in or about the Demised Premises, and shall further indemnify, defend and hold harmless the Indemnitees from and against any and all claims arising from any breach or default in the performance of any obligation on Tenant's part to be performed under the terms of this Lease, or arising from any act, omission or negligence or willful or criminal misconduct of Tenant, or any officer, agent, employee, independent contractor, guest, or invitee thereof, and from all costs, attorneys' fees and disbursements, and liabilities incurred in the defense of any such claim or any action or proceeding which may be brought against, out of or in any way related to this Lease.  Upon notice from Landlord, Tenant shall defend any such claim, demand, cause of action or suit at Tenant's expense by counsel satisfactory to Landlord in its sole discretion.  As a material part of the consideration to Landlord for this Lease, Tenant hereby assumes all risk of damage to property or injury to persons in, upon or about the Demised Premises from any cause, and Tenant hereby waives all claims with respect thereto against Landlord.  Tenant shall give immediate notice to Landlord in case of

casualty or accidents in the Demised Premises.  The provisions of this Article 27 shall survive the expiration or sooner termination of this Lease.

27.5.    All personal property of Tenant, including goods, wares, merchandise, inventory, trade fixtures and other personal property of Tenant, shall be stored at the sole risk of Tenant. Landlord or its agents shall not be liable for any loss or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water or rain which may leak from any part of the Shopping Center or from the pipes, appliances or plumbing works therein or from the roof, street or subsurface or from any other places resulting from dampness or any other cause whatsoever, or from the act or negligence of any other tenant or any officer, agent, employee, contractor or guest of any such tenant, except personal injury caused by or due to the gross negligence or willful misconduct of Landlord.  Landlord or its agents shall not be liable for interference with the electrical service, ventilation, or for any latent defect in the Demised Premises.

## ARTICLE 28.

## HAZARDOUS MATERIALS

28.1.    During the term of this Lease, Tenant shall comply with all Environmental Laws and Environmental Permits (each as defined in Section 28.7 hereof) applicable to the operation or use of the Demised Premises, will cause all other persons occupying or using the Demised Premises to comply with all such Environmental Laws and Environmental Permits, will immediately pay or cause to be paid all costs and expenses incurred by reason of such compliance, and will obtain and renew all Environmental Permits required for operation or use of the Demised Premises.

28.2.    Tenant shall not generate, use, treat, store, handle, release or dispose of, or permit the generation, use, treatment, storage, handling, release or disposal of Hazardous Materials (as defined in Section 28.7 hereof) in the Demised Premises, or the Shopping Center, or transport or permit the transportation of Hazardous Materials to or from the Demised Premises or the Shopping Center except for limited quantities used or stored at the Demised Premises and required in connection with the routine operation and maintenance of the Demised Premises, and then only upon the written consent of Landlord and in compliance with all applicable Environmental Laws and Environmental Permits.

28.3.    At any time and from time to time during the term of this Lease, Landlord may perform, at Tenant's sole cost and expense, an environmental site assessment report concerning the Demised Premises, prepared by an environmental consulting firm chosen by Landlord, indicating the presence or absence of Hazardous Materials caused or permitted by Tenant and the potential cost of any compliance, removal or remedial action in connection with any such Hazardous Materials on the Demised Premises.  Tenant shall grant and hereby grants to Landlord and its agents access to the Demised Premises and specifically grants Landlord an irrevocable non-exclusive license to undertake such an assessment; and the cost of such assessment shall be immediately due and payable on demand.

28.4.    Tenant will immediately advise Landlord in writing of any of the following: (1) any pending or threatened Environmental Claim (as defined in Section 28.7 hereof) against Tenant relating to the Demised Premises or the Shopping Center; (2) any condition or occurrence on the Demised Premises or the Shopping Center that (a) results in noncompliance by Tenant with any applicable Environmental Law, or (b) could reasonably be anticipated to form the basis of an Environmental Claim against Tenant or Landlord or the Demised Premises; (3) any condition or occurrence on the Demised Premises or any property adjoining the Demised Premises that could reasonably be anticipated to cause the Demised Premises to be subject to any restrictions on the ownership, occupancy, use or transferability of the Demised Premises under any Environmental Law; and (4) the actual or anticipated taking of any remedial action by Tenant in response to the actual or alleged presence of any Hazardous Material on the Demised Premises or the Shopping Center.  All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and Tenant's response thereto.  In addition, Tenant will provide Landlord with copies of all communications regarding the Demised Premises with any government or governmental agency relating to Environmental Laws, all such communications with any person relating to Environmental Claims, and such detailed reports of any such Environmental Claim as may reasonably be requested by Landlord.  In the event any investigation or monitoring of site conditions or any clean-up, containment, restoration, removal or other remedial work (collectively, the "Remedial Work") is required under any Environmental Law, by any judicial order, or by any governmental entity as the result of operations or activities upon, or any use or occupancy of any portion of the Demised Premises by Tenant or Tenant Affiliates, then, at

Landlord's option, either Tenant shall perform or cause to be performed the Remedial Work in compliance with such law or Landlord may cause such Remedial Work to be performed and Tenant shall reimburse Landlord for the cost thereof within ten (10) days of demand therefor. All Remedial Work performed by Tenant shall be performed by one or more contractors, selected by Tenant and approved in advance in writing by Landlord, and under the supervision of a consulting engineer selected by Tenant and approved in advance in writing by Landlord. All costs and expenses of such Remedial Work shall be paid by Tenant, including, without limitation, the charges of such contractor(s), the consulting engineer, and Landlord's reasonable attorneys' fees and costs incurred in connection with monitoring or review of such Remedial Work. The covenants and agreements of Tenant set forth in this Section 28.4 shall survive the expiration or earlier termination of this Lease. As used herein, the term "Tenant Affiliates" shall mean Tenant, its assignees, subtenants, and their respective agents, servants, employees, representatives and contractors.

28.5.    Tenant will not change or permit to be changed the use of the Demised Premises to a use other than the Permitted Use unless Tenant shall have notified Landlord thereof in writing and Landlord shall have determined, in its sole and absolute discretion, that such change will not result in the presence of Hazardous Materials on the Demised Premises, except for those permitted by Section 28.2 above and unless Landlord otherwise agrees to waive the requirements of Section 9.2 hereof.

28.6.    (a)    Tenant agrees to defend, indemnify and hold harmless the Indemnitees (as defined in Section 27.4) from and against all obligations (including removal and remedial actions), losses, claims, suits, judgments, liabilities, penalties, damages (including consequential and punitive damages), costs and expenses (including attorneys' and consultants' fees and expenses) of any kind or nature whatsoever that may at any time be incurred by, imposed on or asserted against such Indemnitees directly or indirectly based on, or arising or resulting from (a) the actual or alleged presence of Hazardous Materials on the Shopping Center which is caused or permitted by Tenant and (b) any Environmental Claim relating in any way to Tenant's operation or use of the Demised Premises (collectively, the "Hazardous Materials Indemnified Matters"). The provisions of this Article 28 shall survive the expiration or sooner termination of this Lease.

(b)    To the extent that the undertaking in the preceding paragraph may be unenforceable because it is violative of any law or public policy, Tenant will contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Hazardous Materials Indemnified Matters incurred by the Indemnitees.

(c)    All sums paid and costs incurred by Landlord with respect to any Hazardous Materials Indemnified Matter shall bear interest at the lesser of (i) eighteen percent (18%) per annum, or (ii) the maximum legal rate of interest allowed by the state in which the Shopping Center is located, from the date so paid or incurred until reimbursed by Tenant, and all such sums and costs shall be immediately due and payable on demand.

28.7.    (a)    "Hazardous Materials" means (i) petroleum or petroleum products, natural or synthetic gas, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, and radon gas; (ii) any substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar import, under any applicable Environmental Law; and (iii) any other substance exposure which is regulated by any governmental authority; (b) "Environmental Laws" means any federal, state or local statute, law, rule, regulation, ordinance, code, policy or rule of common law now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to the environment, health, safety or Hazardous Materials, including without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 et seq.; the Clean Water Act, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f et seq.; the Atomic Energy Act, 42 U.S.C. §§ 2011 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 136 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq.; (c) "Environmental Claims" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of non-compliance or violation, investigations, proceedings, consent orders or consent agreements relating in any way to any Environmental Law or any Environmental Permit, including without limitation (i) any and all Environmental Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages

pursuant to any applicable Environmental Law and (ii) any and all Environmental Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment; (d) "Environmental Permits" means all permits, approvals, identification numbers, licenses and other authorizations required under any applicable Environmental Law.

## ARTICLE 29.

## INTENTIONALLY DELETED

## ARTICLE 30.

## MISCELLANEOUS

30.1.    Nothing in this Lease shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of landlord and tenant.

30.2.    Tenant shall not for any reason withhold or reduce Tenant's required payments of rentals and other charges provided in this Lease, it being agreed that the obligations of Landlord under this Lease are independent of Tenant's obligations except as may be otherwise expressly provided.  The immediately preceding sentence shall not be deemed to deny Tenant the ability of pursuing all rights granted it under this Lease or at law; however, at the direction of Landlord, Tenant's claims in this regard shall be litigated in proceedings different from any litigation involving rental claims or other claims by Landlord against Tenant (i.e., each party may proceed to a separate judgment without consideration, counterclaim or offset as to the claims asserted by the other party).

30.3.    The liability of Landlord or of any person acting on behalf of Landlord to Tenant for or in respect of any default by Landlord under the terms of this Lease or in respect of any other claim or cause of action shall be limited to the interest of Landlord in the Shopping Center, and Tenant agrees to look solely to Landlord's interest in the Shopping Center for the recovery and satisfaction of any judgment against Landlord, or any person acting on behalf of Landlord.

30.4.    In all circumstances under this Lease where the prior consent of Landlord is required before Tenant is authorized to take any particular type of action and, pursuant to the express terms of this Lease Landlord may not unreasonably withhold its consent, Tenant agrees that its exclusive remedy if it believes that such consent has been withheld improperly shall be to institute litigation either for a declaratory judgment or for a mandatory injunction requiring that such consent be given (with Tenant hereby waiving any claim for damages, attorneys' fees or any other remedy).

30.5.    Whenever a period of time is herein prescribed for action to be taken by Landlord, Landlord shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of Landlord.

30.6.    Intentionally Deleted.

30.7.    Tenant agrees to comply with and observe the "Rules and Regulations" attached to and made a part of this Lease as Exhibit "G", as amended from time to time by Landlord. Tenant recognizes that Landlord has the right to make reasonable amendments to the Rules and Regulations from time to time for the operation and maintenance of the Shopping Center, provided that the same are not inconsistent with the provisions of this Lease and a copy thereof is sent to Tenant.  Tenant shall cause its employees, agents, customers and invitees to comply with and observe such Rules and Regulations as amended from time to time.   Nothing contained in this Lease shall be construed to impose upon Landlord any duty or obligation to enforce such Rules and Regulations, as amended, as against any other tenant of the Shopping Center, and Landlord shall not be liable to Tenant for any violation of the Rules and Regulations by any other tenant, its employees, agents or invitees.  In case of any conflict between the Rules and Regulations and any term of this Lease, the provisions which are the more restrictive against Tenant shall govern.

30.8.   If any provision of this Lease should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Lease shall not be affected thereby.

30.9.   <u>Exhibit "B"</u> to this Lease, and the use of any store names on such Exhibit, is not a representation as to the identity, size, location or opening date of any tenant, occupant, or facility within the Shopping Center or a representation that any store so named will open or operate in the Shopping Center.  Subject to the terms of the Lease, Landlord reserves the right, notwithstanding the matters depicted on <u>Exhibit "B"</u>, (a) not to construct, to construct differently (including location, size, shape, height and/ or design) or, after being constructed, to change, alter, modify, delete or add buildings and/or structures (including, without limitation, future phases or additions) to and from the Shopping Center, and (b) to change the access points to the Shopping Center, the parking areas, and/or the Common Area and to otherwise modify any items or matters indicated on <u>Exhibit "B"</u> at any time and from time to time.

30.10.  The laws of the State of Colorado, without giving effect to the application of any contrary principles of conflicts of laws, shall govern the interpretation, validity, performance and enforcement of this Lease.  Venue for any action under this Lease shall be the county in which the Shopping Center is located.

30.11.  The captions used herein are for convenience only and do not limit or amplify the provisions hereof.

30.12.  Whenever herein the singular number is used, the same shall include the plural, and words of any gender shall include each other gender.

30.13.  All covenants and obligations contained within this Lease shall bind and inure to the benefit of Landlord, its successors and assigns, and shall be binding upon Tenant, its permitted successors and assigns.

30.14.  This Lease contains the entire agreement between the parties, and no rights are created in favor of either party other than as specified or expressly contemplated in this Lease.  No brochure, rendering, information or correspondence shall be deemed to be a part of this agreement unless specifically incorporated herein by reference.  In addition, no agreement shall be effective to change, modify or terminate this Lease in whole or in part unless such is in writing and duly signed by the party against whom enforcement of such change, modification or termination is sought.

30.15.  LANDLORD AND TENANT HEREBY ACKNOWLEDGE THAT THEY ARE NOT RELYING UPON ANY BROCHURE, RENDERING, INFORMATION, REPRESENTATION OR PROMISE OF THE OTHER, EXCEPT AS MAY BE EXPRESSLY SET FORTH IN THIS LEASE.

30.16.  No waiver of any of the terms, covenants, provisions, conditions, rules and regulations imposed by this Lease, and no waiver of any legal or equitable relief or remedy, shall be implied by the failure of Landlord to assert any rights, declare any forfeiture, or for any other reason.  No waiver of any of the terms, provisions, covenants, conditions, rules and regulations shall be valid unless it shall be in writing signed by Landlord.  No waiver by Landlord or forgiveness of performance by Landlord with respect to one or more tenants in the Shopping Center shall constitute a waiver or forgiveness of performance in respect to Tenant.  Landlord's consent to or approval of any act by Tenant requiring Landlord's consent or approval under this Lease shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act of Tenant.  No act or thing done by Landlord or Landlord's agents during the term of this Lease shall be deemed an acceptance of a surrender of the Demised Premises, unless in writing signed by Landlord.  The delivery of the keys to any employee or agent of Landlord shall not operate as a termination of this Lease or a surrender of the Demised Premises.  The acceptance of any rent by Landlord following a breach of this Lease by Tenant shall not constitute a waiver by Landlord of such breach or any other breach unless such waiver is expressly stated in a writing signed by Landlord.  The acceptance of any rent by Landlord from any assignee or subtenant not approved in writing by Landlord shall not constitute Landlord's approval of the assignment or sublease nor constitute a waiver of the requirement for Landlord's approval.

30.17.  Tenant shall deliver and surrender to Landlord possession of the Demised Premises (including all of Tenant's permanent work upon and to the Demised Premises, all replacements and all fixtures permanently attached to the Demised Premises) immediately upon the expiration of the Lease Term or the termination of this Lease broom-clean and in as good condition and repair as the same were on the delivery date (loss by any insured casualty and ordinary wear and tear only excepted) and deliver the keys at the office of Landlord or Landlord's agent; provided, however, that upon Landlord's request made at least thirty (30) days

prior to the end of the Lease Term, or the date Tenant is otherwise required to vacate the Demised Premises, Tenant shall remove all fixtures and equipment affixed to the Demised Premises by Tenant, and repair and restore the Demised Premises to their condition on the delivery date (loss by any insured casualty and ordinary wear and tear only excepted), at Tenant's sole expense.  The removal shall be performed prior to the earlier of the end of the Lease Term or the date Tenant is required to vacate the Demised Premises.

Notwithstanding the foregoing, except as otherwise provided in this grammatical paragraph, all "Removable Improvements" (as hereinbelow defined) shall be and remain the property of Tenant and may be removed by Tenant at the conclusion of the Lease Term if Tenant is not in default under this Lease, and so long as such removal does not damage original structural aspects of the Shopping Center as they existed as of the date of the Prior Lease.  "Removable Improvements" means all structural improvements, additions, alterations, fixtures and coverings installed in the Demised Premises at Tenant's expense (and not in replacement of similar work or materials originally installed by Landlord or Landlord's predecessor-in-interest) and attached or affixed to the floors, walls, ceilings or other parts of the Demised Premises and all non-structural interior and exterior decorations and improvements as well as all restaurant equipment, furniture, furnishings and movable fixtures, including counters, shelving, showcases, mirrors and similar items, installed in the Demised Premises at Tenant's expense, including Tenant's signs, even when, but for this provision, such improvements would be considered as becoming part of the Demised Premises.  However, notwithstanding anything to the contrary, Tenant shall not remove or deface, and Removable Improvements shall not include, any exterior décor and/or structural addition(s) to the Demised Premises (including, but not limited to, the architectural tower attached thereto, the statue attached to such tower, and/or any fountains), toilets, plumbing, HVAC equipment, or hot water heaters (except boilers).

During the final thirty (30) days of the Lease Term ("Winding Down Period"), provided Tenant is not in default under this Lease, Tenant has the right to conduct an auction within the Demised Premises for the purpose of inventorying, marketing, and selling the Removable Improvements.  No less than ten (10) days prior to conducting the auction, Tenant shall:  (1) provide Landlord with an itemized list of Removable Improvements and allow Landlord five (5) days after receipt to review and confirm the Removable Improvements do not include items which, by the terms of this Section 30.17, are not to be removed by Tenant; (2) provide Landlord with the name and contact information for the auctioneer, who shall be bonded and insured in an amount reasonably required by Landlord; (3) provide for Landlord's review and approval the necessary certificates of insurance name Tenant as the insured and Landlord as an additional insured and evidencing (y) Commercial General Liability insurance of no less than One Million Dollars ($1,000,000.00) per occurrence and protecting Tenant and Landlord against any liability to the public or any invitee of Tenant incidental to Tenant's use of the Demised Premises or the remainder of the Shopping Center, and (z) All Risk or Special Form coverage protecting Tenant and Landlord against loss or damage to the Demised Premises for the full replacement values of the Demised Premises and all alterations and improvements therein.  Notwithstanding anything contained herein to the contrary, all items of Removable Improvements shall be removed from the Demised Premises during the Winding Down Period and no less than two (2) days prior to the expiration date of the Lease Term, Landlord and Tenant shall schedule and conduct a joint walk-through of the Demised Premises to confirm compliance with the surrender obligations under this Section 30.17.

30.18.  Tenant shall not record this Lease.  Without the prior written consent of Landlord, Tenant shall not record any memorandum of this Lease, short form of this Lease, or other reference to this Lease.

30.19.  The submission of this Lease for examination does not constitute a reservation of or option for the Demised Premises or any other space in the Shopping Center, and shall not vest any right in Tenant.  This Lease shall become effective as a lease only upon its execution and delivery by the parties.

30.20.  LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LEASE OR ANY DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER WITH THE DEMISED PREMISES (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS LEASE OR ANY CLAIMS OR DEFENSES ASSERTING THAT THIS LEASE WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).  THIS WAIVER IS A MATERIAL INDUCEMENT FOR LANDLORD TO ENTER AND ACCEPT THIS LEASE.

30.21.  If Tenant shall be one or more individuals, corporations or other entities, whether or not operating as a partnership or joint venture, then each such individual, corporation, entity, joint venturer or partner shall be deemed to be both jointly and severally liable for the payment of the entire rent and other payments specified herein.

30.22  Landlord hereby consents to Tenant's installation on the roof of the Demised Premises of one (1) satellite dish or antenna (the "Satellite"), as long as the installation thereof and the maintenance and use of the Satellite is in accordance with all terms of this Lease.  Tenant shall submit to Landlord written plans for the installation, maintenance and use of the Satellite for Landlord's review and written consent (which consent shall not be unreasonably withheld) prior to installation thereof.  Tenant acknowledges that Landlord may, at any time, and without liability to Tenant therefor, allow other tenants of the Shopping Center or other persons to use the roof for any purpose and that such uses may interfere with Tenant's use of the Satellite and Tenant waives any claim in connection therewith.  Tenant further acknowledges that Landlord has made no representation as to the utility to Tenant of the Satellite.  Tenant shall be responsible for the cost of installation, maintenance and removal of all rooftop equipment.  Landlord reserves the right at any time to require Tenant to move the Satellite to another location on the roof of the Demised Premises at Tenant's sole cost and expense.  Tenant's right to install and use the Satellite shall be subject to the following conditions:

(a)  The Satellite shall be considered Tenant's property under this Lease, and shall be insured as part of Tenant's Special Form – Causes of Loss policy required pursuant to Section 15.2 hereinabove.

(b)  Tenant's installation of the Satellite shall be made pursuant to Article 11 of this Lease and shall be deemed to be a structural alteration under the provisions of this Lease;

(c)  Any damage by fire or any other casualty or other cause to the Satellite shall be at Tenant's sole risk and expense, and any such damage, whether partial or complete, shall in no way operate to terminate this Lease or affect Tenant's obligations hereunder;

(d)  No condemnation of the roof or other parts of the Shopping Center used in connection with the Satellite shall give rise to any right of Tenant to terminate this Lease, nor shall Tenant be entitled to any award or damages with respect thereto;

(e)  In no event shall Tenant assign, transfer, mortgage, encumber, sublet, rent or otherwise alienate the appurtenant right described in this Section 30.22 to install, maintain and use the Satellite;

(f)  Tenant's indemnification of Landlord as provided in this Lease shall be deemed to include, with reference to the Demised Premises, the use of the roof of the Demised Premises for and in connection with the Satellite;

(g)  Landlord's waiver pursuant to the provisions of Section 16.3 of this Lease shall not be deemed to apply to roof damage due to the Satellite;

(h)  Tenant shall use a roof contractor approved by Landlord in its sole discretion for any work relating to the Satellite, and if such installation would breach Landlord's roof warranty, the same shall not be allowed.  Prior to installation, Tenant shall provide Landlord with a certificate of insurance evidencing that the contractor is licensed and insured, and the insurance policy must list Landlord, Landlord's managing agent, and any Mortgagee(s) as additional insureds;

(i)  The Satellite must be screened from view and not be above the parapet; and

(j)  Tenant agrees to pursue receipt of all approvals from all governmental authorities and to assume the costs of securing such approvals.

Landlord shall have access to the area surrounding the Satellite as needed in order to (i) inspect the equipment, (ii) properly maintain and repair the roof and other areas of the Shopping Center, and (iii) exhibit the roof for purpose of sale, lease, ground lease or financing of the Shopping Center.  In the event that Landlord is performing work on the roof, Tenant agrees at its sole risk and expense, if required by Landlord, to temporarily remove or relocate the Satellite in order to facilitate such work.  The Satellite will be labeled with Tenant's trade name.

[SIGNATURE PAGE FOLLOWS]

EXECUTED as of the latest date accompanying a signature by Landlord or Tenant below.

LANDLORD:

BSV LAMONT JCRS LLC,
a Delaware limited liability company

By: _____
Authorized Person
Name: _THOMAS M. YOCKEY_
Title: _Chief Executive Officer_

Date of Signature: ___9/12/14___

TENANT:

SUMMIT FAMILY RESTAURANTS INC., a
Delaware corporation, d/b/a "Casa Bonita"

By: _____
Name: Robert E. Wheaton
Title: _President_

Date of Signature: ___9/8/14___

Taxpayer Identification No.: 87-0264039

<u>**EXHIBIT "A"**</u>

<u>**GUARANTY OF LEASE**</u>

FOR VALUE RECEIVED, and in consideration for, and as an inducement to BSV Lamont JCRS LLC, a Delaware limited liability company, to enter into a lease (the "Lease") as "Landlord" with Summit Family Restaurants Inc., a Delaware corporation, d/b/a "Casa Bonita", as "Tenant," the undersigned, whether one or more, jointly and severally do hereby unconditionally guarantee to Landlord (i) the punctual and full payment of all rents of every kind, additional rents and all other charges to be paid by Tenant under the Lease and (ii) the full and timely performance and observance of all the covenants, conditions, and agreements to be performed and observed by Tenant under the Lease.  The undersigned shall indemnify, defend and hold harmless Landlord and its affiliates from any loss, damages or costs (including without limitation, the fees of Landlord's attorneys and court costs) arising out of any failure to pay the aforesaid rents and other charges or the failure to perform any of the aforesaid covenants, conditions and agreements under the Lease. The undersigned further expressly agree that the validity of this Guaranty of Lease and the obligations of the undersigned hereunder shall in no way be terminated, affected or impaired by reason of any forbearances, settlements or compromises between Landlord and Tenant or the invalidity or unenforceability of the Lease for any reason whatsoever or by the relief of Tenant from any of Tenant's obligations under the Lease by operation of law or otherwise, including, without limitation of the generality of the foregoing, the rejection or assignment of the Lease in connection with proceedings under any present or future provision of the federal Bankruptcy Act, or any similar law or statute of the United States or any state thereof.

The undersigned further covenant and agree that this Guaranty of Lease shall be and remain in full force and effect as to any renewal, modification or extension of the Lease, whether or not known to or approved by the undersigned, and that no subletting, assignment or other transfer of the Lease, or any interest therein or any such renewal, modification or extension, shall operate to extinguish or diminish the liability of the undersigned hereunder.  In the event of any termination of the Lease by Landlord, the undersigned's liability hereunder shall not be terminated, but the undersigned shall be and remain fully liable for all damages, costs, expenses and other claims which may arise under or in connection with the Lease.  If the undersigned shall, directly or indirectly, advance any sums to Tenant, such sums and indebtedness shall be subordinate in all respects to the amounts then and thereafter due and owing by Tenant under the Lease.

Wherever reference is made to the liability of Tenant in the Lease, such reference shall be deemed likewise to refer to the undersigned, jointly and severally, with Tenant.  The liability of the undersigned for the obligations of Tenant under the Lease shall be primary, absolute and unconditional.  In any right of action which shall accrue to Landlord under the Lease, Landlord may, at Landlord's option, proceed against any one or more of the undersigned and/or Tenant, jointly or severally, and may proceed against any one or more of the undersigned without having demanded performance of, commenced any action against or having obtained any judgment against Tenant.  The undersigned hereby waive any obligation on the part of Landlord to enforce or seek to enforce the terms of the Lease against Tenant as a condition to Landlord's right to proceed against the undersigned hereunder.  The undersigned hereby expressly waive: (i) notice of acceptance of this Guaranty of Lease and of presentment, demand and protest; (ii) notice of any default hereunder or under the Lease and all indulgences; (iii) demand for observance, performance or enforcement of any terms or provisions of this Guaranty of Lease or of the Lease; and (iv) all other notices and demands otherwise required by law which the undersigned may lawfully waive.  This Guaranty of Lease is a guaranty of payment and not a guaranty of collection. The undersigned agree that in the event this Guaranty of Lease shall be enforced by suit or otherwise, the undersigned will reimburse the Landlord, upon demand, for all expenses incurred in connection therewith, including, without limitation, reasonable attorneys' fees.

The undersigned hereby waive, to the maximum extent permitted by law, all defenses available to a guarantor or surety, whether the waiver is specifically herein enumerated or not, including without limitation any statute of limitations affecting the enforcement of this Guaranty of Lease, and any right of set-off or compensation against amounts due under this Guaranty of Lease.

THE UNDERSIGNED HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY OF LEASE OR ANY DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS

(WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE UNDERSIGNED OR LANDLORD ARISING OUT OR RELATED IN ANY MANNER WITH THIS GUARANTY OF LEASE (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS GUARANTY OF LEASE OR ANY CLAIMS OR DEFENSES ASSERTING THAT THIS GUARANTY OF LEASE WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR LANDLORD TO ENTER AND ACCEPT THE LEASE.

Upon the occurrence of an event of default pursuant to the Lease, the undersigned hereby authorize any attorney designated by the Landlord or any clerk of any court of record in Colorado or elsewhere to appear for the undersigned in any court of record and confess judgment against the undersigned without prior hearing in favor of the Landlord for, and in the amount of , all amounts payable by the undersigned to the Landlord under the terms of this Guaranty of Lease, costs of suit and attorneys' fees of Twenty-Five Thousand Dollars ($25,000.00). The undersigned hereby release, to the extent permitted by applicable law, all errors and all rights of exemption, appeal, stay of execution, inquisition and other rights to which the undersigned may otherwise be entitled under the laws of the United States of America or of any state or possession of the United States of America now in force and which may hereafter be enacted. The undersigned hereby consent to the immediate execution of such judgment. The authority and power to appear for and enter judgment against any or all of the undersigned shall not be exhausted by one or more exercises thereof or by any imperfect exercise thereof and shall not be extinguished by any judgment entered pursuant thereto. Such authority may be exercised as to any or all of the undersigned on one or more occasions or from time to time in the same or different jurisdictions as often as the Landlord shall deem necessary and desirable, for all of which this Guaranty of Lease shall be a sufficient warrant.

The undersigned hereby assign to Landlord any rights the undersigned may have to file a claim and proof of claim in any bankruptcy or similar proceeding of Tenant and any awards of payments thereon to which the undersigned would otherwise be entitled.

It is further agreed that all of the terms and provisions hereof shall inure to the benefit of and may be enforced by the respective heirs, executors, successors and assigns of Landlord and the holder of any mortgage to which the Lease may be subject and subordinate from time to time, and shall be binding upon the respective heirs, executors, successors and assigns of the undersigned. Landlord may, without notice, assign this Guaranty of Lease, and no such assignment shall diminish the undersigned's liability under this Guaranty of Lease.

In the event more than one person or entity executes this Guaranty of Lease, the liability of such signatories hereunder shall be joint and several. In the event only one person or entity executes this Guaranty of Lease, all provisions hereof which refer to more than one guarantor shall be automatically modified to refer to only one guarantor, and otherwise this Guaranty of Lease shall remain unmodified and in full force and effect.

It is understood that other agreements similar to this Guaranty of Lease may, at Landlord's sole option and discretion, be executed by other persons with respect to the Lease. This Guaranty of Lease shall be cumulative of any such agreements and the liabilities and obligations of the undersigned hereunder shall in no event be affected or diminished by reason of such other agreements. Moreover, in the event Landlord obtains the signature of more than one guarantor on this Guaranty of Lease or obtains additional guarantee agreements, or both, the undersigned agree that Landlord, in Landlord's sole discretion, may (i) compound or settle with any one or more of the guarantors for such consideration as Landlord may deem proper, and (ii) release one or more of the guarantors from liability. The undersigned further agree that no such action shall impair the rights of Landlord to enforce the Lease against any remaining guarantor or guarantors, including the undersigned.

The undersigned agree to execute and deliver to Landlord, from time to time, upon five (5) days notice from Landlord, a certificate addressed to Landlord, any mortgagee or prospective mortgagee, or any prospective purchaser, certifying (i) that this Guaranty of Lease is unmodified and in full force and effect and (ii) to such other matters as Landlord may reasonably request. The undersigned further agree that upon request by Landlord from time to time, the undersigned shall furnish Landlord, within five (5) days of receipt of such request, with a copy of the undersigned's financial statements, in form and substance reasonably satisfactory to Landlord, reflecting the undersigned's current financial condition. The undersigned represents and warrants that all financial statements, records and information furnished by the undersigned to Landlord in connection with this Guaranty of Lease are true, correct and complete in all respects.

Exhibit "A" - Page 2 of 3

If any provision of this Guaranty of Lease or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Guaranty of Lease and the application of that provision to other persons or circumstances shall not be affected but rather shall be enforced to the fullest extent permitted by law.

If the undersigned is a corporation (including any form of professional association), then each individual executing or attesting this Guaranty of Lease on behalf of such corporation covenants, warrants and represents that he or she is duly authorized to execute or attest and deliver this Guaranty of Lease on behalf of such corporation.  If the undersigned is a partnership (general or limited) or limited liability company, then each individual executing this Guaranty of Lease on behalf of the partnership or company hereby covenants, warrants and represents that he or she is duly authorized to execute and deliver this Guaranty of Lease on behalf of the partnership or company in accordance with the partnership agreement or membership agreement, as the case may be, or an amendment thereto, now in effect.

This Guaranty of Lease shall be governed by the laws of the State of Colorado, excluding choice of laws principles.

Notwithstanding anything herein to the contrary, and provided that Tenant is not in default under the Lease, then as of the first day of the sixth (6th) Lease Year, the undersigned shall have no further liability thereafter accruing under this Guaranty of Lease; provided, however, the undersigned shall be responsible for all liabilities accruing during the first five (5) Lease Years and any expenses incurred by Landlord in collecting the same, including attorneys' fees and interest.

EXECUTED UNDER SEAL as of the _12th_ day of _September_ , _2014_.

GUARANTOR:

STAR BUFFET, INC., a Delaware corporation

By: _____

Name: Robert E. Wheaton

Title: __President__

Date of Signature: __9/8/14__

Taxpayer Identification No.:  84-1430786

Exhibit "A" - Page 3 of 3

Exhibit 1, Page 42

## EXHIBIT "B"

## SHOPPING CENTER



## EXHIBIT "C"

## DEMISED PREMISES



Exhibit "C" - Page 1 of 1

## EXHIBIT "D"

## SHOPPING CENTER PROHIBITED USES

**Wireless Republic**
Section 37 - Grant of Exclusive Use - For so long as Tenant shall not be in default hereunder, Landlord shall not enter into a lease or consent to the use and occupancy of any other space within the Shopping Center by a tenant, subtenant, assignee, licensee or concessionaire (other than Verizon or AT&T), who sells wireless phones, wireless services and/related accessories as a primary business. "Primary business" shall be defined, for the purposes of this Article 37, as any business that generates more than 20% of such tenants gross revenue.

**Dollar Tree**
Section A.15 - Tenant shall have an Exclusive for a single price point variety retail store. A single price point variety retail store is hereby defined as a store that offers all of its merchandise for sale at a single price point per item. In addition, Landlord will not permit any other occupant in the Shopping Center whose "principal business" is to operate the following, without Tenants consent, which shall not be unreasonably withheld: (1) A close out store; (2) A retail store whose principal business" is: (a) Selling variety retail merchandise at a single price point; (b) Selling gifts, cards, and other party supplies (individually or collectively); or (c) Selling artificial flowers and picture frames (individually or collectively); (1) Variety retail operations with the word "Dollar" in their trade name. For purpose of this Section, "principal business" shall be defined as selling such merchandise in 25% or more of the sales floor area (including ½ of the adjacent aisle space). Notwithstanding the foregoing, this exclusive shall not apply to (1) any tenant or occupant selling single price point apparel as its principal business or (2) any current occupant or tenant of the Shopping Center who is operating under their current use clause as of the date of this Lease; provided, however, in the event Landlord's consent is required for a change in permitted use, Landlord shall not consent to a change of any tenants use which would violate Tenants Exclusive Use. This exclusive shall not apply to any existing or future tenant that does not need Landlords consent to change its use.

**Pizza Hut**
Section 8.6 - So long as Tenant is not in default beyond any applicable cure period, Landlord shall not allow the use of any real property leased or owned by landlord in the Center for the sale of prepared pizza.

**Metropolitan Association of Retarded Citizens, Inc. (ARC Thrift)**
Section 40 - Provided Tenant is not in default under the terms of this lease and subject to the rights of existing tenants in the Shopping Center, landlord shall not lease space in the Shopping Center to another tenant whose primary source of revenue (defined as 51% or more) is derived from the sale of used or second hand merchandise. This exclusivity provision shall not apply to a pawn shop or a store whose primary source of revenue (defined as 51% or more) is the sale of jewelry, coins or antique furniture.

**Planet Fitness**
Exhibit "I" - Subject to the conditions and exceptions mentioned below, Landlord agrees that during the original term and any renewal term of this Lease Landlord will not permit any portion of the Shopping Center, other than the Demised Premises, to be used by a tenant whose principal business activity is the operation of a full-service health and fitness center/fitness club (the "Restriction"). . . . The Restriction shall not apply to (i) any tenant primarily offering classes in specialized physical disciplines (e.g. martial arts, yoga, or dance), as opposed to fitness generally, (ii) any tenant operating a fitness center primarily specializing in fitness for children (e.g., Kid Zone, Gymboree, or My Gym), or (iii) any tenant whose primary business is the operation of a weight loss center (e.g., Weight Watchers, Jenny Craig or Lindora).

**Prohibited Uses:**

Not permitted to use any portion of the property for x-rated or adult movies, bingo parlor, bar or tavern (except as part of a restaurant), adult bookstore, gym (not including first-class health/exercise spas), auto repair facility, dance hall, billiard or pool hall, massage parlor, warehouse, car wash, or the sale, rental or leasing of motor vehicles or trailers.

**EXHIBIT "E"**

**CONSTRUCTION: CRITERIA AND DESCRIPTION OF LANDLORD'S
AND TENANT'S WORK**

<u>ARTICLE I.</u>   <u>GENERAL</u>

Tenant hereby accepts the Demised Premises "as is" and "ready for occupancy".   Prior to any modification of the existing Demised Premises, Tenant shall adhere to the following:

A.   In the event of any dispute as to work performed or required to be performed by Landlord or Tenant, the certificate of Landlord's architect or general contractor shall be conclusive.  By continuing to occupy the Demised Premises, Tenant shall be deemed to have accepted the same and to have acknowledged that the same fully comply with Landlord's covenants and obligations under this Lease.

B.   Intentionally Deleted.

<u>ARTICLE II.</u>   <u>PRE-CONSTRUCTION OBLIGATIONS</u>

A.   All plans, diagrams, schedules, specifications and other data relating to Tenant's Work must be furnished by Tenant to Landlord complete, sufficient to obtain a building permit, and ready for Landlord's consideration and final approval.  Without limiting the generality of the immediately preceding sentence, Tenant's submissions must include a floor plan, a reflected ceiling plan, a plumbing plan, elevations of walls and a fixture plan.  All drawings shall be at a scale of either one-eighth inch (1/8") or one-quarter inch (1/4").  Tenant shall reimburse Landlord for any loss or extra cost which may result to Landlord by reason of failure on the part of Tenant to submit any such plans, diagrams, schedules, specifications and/or other data within the required period of time.

B.   Tenant shall secure Landlord's written approval of all designs, plans, specifications, materials, contractors and contracts for Tenant's Work before beginning Tenant's Work, shall follow (and cause its contractor to follow) whatever construction rules which Landlord may deliver to Tenant in connection with the performance of work by tenants in the Shopping Center, and shall secure the necessary licenses and permits to be used in performing Tenant's Work.   When finished, Tenant's Work shall be subject to Landlord's inspection, approval and acceptance.

C.   [INTENTIONALLY OMITTED].

D.   The insurance requirements under Article 15 of the Lease and the indemnity requirements under Article 16 of the Lease shall apply during the construction contemplated in this Exhibit, and Tenant shall provide evidence of appropriate insurance coverage prior to beginning any of Tenant's Work.   In addition, and without limiting the generality of the immediately preceding sentence, at Landlord's option, Landlord may require that prior to beginning any of Tenant's Work, Tenant shall provide Landlord with evidence of insurance covering both Tenant and Tenant's contractor against damage to their personal property, as well as against third-party liability and worker's compensation claims arising out of all construction and associated activities.  All policies of insurance shall be subject to Landlord's prior approval and shall be endorsed showing Landlord as an additional insured (or, if permitted by Landlord, may provide a waiver of subrogation against Landlord).

<u>ARTICLE III.</u>   <u>DESCRIPTION OF LANDLORD'S WORK</u>

A.   NONE.

B.   Intentionally Deleted.

<u>ARTICLE IV.</u>   <u>DESCRIPTION OF TENANT'S WORK</u>

A.   Intentionally Deleted.

B.   Intentionally Deleted.

C.   Intentionally Deleted.

D.   All work undertaken by Tenant shall be at Tenant's expense, and shall not damage the building or any part thereof.  Any roof penetration shall be performed by Landlord's roofer or, at Landlord's option, by a bonded roofer approved in advance by Landlord.  The work

Exhibit "E" - Page 1 of 2

Exhibit 1, Page 46

shall be begun only after Landlord has given consent, which consent shall in part be conditioned upon Tenant's plans, to include materials acceptable to Landlord, in order to prevent injury to the roof and to spread the weight of the equipment being installed.  Tenant shall also be responsible for obtaining, and paying for, professional inspections of any structural work (including, without limitation, any roof work or concrete work).

       E.     All work undertaken by Tenant shall be awarded to Landlord's contractor unless, before any construction begins, Tenant chooses and receives Landlord's written approval (which approval shall not be unreasonably withheld, conditioned, or delayed) for another contractor to complete Tenant's Work (except for with respect to the fire alarm system, which work must be performed by a contractor on Landlord's pre-approved list).

       F.     Intentionally Deleted..

       G.     Tenant shall provide Landlord with "as built" drawings for all work undertaken by Tenant in the Demised Premises during the Term of this Lease within thirty (30) days after completion of the work.

## EXHIBIT "F"

## INTENTIONALLY DELETED

## EXHIBIT "G"

### SHOPPING CENTER
### RULES AND REGULATIONS

The terms defined in the Lease shall have the same meanings when used below.

1.      Tenant shall not obstruct or encumber any part of the Common Area or use the same for any purpose other than that for which the Common Area was designed.  Tenant shall, at its own expense, keep the sidewalks and curb directly in front of the Demised Premises clean and free from ice, snow, and debris.  Landlord shall have the right to control and operate the Common Area in such manner as Landlord deems best for the benefit of the Shopping Center and the tenants generally.  Tenant shall not permit the visit to the Demised Premises of persons in such numbers or under such conditions as to interfere with the use and enjoyment by Landlord or other tenants of any part of the Common Area or the exterior of the Demised Premises.  Tenant shall not solicit business in the Common Area.

2.      No awnings or other projections or shades shall be attached to the outside walls of the Demised Premises without the prior written consent of the Landlord.  Tenant shall not mark, paint, drill into or in any way deface, or string wires through, any part of the Shopping Center or the exterior of the Demised Premises.

3.      The toilets, sinks, and other plumbing fixtures shall not be used by Tenant for any purposes other than those for which they were constructed, and no Hazardous Materials, sweepings, rubbish, rags or other such substances shall be thrown therein.

4.      No animals of any kind shall be brought into or kept in or about the Demised Premises or the Shopping Center by Tenant.  Tenant shall not cause or permit any unusual or objectionable odors to be produced upon or emanate from the Demised Premises.  The Demised Premises shall not be used for sleeping purposes.

5.      No inflammable, combustible or explosive fluid, chemical or substance shall be brought or kept upon the Demised Premises by Tenant, except routine cleaning materials and materials sold in the ordinary course of Tenant's business, provided that such materials are stored, used, handled, and disposed of in accordance with all applicable Regulations.

6.      Tenant shall not play or permit to be played any radio, television or recorded music in such a manner that the same can be heard outside of the Demised Premises, or emit or cause to be emitted or transmitted any vibrations outside of the Demised Premises.

7.      Before closing and leaving the Demised Premises, the Tenant shall, in each instance, ensure that all entrances to the Demised Premises are locked.  Tenant shall, upon the termination of its tenancy, deliver to Landlord all keys to the Demised Premises furnished to, or otherwise procured by, Tenant.  In the event of the loss of any keys so furnished, Tenant shall pay Landlord the cost of the lost keys or the cost of replacing the locks operated by the lost key or keys, at Landlord's sole discretion.

8.      Tenant shall place all garbage, trash and refuse in proper containers both in the interior of the Demised Premises and in the trash area designated by Landlord.

9.      The requirements of Tenant will be attended to only upon application at the main office of the Landlord or its managing agent for the Shopping Center.  Employees of Landlord shall not perform any work or do anything for Tenant unless under special instructions from Landlord or its authorized agent.

10.      There shall not be used in any hallway or on any sidewalk of the Shopping Center, either by Tenant or by jobbers or others, in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and side guards.

11.      Tenant shall leave exposed all access plates to underfloor conduits within the Demised Premises.  Where carpet is installed by Tenant, the carpet shall be cut around such access plates.

12.      Tenant shall keep the store front glass and glass door of the Demised Premises in good repair and clean condition, and shall use the store window(s) solely for the display of store merchandise.  Tenant shall light the store window(s) and its exterior sign from dusk to dawn, seven (7) days per week, unless otherwise agreed in writing by Landlord.

Exhibit "G" - Page 1 of 2

13.     Landlord may refuse admission to the Shopping Center outside of ordinary business hours to any person not known to the watchman in charge or not having a pass issued by Tenant or not properly identified.  Landlord may require all persons admitted to, or leaving, the Shopping Center outside of ordinary business hours to register.

14.     Tenant shall not place any mats, trash or other objects on the sidewalks or Common Area.

15.     Landlord may, upon request by any tenant, waive the compliance by such tenant of any of the foregoing Rules and Regulations, provided that (i) no waiver shall be effective unless in writing and signed by Landlord or Landlord's authorized agent, (ii) any such waiver shall not relieve such tenant from the obligation to comply with such rule or regulation in other instances unless expressly consented to by Landlord, and (iii) any waiver granted to any tenant shall not relieve any other tenant from the obligation of complying with the foregoing Rules and Regulations unless such other tenant has received a similar waiver in writing from Landlord.

16.     On or before the Commencement Date, Tenant shall, at its own expense, install in the Demised Premises one or more fire alarms and/or smoke detectors, and a burglar or intrusion alarm system, of a quality and coverage satisfactory to Landlord.  At all times after the aforesaid installations and continuing throughout the Term of this Lease, Tenant shall keep such alarm(s), detector(s) and system(s) in good working order, condition and repair, and activated; provided, however, that the burglar or intrusion alarm system need not be activated during the hours the Demised Premises are open for business to the public.

Exhibit "G" - Page 2 of 2

## EXHIBIT "H"

## RENEWAL OPTIONS

Tenant (but not any assignee or subtenant of Tenant, even if Landlord's consent is obtained as required by Article 19 of this Lease) is granted the option(s) to extend the term of this Lease for two (2) consecutive periods of five (5) years each, provided (a) Tenant is not in default at the time of exercise of the respective option or at the commencement of the respective extended term, and (b) Tenant gives written notice of its exercise of the respective option at least three hundred sixty-five (365) days, but no more than five hundred forty-five (545) days, prior to the expiration of the original term or the expiration of the then existing term. Each extension term shall be upon the same terms, conditions and rentals (including a percentage rental rate equal to 4.75%), except (i) Tenant shall have no further right of renewal after the last extension term prescribed above; (ii) Tenant shall not be entitled to any payment or credit for tenant improvements or any abatement of rental; and (iii) the monthly minimum guaranteed rental will be as follows:

|  | ANNUAL RENT | MONTHLY INSTALLMENT |
|---|---|---|
| **First Extension Term** | | |
| Lease Year 16 | $353,015.88 | $29,417.99 |
| Lease Year 17 | $360,076.20 | $30,006.35 |
| Lease Year 18 | $367,277.76 | $30,606.48 |
| Lease Year 19 | $374,623.32 | $31,218.61 |
| Lease Year 20 | $382,115.76 | $31,842.98 |
| **Second Extension Term** | | |
| Lease Year 21 | $389,758.08 | $32,479.84 |
| Lease Year 22 | $397,553.28 | $33,129.44 |
| Lease Year 23 | $405,504.36 | $33,792.03 |
| Lease Year 24 | $413,614.44 | $34,467.87 |
| Lease Year 25 | $421,886.76 | $35,157.23 |

INITIALED:

LANDLORD: _____

TENANT: _____

## EXHIBIT "I"

## RESTRICTION ON SHOPPING CENTER

1.      The Restriction.  Subject to the conditions and exceptions mentioned below, Landlord agrees that during the original term and any renewal term of this Lease Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is (a) the operation of a Mexican-themed full service sit-down restaurant (it being agreed that a "sit-down restaurant" shall mean a restaurant where food and drink orders are primarily taken from, and served to, seated customers at tables by waitstaff), such as Uncle Julio's or On the Border, or (b) any kind of buffet-style restaurant (such as Golden Corral) (the "Restriction").

2.      Conditions.  The Restriction shall apply only as long as all of the following conditions exist:

        (a)      Tenant is occupying the Demised Premises and doing business in the manner permitted by Section 1(s) of this Lease; and

        (b)      There has not been an uncured event of default by Tenant under this Lease.

        Upon the failure of one or more of the above conditions, the Restriction shall automatically cease and shall thereafter be of no further force or effect.

3.      Exceptions.  The following exceptions apply to the Restriction:

        (a)      The Restriction shall not apply to presently existing leases, or to successors or assigns of tenants under such existing leases or to any lease renewals, expansions, extensions, relocations or replacements of such tenants.

        (b)      The Restriction shall not apply to any land located outside the present boundaries of the Shopping Center.

        (c)      If a court of competent jurisdiction or a governmental agency should determine the Restriction to be illegal or unenforceable, or if Landlord and Tenant should agree that the Restriction is illegal or unenforceable, the Restriction shall automatically cease and shall thereafter be of no further force or effect; moreover, Landlord and Tenant further agree that in such event the remainder of this Lease will continue in full force and effect.

INITIALED:

LANDLORD: _____

TENANT: _____

S:\Broad Street Realty\JCRS\Casa Bonita\Leasev8.doc