## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 21-13328-MER |
| SUMMIT FAMILY RESTAURANTS INC. | ) | |
| | ) | |
| | ) | Chapter 11 |
| | ) | Subchapter V |
| Debtor. | ) | |

---

### MOTION TO (A) APPROVE PURCHASE AND SALE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 363(b) AND (f); AND (B) TO ASSUME AND ASSIGN UNEXPIRED LEASE PURSUANT TO 11 U.S.C. § 365(f)

---

Summit Family Restaurants, Inc., Debtor-in-Possession herein, by and through its undersigned counsel, hereby submits its Motion to (a) Approve Purchase and Sale Agreement For the Sale of Substantially all of Debtor's Assets Free and Clear of All Liens, Claims and Encumbrances, pursuant to 11 U.S.C. §§ 363(b) and (f) and to Assume and Assign Unexpired Lease Pursuant to 11 U.S.C. § 365(f) (the "Motion"). In support of the Motion, Summit Family Restaurants, Inc. states as follows:

### I. BACKGROUND

1.      Summit Family Restaurants, Inc. ("Debtor" or "Summit") filed for relief under chapter 11 of the Bankruptcy Code on April 6, 2021 in the Bankruptcy Court for the District of Arizona under Case Number 21-02477-BKM. On June 23, 2021, venue of the case was transferred to the Bankruptcy Court for the District of Colorado under this case number. Debtor is acting as debtor-in-possession.

2.      Debtor owns and operates the famous Casa Bonita restaurant, located at 6715 W. Colfax Avenue, Lakewood, Colorado 80214. The intellectual property associated with Casa Bonita is owned by a different company, Casa Bonita Denver, Inc. ("CBDI").

Secured Claims

3.      Summit did not identify any secured claims on its Schedule D. During the course of the case, three secured claims were filed: (a) the secured claim of the Internal Revenue Service (the "IRS") in the sum of $175,910.04; (b) the secured claim of the U.S. Small Business Administration

("SBA") in the sum of $154,176.37; and (c) the secured claim of the Jefferson County Treasurer in the sum of $21,985.70. Summit does not dispute any of that debt. The total secured debt in the case, therefore, equals $352,072.11.

### The Landlord

4.      On or about September 12, 2014, Summit entered into a Shopping Center Lease, Lease Agreement with BSV Lamont JCRS LLC ("BSV") under which Summit leases the premises located at 6715 W. Colfax Avenue, Lakewood, Colorado (the "Lease").

5.      BSV filed a proof of claim asserting pre-petition damages against Summit in the amount of $1,064,529.05, including unpaid pre-petition rent and amounts alleged due under a certain liquidated damages clause. While Summit is current on its post-petition rental obligations, BSV alleges post-petition liquidated damages are due and owing as well.

6.      BSV and Summit entered into a Stipulation resolving BSV's claims in the bankruptcy case. The parties agreed BSV's damages claim is a general unsecured claim in the sum of $900,000.00, which amount is required to be paid under the Lease to cure the obligations thereunder. While nothing in the agreement between BSV and Summit alters Summit's ongoing obligation to pay rent, BSV has agreed to accept the sum of $900,000 in full and final satisfaction of all other sums due and owing. The parties are documenting the Stipulation, and the same will be filed with the Court at that time.

### Unsecured creditors

7.      After consideration of the secured claims and the settled claim of BSV, there remains an estimated $1,640,122.71 in outstanding claims, which amount includes estimated administrative claims, and of which $1,480,003.04 are disputed or contingent. A true and correct analysis of the outstanding claims in the case is attached hereto as **Exhibit 1**.

8.      Summit received two PPP loans from the SBA. As noted on the Claims Analysis, the first PPP loan was forgiven in its entirety and deemed paid in full. The second outstanding PPP loan makes up $1,001,563 of the $1,640,122.71 in unsecured claims. Summit expects most, if not all, of that loan will be forgiven. Out of an abundance of caution, however, the full $1,001,563 is included in the Claims Analysis.

9.      The other disputed claim in this case is the litigation claim of Samuel Hernandez. Mr. Hernandez filed an unsecured claim in the sum of $478,440.04. As with the PPP loan, out of an abundance of caution, the full amount of $478,440.04 is included in the universe of potential claims.

<u>The Asset Purchase Agreement</u>

10.     On or about September 23, 2021, Summit entered in an Asset Purchase Agreement (the "APA") with the Beautiful OPCO, LLC (the "Buyer"). In relevant part, the APA provides Buyer is purchasing substantially all of Summit's assets for the sum of $3,100,000.00 (the "Purchase Price"). A true and correct copy of the fully executed APA is attached hereto as **Exhibit 2**.[1]

11.     Buyer will wire the Purchase Price to Summit at closing. Other than as described herein, Summit will use the Purchase Price to fully and finally wind up its affairs through a Plan of Liquidation. Given Summit's Claims Analysis, the Purchase Price is in an amount sufficient to pay all claims in the case with room to spare.

12.     Summit picked this Buyer out of other interested parties. To that end, the APA specifically forbids Summit from soliciting other bids. Given the Buyer's offer is sufficient to pay all claims in the case in full, and that Buyer has committed significant time and resources to negotiating the terms of the APA at arm's length, Summit asserts said term is commercially reasonable.

13.     As part of the APA, Summit is assigning the Lease to the Buyer and Buyer is assuming the Lease. The APA contemplates Summit using $900,000.00 of the Purchase Price to cure Summit's obligation to BSV. BSV has agreed to said treatment. The ongoing obligations under the Lease are the sole and exclusive obligation of Summit which Buyer is assuming under the APA.

14.     In accordance with L.B.R. 6004-1(b), Summit highlights the following terms of the APA:

a.      **Private Sale/No Competitive Bidding**. As noted, the proposed sale is a private sale and the APA specifically forbids Summit from soliciting other bids. Given the Purchase Price is sufficient to pay all creditors in full, Summit asserts the term is reasonable.

b.      **Closing and Other Deadlines**. The Closing Date has been set for two-days following the conclusion of all conditions precedent to closing, which are described in Article IX and X of the APA. It is anticipated closing will take place within two (2) days after the order approving this Motion is considered final.

---

1 A separate Asset Purchase Agreement was entered into between CBDI and The Beautiful House, LLC, an entity related to the Buyer. Because CBDI is not a debtor in bankruptcy, the agreement between CBDI and The Beautiful House, LLC is not subject to the jurisdiction of this Court.

c.     **Use of Proceeds**. This sale motion requests authority for Summit to immediately distribute the sum of $900,000.00 of the Purchase Price to BSV without further Order from the Court. The $900,000.00 represents the agreed cure obligation to BSV which will allow Summit to assume and assign the Lease to Buyer. The remaining proceeds will be placed in Summit's Debtor-in-Possession account and used to fund a liquidating subchapter v Plan to pay the remaining creditors in full. Debtor will not use the Purchase Price for any purpose without further Order of this Court.

d.     **Record Retention**. Notwithstanding the sale of substantially all of its assets, Summit will retain access to all of its books and records as necessary to administer its bankruptcy estate.

e.     **Successor Liability**. Summit and Buyer seek a finding that Buyer is not a "successor" to Summit or its bankruptcy estate by any theory of law or equity.

f.     **Relief from Fed.R.Bankr.P. 6004(h)**. Summit seeks relief from the fourteen-day stay imposed by Fed.R.Bankr.P. 6004(h).

## II. RELIEF REQUESTED

<u>Approval of the APA</u>

15.     The Bankruptcy Court's power to authorize a sale under section 363(b) is to be exercised at the Court's discretion. *In re WPRV-TV, Inc.*, 983 F.2d 336, 340 (1st Cir. 1993); *New Haven Radio, Inc. v. Meister (In re Martin-Trigona)*, 760 F.2d 1334, 1346 (2d Cir. 1985); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1069 (2d Cir. 1983).

16.     "In order to approve a sale of substantially all the Debtor's assets outside the ordinary course of business, the following elements must be met. The Debtor must show (1) that a sound business reason exists for the sale; (2) there has been adequate and reasonable notice to interested parties, including full disclosure of the sale terms and the Debtor's relationship with the buyer; (3) that the sale price is fair and reasonable; and (4) that the proposed buyer is proceeding in good faith." *In re Med. Software Solutions*, 286 B.R. 431, 439-440 (Bankr. D. Utah 2002).

17.     A sound business reason exists for the sale. The sale under the APA maximizes the value of Casa Bonita and provides Summit with sufficient resources to pay all its creditors in full.

18.     There has been adequate and reasonable notice to interested parties.  The sale in this case has generated national attention.  Summit filed a Status Report on August 18, 2021 advising the Court and parties in interest regarding the sale plan.  Additionally, notice of this Motion is being provided to all creditors in accordance with Fed.R.Bankr.P. 2002 and L.B.R. 2002-1.

19.     Finally, the Purchase Price is fair and reasonable.  While there could be the potential for a higher purchase price for Summit's assets if the sale was subject to competitive bidding, the Purchase Price is sufficient to pay all Summit's creditors in full, and Summit selected the Buyer as the best steward for Casa Bonita moving forward.

20.     The Buyer is proceeding in good faith.  While the Bankruptcy Code does not define "good faith," courts have held that for purposes of section 363(m), a "good faith purchaser" is one who buys "in good faith" and "for value" and that lack of good faith is shown by fraud, collusion, or an attempt to take grossly unfair advantage of other bidders.  *In re Abbots Diaries of PA.*, 788 F.2d 143, 147 (3d Cir. Pa. 1986); *In re Tempo Technology Corp.*, 202 B.R. 363, 367 (D. Del. 1996).

21.     The sale is the product of arm's length negotiations between Summit and the Buyer.  The Buyer is a neutral third-party buyer with no prior connection to Summit or its management.  The sale to the Buyers is in good faith and for fair market value.

22.     Summit further requests the sale of substantially all its assets to Buyer be free and clear of all liens, claims, and encumbrances except those expressly assumed and assigned.  Pursuant to 11 U.S.C. § 363(f)(3), a debtor may sell property "free and clear of any interest in such property" if the sale price is greater than the aggregate amount of the liens against the property.  Here, the Purchase Price is $3,100,000.00.  The liens against Summit's assets total approximately $352,072.11.  Thus, the sale of substantially all Summit's assets to the Buyer free and clear of any liens, claims and encumbrances is appropriate pursuant to 11 U.S.C. § 363(f)(2).

23.     The Buyer here is also requesting that the Court find that it is not a "successor" to the debtor for purposes of successor liability.  While there is some law to the contrary, the modern trend in the law is to read § 363(f)'s "interest in such property" language broadly to include not just liens against the property being sold, but also claims that arose from ownership of the property. *See In re Chrysler LLC*, 576 F.3d 108, 123–26 (2d Cir.2009) (product liability claims), *vacated as moot sub nom. Ind. State Police Pension Trust v. Chrysler LLC,* 558 U.S. 1087, 130 S.Ct. 1015, 175 L.Ed.2d 614 (2009); *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–90 (3d Cir.2003) (airline workers' employment discrimination claims and flight attendants' rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581–82, 585 (4th Cir.1996) (debtors' obligation to pay

premiums under federal statutes imposing liability on "operators," "related persons," and "successors in interest"); *In re PBBPC, Inc.*, 484 B.R. 860, 867–70 (1st Cir. BAP 2013) (unemployment agency's right to tax asset purchaser based on asset seller's experience rating); *see also Ouray Sportswear, LLV v. Indus. Claim Appeals Off.*, 315 P.3d 1280, 1282-83 (2013) (bankruptcy court may authorize sale free and clear of successor liability claims); 3 Alan M. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 363.06(1) (16th ed. 2013) ("[T]he trend seems to be in favor of a broader definition that encompasses other obligations that may flow from ownership of the property.").

24.     The sale of substantially all of Summit's assets to Buyer in accordance with the terms of the APA, free and clear of all liens, claims, and encumbrances, including any successor liability claims, is in the best interest of Summit, its estate, and its creditors. The sale will allow Summit to maximize the value of its assets, and to pay all allowed claims in full.

        Assumption and Assignment of the Lease.

25.     Summit further seeks authorization to assume the Lease and assign the Lease to Buyer upon closing of the Sale. The Lease is attached hereto as **Exhibit 3**.

26.     Pursuant to 11 U.S.C. § 365(f)(2), a debtor may assign an executory contract or unexpired lease if the debtor assumes the lease in accordance with Section 365 and "adequate assurance of future performance by the assignee of such contract of lease is provided, whether or not there has been a default in such contract of lease."

27.     Assumption or rejection of executory contracts or unexpired leases by a debtor is subject to Court review under the business judgment standard. See *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *In re Mile High Medal Systems, Inc.*, 899 F.2d 887, 896 (10th Cir. 1990); *In re Grayhall Resources, Inc.*, 63 B.R. 382, 384 (Bankr. D. Colo. 1986).

28.     Pursuant to the business judgment test, the debtor's decision to assume or reject an executory contract or an unexpired lease should be approved when the debtor decides, in good faith, that assumption or rejection is beneficial to the estate. *In re Chipwich, Inc.*, 54 B.R. 427, 430-431 (Bankr. S.D.N.Y. 1985) ("it is enough, if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate"). Under Section 365(a), "the debtor's business judgment should not be interfered with, absent a showing of bad faith or abuse of business discretion." *Chipwich, Inc.*, 54 B.R. 430-31. As stated by one court, "Court approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course." *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981).

29.     Summit, in exercising its business judgment, has determined the Lease provides a

benefit to the estate, as it is through maintaining the Lease that Casa Bonita can remain in operation. BSV has agreed to accept the sum of $900,000.00 from Summit out of the Purchase Price to cure any and all outstanding defaults and has consented to assumption of the Lease from the Buyer.

30.     There is adequate assurance of future performance by Buyer. Buyer has significant resources and has partnered with an entity with substantial experience in the hospitality industry, who owns and operates a number of restaurants in the greater Denver area. Between Buyer's experience and resources, there is adequate assurance of further performance by the Buyer.

WHEREFORE, the Debtor requests the Court enter an Order:

(a)     Authorizing Summit to sell substantially all its assets to Buyer, pursuant to the APA, and for the sum of $3,100,000.00, other than in the ordinary course of business, free and clear of all liens and interests pursuant to 11 U.S.C. § 363(b) and (f) with any liens and other interests attaching to proceeds of sale;

(b)     Authorizing Debtor to assume and assign the Lease to Buyer, and to distribute the $900,000.00 cure amount to BSV after closing of the sale and without further Order of this Court;

(c)     Suspend the fourteen-day stay of Fed.R.Bankr.P. 6004(h); and

(d)     For such other and further relief as the Court deems appropriate.

DATED this 27th day of September, 2021.

Respectfully submitted,

/s/Jonathan M. Dickey

Jonathan M. Dickey, #46981
KUTNER BRINEN DICKEY RILEY, P.C.
1660 Lincoln Street, Suite 1720
Denver, CO 80264
jmd@kutnerlaw.com
Telephone: 303-832-3047
Attorneys for the Debtor

## CERTIFICATE OF SERVICE

I certify that on September 27, 2021, I served a complete copy of the foregoing **MOTION TO (A) APPROVE PURCHASE AND SALE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. SECTION 363(b) AND (f); AND (B) TO ASSUME AND ASSIGN UNEXPIRED LEASE PURSUANT TO 11 U.S.C. SECTION 365(f) AND NOTICE OF MOTION TO (A) APPROVE PURCHASE AND SALE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. SECTION 363(b) AND (f); AND (B) TO ASSUME AND ASSIGN UNEXPIRED LEASE PURSUANT TO 11 U.S.C. SECTION 365(f)** on the following parties in compliance with the Federal Rules of Bankruptcy Procedure and the Court's Local Rules:

Robert Samuel Boughner, Esq.
US Trustee's Office
Byron G. Rogers Federal
Building
1961 Stout Street
Suite 12-200
Denver, CO 80294

Christopher C. Simpson,
Trustee
Osborn Maledon PA
2929 North Central Avenue
Suite 2100
Phoenix, AZ 85012

Matthew D. Skeen, Jr., Esq.
217 East 7th Avenue
Denver, CO 80203

D. Lamar Hawkins, Esq.
Guidant Law Firm
402 East Southern Avenue
Tempe, AZ 85282

Patty Chan, Esq.
Office of the U.S. Trustee
230 North First Avenue
Suite 204
Phoenix, AZ 85003

Bradley D. Pack, Esq.
Engelman Berger, P.C.
2800 North Central Avenue
Suite 1200
Phoenix, AZ 85004

Christopher J. Dawes, Esq.
Fox Rothschild – Denver
1225 17th Street
Suite 2200
Denver, CO 80202

Patrick F. Keery, Esq.
Keery McCue, PLLC
6803 East Main Street
Suite 1116
Scottsdale, AZ 85251

Heather L. Ries, Esq.
Fox Rothschild LLP
777 South Flagler Drive
Suite 1700 West Tower
West Palm Beach, FL 33401-6159

Jefferson County Treasurer
100 Jefferson County Pkwy
2520
Golden, CO 80419

```
Internal Revenue Service              The Beautiful Opco, LLC
PO Box 7346                           2381 Rosecrans Ave., Suite
Philadelphia, PA 19101-7346           350
                                      El Segundo, CA 90246
United States Small Business          Attn: General Counsel
Administration
c/o Ted Lam, District Counsel         The Beautiful Opco, LLC
312 N. Spring Street, 5th             c/o DLA Piper LLP (US)
Floor                                 2000 Avenue of the Stars
Los Angeles, CA 90012                 North Tower, Suite 400
                                      Los Angeles, CA 90067
```

**/s/Vicky Martina**_____
**Vicky Martina**
**Kutner Brinen Dickey Riley PC**

Execution Version

## ASSET PURCHASE AGREEMENT

### BY AND BETWEEN

**SUMMIT FAMILY RESTAURANTS INC.,**
**as debtor in possession,**

### AND

### THE BEAUTIFUL OPCO, LLC

**September 23, 2021**

## TABLE OF CONTENTS
(continued)

                                                                                            Page

ARTICLE I DEFINITIONS ................................................................................................ 1

    Section 1.1    Definitions ......................................................................................... 1
    Section 1.2    Other Definitions and Interpretive Matters ................................. 6

ARTICLE II PURCHASE AND SALE ............................................................................... 8

    Section 2.1    Purchase and Sale of the Acquired Assets ................................. 8
    Section 2.2    Excluded Assets ................................................................................ 8
    Section 2.3    Assumed Liabilities ......................................................................... 8
    Section 2.4    Excluded Liabilities ......................................................................... 9
    Section 2.5    Assignments ..................................................................................... 9
    Section 2.6    Further Assurances ......................................................................... 9

ARTICLE III PURCHASE PRICE ..................................................................................... 10

    Section 3.1    Purchase Price ................................................................................. 10
    Section 3.2    Closing Date Payment ..................................................................... 10
    Section 3.3    Allocation of Purchase Price .......................................................... 10
    Section 3.4    Satisfaction of Claims ..................................................................... 10

ARTICLE IV CLOSING ...................................................................................................... 10

    Section 4.1    Closing Date ..................................................................................... 10
    Section 4.2    Buyer's Deliveries .......................................................................... 11
    Section 4.3    Seller's Deliveries .......................................................................... 11

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER ..................... 11

    Section 5.1    Organization and Good Standing ................................................. 11
    Section 5.2    Authority; Validity; Consents ......................................................... 11
    Section 5.3    No Conflicts; Consents .................................................................... 12
    Section 5.4    Title to Acquired Assets ................................................................. 12
    Section 5.5    Material Contracts .......................................................................... 12
    Section 5.6    Intellectual Property ....................................................................... 13
    Section 5.7    Legal Proceedings .......................................................................... 15
    Section 5.8    Leased Premises ............................................................................. 15
    Section 5.9    Compliance with Law; Permits ..................................................... 15
    Section 5.10   Employment Matters ...................................................................... 15
    Section 5.11   Affiliate Transactions ..................................................................... 16
    Section 5.12   Brokers or Finders .......................................................................... 16

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER ..................... 16

    Section 6.1    Organization and Good Standing ................................................. 16
    Section 6.2    Authority; Validity ........................................................................... 16
    Section 6.3    No Conflict; Consents ...................................................................... 17
    Section 6.4    Availability of Funds; Solvency ...................................................... 17

ii

**TABLE OF CONTENTS**
(continued)

Page

Section 6.5    Litigation ........................................................................ 17
Section 6.6    Brokers or Finders ........................................................ 17

ARTICLE VII ACTIONS PRIOR TO THE CLOSING DATE .................... 17

Section 7.1    Operations Prior to the Closing Date ............................ 17
Section 7.2    Bankruptcy Court Filings and Approval ........................ 18
Section 7.3    Access to Information .................................................... 19
Section 7.4    No Solicitation of Other Bids ........................................ 19

ARTICLE VIII ADDITIONAL AGREEMENTS .................................... 20

Section 8.1    Taxes ............................................................................ 20
Section 8.2    Payments Received ........................................................ 20
Section 8.3    Confidentiality .............................................................. 20

ARTICLE IX CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO
            CLOSE ............................................................................ 21

Section 9.1    Accuracy of Representations .......................................... 21
Section 9.2    Seller's Performance ...................................................... 21
Section 9.3    No Order ........................................................................ 21
Section 9.4    Seller's Deliveries .......................................................... 21
Section 9.5    Sale Order ...................................................................... 22
Section 9.6    Closing of CDBI Acquisition ........................................ 22

ARTICLE X CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO
            CLOSE ............................................................................ 22

Section 10.1    Accuracy of Representations ........................................ 22
Section 10.2    Buyer's Performance .................................................... 22
Section 10.3    No Order ...................................................................... 22
Section 10.4    Buyer's Deliveries ........................................................ 22
Section 10.5    Sale Order in Effect ...................................................... 22

ARTICLE XI INDEMNIFICATION .................................................... 22

Section 11.1    Survival ........................................................................ 22
Section 11.2    Indemnification by Seller ............................................ 23
Section 11.3    Indemnification by Buyer ............................................ 23
Section 11.4    Tax Treatment of Indemnification Payments ................ 23
Section 11.5    Limitation .................................................................... 23
Section 11.6    Effect of Investigation .................................................. 23
Section 11.7    Cumulative Remedies .................................................. 23

iii

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| **ARTICLE XII TERMINATION** | | 24 |
| Section 12.1 | Termination Events | 24 |
| **ARTICLE XIII GENERAL PROVISIONS** | | 25 |
| Section 13.1 | Notices | 25 |
| Section 13.2 | Amendment; Waiver | 26 |
| Section 13.3 | Entire Agreement | 26 |
| Section 13.4 | No Presumption as to Drafting | 26 |
| Section 13.5 | Assignment | 27 |
| Section 13.6 | Severability | 27 |
| Section 13.7 | Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver | 27 |
| Section 13.8 | Counterparts | 28 |
| Section 13.9 | Parties in Interest; No Third Party Beneficiaries | 28 |
| Section 13.10 | Specific Performance | 28 |
| **EXHIBIT A FORM OF SALE ORDER** | | 2 |

iv

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of September 23, 2021 (the "Effective Date"), by and between Summit Family Restaurants Inc., a Delaware corporation operating as a debtor in possession in chapter 11 ("Seller"), and The Beautiful Opco, LLC (a "Buyer"). Buyer and the Seller collectively are referred to herein as the "Parties" and each, a "Party". Capitalized terms used herein and not otherwise defined herein have the meaning set forth in Article I.

## RECITALS

WHEREAS, Seller is in the business (the "Business") of owning and operating the "Casa Bonita" restaurant located in Lakewood, Colorado (the "Restaurant");

WHEREAS, Seller filed a voluntary petition pursuant to Subchapter V of Chapter 11 of the Bankruptcy Code on April 6, 2021 (the "Petition Date") in the United States Bankruptcy Court for the District of Arizona under Case Number 21-02477-BKM. On June 23, 2021, venue of the case was transferred to the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court"), Case No. 21-13328-MER (the "Bankruptcy Case");

WHEREAS, Seller believes that, in light of the current circumstances, a sale of substantially all of its assets free and clear of Encumbrances, as provided herein is necessary to preserve and maximize value, and is in the best interest of Seller, its creditors, and stakeholders;

WHEREAS, Seller desires to sell to Buyer all of the Acquired Assets (defined below) and transfer to Buyer the Assumed Liabilities (defined below) and Buyer desires to purchase from Seller all of the Acquired Assets and assume all of the Assumed Liabilities, in each case upon the terms and conditions hereinafter set forth;

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions. For purposes of this Agreement, the following terms have the meanings specified or referenced below.

WEST\295910467.8

"<u>Acquired Assets</u>" shall have the meaning set forth in <u>Section 2.1</u>.

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble.

"<u>Allocation Schedule</u>" shall have the meaning set forth in <u>Section 3.3</u>.

"<u>Assigned Agreements</u>" means the Contracts listed or described in <u>Schedule 2.1(a)</u>.

"<u>Assumed Liabilities</u>" shall have the meaning set forth in <u>Section 2.3</u>.

"<u>Avoidance Actions</u>" means any and all claims for relief of Seller under chapter 5 of the Bankruptcy Code, or state fraudulent conveyance, fraudulent transfer or other similar state laws.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, Sections 101 <u>et seq</u>.

"<u>Bankruptcy Court</u>" shall have the meaning set forth in the Recitals.

"<u>Business</u>" shall have the meaning set forth in the Recitals.

"<u>Business Day</u>" means any day of the year, other than a Saturday or Sunday, on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized by Law to close.

"<u>Buyer</u>" shall have the meaning set forth in the Preamble.

"<u>Buyer Termination Notice</u>" shall have the meaning set forth in <u>Section 12.1(c)(i)</u>.

"<u>Cash Consideration</u>" shall have the meaning set forth in <u>Section 3.1</u>.

"<u>CBDI Acquisition</u>" means the transactions contemplated by that certain Asset Purchase Agreement, dated as of the date hereof, between The Beautiful House, LLC and Casa Bonita Denver, Inc.

"<u>Claims</u>" means all claims, causes of action, rights of recovery (including rights of indemnity, warranty rights, rights of contribution, rights to refunds and rights to reimbursement) and rights of set-off, in each case, of whatever kind or description against any Person.

"<u>Closing</u>" shall have the meaning set forth in <u>Section 4.1</u>.

"<u>Closing Date</u>" shall have the meaning set forth in <u>Section 4.1</u>.

"<u>Closing Legal Impediment</u>" shall have the meaning set forth in <u>Section 9.3</u>.

2

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, agreement, undertaking, license, sublicense, sales order, purchase order or other commitment, whether written or oral (including commitments to enter into any of such), that is binding on any Person or any part of its property under applicable Law.

"Cure Costs" means amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the of the Assigned Agreements, as determined by the Bankruptcy Court. For the avoidance of doubt, Cure Costs do not include (i) any amounts that must be paid and obligations that otherwise must be satisfied with respect to the period of time from the Petition Date to the Closing Date, or (ii) the Liquidated Damages.

"Documents" means all books, records, files, invoices, inventory records, product specifications, customer lists and other customer-related information, cost and pricing information, supplier lists, business plans, personnel records, catalogs, customer literature, quality control records and manuals and credit records of customers relating to any Acquired Asset, including all data and other information stored on hard drives (including those located on remote servers, whether operated by Seller or by Third Party providers), discs, tapes or other media.

"Effective Date" shall have the meaning set forth in the Preamble.

"Encumbrance" means any charge, lien, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Governmental Authority" means any United States federal, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, or any court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court.

"Governmental Authorization" means any approval, consent, license, permit, waiver or other authorization issued granted or otherwise made available by or under the authority of any Governmental Authority.

"Intellectual Property" means all intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing, however arising, pursuant to the Laws of any jurisdiction throughout the world, whether registered or unregistered, including any and all: (a) trademarks, service marks, trade names, brand names, logos, trade dress, design rights and other similar designations of source, sponsorship, association or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications and renewals for, any of the foregoing; (b) internet domain names, whether or not trademarks, registered in any top-level

3

domain by any authorized private registrar or Governmental Authority, web addresses, web pages, websites and related content, accounts with Twitter, Facebook, Instagram, and other social media companies and the content found thereon and related thereto, and URLs; (c) works of authorship, expressions, designs and design registrations, including copyrights, author, performer, moral and neighboring rights, and all registrations, applications for registration and renewals of such copyrights; (d) inventions, discoveries, trade secrets, business and technical information and know-how, databases, architectural and engineering plans, data collections and other confidential and proprietary information and all rights therein; (e) patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions thereof), patent applications, and other patent rights and any other Governmental Authority-issued indicia of invention ownership (including inventor's certificates, petty patents and patent utility models); (f) software and firmware, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation; (g) royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and (h) all rights to any Proceedings of any nature available to or being pursued by Seller to the extent related to the foregoing, whether accruing before, on or after the date hereof, including all rights to and claims for damages, restitution and injunctive relief for infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief, and to collect, or otherwise recover, any such damages.

"Intellectual Property Agreements" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property that is used in or necessary for the conduct of the Business as currently conducted to which Seller is a party, beneficiary or otherwise bound.

"Intellectual Property Assets" means all Intellectual Property that is owned by Seller and used in or necessary for the conduct of the Business as currently conducted.

"Intellectual Property Registrations" means all Intellectual Property Assets that are the subject of any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"Knowledge" means, with respect to any matter in question, in the case of Seller, the actual knowledge of each of Bob Wheaton and Ron Dowdy; and (b) the knowledge that any such person referenced in clause (a) above, as a prudent business person, would have obtained after making due inquiry with respect to the particular matter in question, with respect to such matter.

"Law" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority.

"Lease" means the Lease, dated, between September 12, 2014, between BSV Lamont JRS LLC and Seller, with respect to the Premises.

4

"<u>Liability</u>" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"<u>Liquidated Damages</u>" means the "liquidated damages" claimed prior to the Petition Date against Seller pursuant to Section 9.1 of the Lease.

"<u>Material Adverse Effect</u>" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments and events has had, or would reasonably be expected to have, a material adverse effect on the Seller or the Acquired Assets, taken as a whole.

"<u>Order</u>" means any award, writ, injunction, judgment, order or decree entered, issued, made or rendered by any Governmental Authority.

"<u>Outside Date</u>" shall have the meaning set forth in <u>Section 12.1(b)(ii)</u>.

"<u>Party</u>" or "<u>Parties</u>" means, individually or collectively, Buyer and Seller.

"<u>Permits</u>" means permits, licenses, registrations, consents, certificates, grants, waivers, qualifications, approvals and all other authorizations by or of Governmental Authorities.

"<u>Person</u>" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"<u>Petition Date</u>" shall have the meaning set forth in the Recitals.

"<u>Premises</u>" means leased premises of the Restaurant located at 6715, 6719, and 6731 W. Colfax Ave., Lakewood, CO 80214.

"<u>Proceeding</u>" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority, other than an Avoidance Action.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Representative</u>" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"<u>Sale Hearing</u>" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"<u>Sale Order</u>" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, which Order shall (a) be substantially in the form attached hereto as <u>Exhibit A</u>, with such changes as the Parties have mutually agreed upon, (b) be in a form

5

acceptable to Buyer in its sole discretion; and (c) provide that the Buyer is a buyer in good faith in accordance with Bankruptcy Code section 363(m), and that the Buyer is entitled to all the protections thereof.

"Seller" shall have the meaning set forth in the Preamble.

"Seller Termination Notice" shall have the meaning set forth in Section 12.1(d)(i).

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"Tax" or "Taxes" means any federal, state, provincial, local, municipal, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, escheat, unclaimed property, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto), in each case imposed by any Governmental Authority.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed with or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Third Party" means a Person who or which is neither a Party nor an Affiliate of a Party.

"Transaction Documents" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transfer Taxes" shall have the meaning set forth in Section 8.1(a).

Section 1.2    Other Definitions and Interpretive Matters.

(a)    Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

WEST\295910467.8

(ii)     Any reference in this Agreement to $ means U.S. dollars.

(iii)     Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement. No reference to or disclosure of any item or other matter in the Exhibits and Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Exhibits and Schedules. No disclosure in the Exhibits and Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. Any information, item or other disclosure set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedule is reasonably apparent from the facts specified in such disclosure. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)     Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)     The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement unless otherwise specified.

(vi)     Words such as "herein," "hereof" and "hereunder" refer to this Agreement as whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii)     The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)     No Strict Construction.  Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

7

## ARTICLE II

## PURCHASE AND SALE

Section 2.1    Purchase and Sale of the Acquired Assets.  Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code and subject to the terms and conditions of this Agreement, on the Closing Date, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances, all right, title and interest of Seller in, to or under the following (collectively, the "Acquired Assets"):

(a)    all Assigned Agreements;

(b)    all leaseholder rights of Seller under the Lease and otherwise related to the Premises;

(c)    the Intellectual Property Assets, including, without limitation, the Intellectual Property of the Business or otherwise owned or held for use by Seller related to the "Casa Bonita" restaurant brand or the Restaurant;

(d)    any tangible or intangible property that incorporates any Intellectual Property described in Section 2.1(c) (whether or not such Intellectual Property is owned by Seller), including, without limitation, merchandise, signage, stationary, menus, websites, internet domains and social media accounts;

(e)    all Claims of Seller (other than warranty claims and Avoidance Actions) to the extent arising out of, or relating to, the assets referenced in clauses (a) and (b) of this Section 2.1;

(f)    all inventory (including all raw materials, supplies, work-in-process, finished goods, goods in transit, returned goods and other items included in inventory), in each case to the extent located at or in transit to the Restaurant;

(g)    all Permits, to the extent transferable, including, without limitation, the liquor license for the Restaurant (the "Acquired Permits");

(h)    all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property, in each case to the extent located at the Restaurant;

(i)    true and complete copies of all Documents; and

(j)    all goodwill associated with the assets referenced in this Section 2.1.

Section 2.2    Excluded Assets.  All assets of the Seller not constituting Acquired Assets are expressly excluded from the purchase and sale contemplated hereby.

Section 2.3    Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Buyer shall assume and agree to perform and discharge, when due (in

8

accordance with their respective terms and subject to the respective conditions thereof), all Liabilities under the Assigned Agreements arising after the Closing (the "Assumed Liabilities"); provided, however, without limiting the foregoing, Buyer is not assuming any liability for Liquidated Damages under the Lease.

Section 2.4    Excluded Liabilities.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge, and Seller shall be solely and exclusively liable with respect to, any Liability of Seller that is not an Assumed Liability (such Liabilities, collectively, the "Excluded Liabilities").

Section 2.5    Assignments.  Seller shall transfer and assign all Assigned Agreements to Buyer, and Buyer shall assume all Assigned Agreements from Seller, as of the Closing pursuant to, inter alia, Section 365 of the Bankruptcy Code and the Sale Order.  Notwithstanding anything to the contrary in this Agreement, to the extent that the assignment to Buyer of any Assigned Agreement is not approved by the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment or an undertaking or attempt to assign the same or any right or interest therein if such consent is not given and the Closing shall proceed with respect to the remaining Assigned Agreements with a reduction in the Purchase Price as mutually agreed upon by the Parties or by order of the Bankruptcy Court; provided, however, that Seller will use its commercially reasonable efforts to obtain any such consents to assign such Assigned Agreements to Buyer.

Section 2.6    Further Assurances.  At the Closing, Seller shall, upon Buyer's request, execute and deliver to Buyer such other instruments of transfer as shall be reasonably necessary to vest in Buyer title to the Acquired Assets and such other instruments as shall be reasonably necessary to evidence the assignment by Seller and assumption by Buyer of the Assigned Agreements, and each of Seller, on the one hand, and Buyer, on the other hand, shall use its commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary under applicable Law, and execute and deliver such instruments and documents and to take such other actions, as may be required to consummate the transactions contemplated by this Agreement at or after the Closing; provided that nothing in this Section 2.6 shall prohibit Seller from ceasing operations or winding up its affairs following the Closing.  In furtherance and not in limitation of the foregoing, in the event that any of the Acquired Assets shall not have been conveyed at Closing, Seller shall use commercially reasonable efforts to convey such Acquired Assets to Buyer as promptly as practicable after the Closing.  With respect to each Assigned Agreement, Buyer shall make reasonable efforts to provide "adequate assurance of future performance" as required under Bankruptcy Code Section 365(b)(1)(c) of the future performance by Buyer of each such Assigned Agreement.  Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate  demonstration of adequate assurance of future performance under the Assigned Agreements, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making  Buyer's and Seller's Representatives available to testify before the Bankruptcy Court.

9

## ARTICLE III

## PURCHASE PRICE

Section 3.1    Purchase Price.  The purchase price (the "Purchase Price") for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Acquired Assets shall consist of:

      (a)      $3,100,000 (the "Cash Consideration"); and

      (b)      the assumption of the Assumed Liabilities.

Section 3.2    Closing Date Payment.    At the Closing, Buyer shall pay the Cash Consideration to Seller by wire transfer of immediately available funds to an account as designated to Buyer by Seller in writing at least two (2) Business Days prior to the Closing.

Section 3.3    Allocation of Purchase Price.  Set forth on Schedule 3.3 attached hereto is a schedule allocating the Purchase Price (as may be adjusted pursuant to the terms of this Agreement) among the Acquired Assets, including the Assumed Liabilities to the extent such Liabilities are required to be treated as part of the purchase price for Tax purposes in accordance with Section 1060 of the Code (the "Allocation Schedule").  Buyer and Seller will each file all Tax Returns (including IRS Forms 8594) consistent with the Allocation Schedule(s) established in accordance with this Section 3.3.  Seller, on the one hand, and Buyer, on the other hand, each agree to provide the other promptly with any other information required to complete IRS Forms 8594. Neither Buyer nor any Seller shall take any Tax position inconsistent with such Allocation Schedule, and neither Buyer nor any Seller shall agree to any proposed adjustment based upon or arising out of the Allocation Schedule by any Governmental Authority without first giving the other Party prior written notice; provided, however, that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Allocation Schedule, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of such Allocation Schedule.

Section 3.4    Satisfaction of Claims.  Sellers covenants to promptly after the Closing Date use the Purchase Price to pay off and satisfy all claims of creditors of Seller, including without limitation the Cure Costs, except to the extent it is permitted to, and does, object to such claims in accordance with the Bankruptcy Code.  It is understood Seller will satisfy all claims of its creditors, with the exception of the Assumed Liabilities, via a confirmed Chapter 11 Plan in the Bankruptcy Case.

## ARTICLE IV

## CLOSING

Section 4.1    Closing Date.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place via the electronic exchange of the Transaction Documents no later than the second (2nd) Business Day following the date on which

WEST\295910467.8

the conditions set forth in Article IX and Article X have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or at such other place or time as Buyer and the Seller may mutually agree. The date and time at which the Closing actually occurs is referred to as the "Closing Date."

Section 4.2    Buyer's Deliveries. At the Closing, Buyer shall deliver to Seller:

      (a)    the Cash Consideration;

      (b)    each other Transaction Document not previously executed to which Buyer is a party, duly executed by Buyer;

      (c)    the certificates of Buyer to be received by Seller pursuant to Section 10.1 and 10.2.

Section 4.3    Seller's Deliveries. At the Closing, Seller shall deliver to Buyer:

      (a)    each other Transaction Document to which Seller is a party, duly executed by Seller;

      (b)    a copy of the Sale Order entered by the Bankruptcy Court;

      (c)    the certificates of Seller to be received by Buyer reasonably satisfactory to Buyer pursuant to Section 9.1 and 9.2;

      (d)    a certificate of non-foreign status executed by Seller prepared in accordance with Treasury Regulation Section 1.1445-2(b); and

      (e)    such bills of sale, deeds, endorsements, assignments, and other good and sufficient instruments, in form reasonably satisfactory to Buyer, which are reasonably necessary to vest in Buyer all the right, title and interest of Seller in, to or under any or all of the Acquired Assets free and clear of Encumbrances.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer that the statements contained in this Article V are true and correct as of the date hereof:

Section 5.1    Organization and Good Standing. Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization. Subject to the limitations imposed on such Seller as a result of the Bankruptcy Case, Seller has the requisite corporate power and authority to own or lease and to operate and use its properties.

Section 5.2    Authority; Validity; Consents. Seller has, subject to requisite Bankruptcy Court approval, as applicable, the requisite corporate power and authority necessary to enter into

11

and perform its obligations under this Agreement and the other Transaction Documents and to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing. Subject to requisite Bankruptcy Court approval, as applicable, this Agreement and the other Transaction Documents constitute, with respect to Seller, the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

Section 5.3    No Conflicts; Consents. The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Order applicable to Seller, the Business or the Acquired Assets; (c) conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which Seller is a party or by which Seller or the Business is bound or to which any of the Acquired Assets are subject (including any Assigned Agreement); or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Acquired Assets. Subject to, and after giving effect to, requisite Bankruptcy Court approval (including, without limitation, the Sale Order), as applicable, and except (a) for entry of the Sale Order and (b) for notices, filings and consents required in connection with the Bankruptcy Case, Seller is not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby.

Section 5.4    Title to Acquired Assets.  Immediately prior to Closing, Seller will have and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and subject to the terms of the Sale Order, Seller will thereby transfer to Buyer, good and marketable title to or, a valid contractual interest in all of the Acquired Assets free and clear of all Encumbrances.

Section 5.5    Material Contracts.

(a)    Schedule 5.5 lists each of the following Contracts (x) by which any of the Acquired Assets are bound or affected or (y) to which Seller is a party or by which it is bound in connection with the Business or the Acquired Assets (such Contracts, together with the Lease and all Intellectual Property Agreements set forth in Schedule 5.6(b) of the Disclosure Schedules, being "Material Contracts"):

(i)    all Contracts involving aggregate consideration or amounts in excess of $10,000;

(ii)    all customer, supplier, broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts;

(iii)    all employment agreements and Contracts with employees, independent contractors or consultants (or similar arrangements);

(iv)    all Contracts relating to indebtedness (including, without limitation, guarantees);

(v)    all joint venture, partnership or similar Contracts;

(vi)    all Contracts for the sale of any of the Acquired Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Acquired Assets or with respect to any restriction on any Acquired Asset;

(vii)    all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds or grants an interest in real property; and

(viii)    all other Contracts that are material to the Acquired Assets or the operation of the Business and not previously disclosed pursuant to this Section 5.5.

(b)    Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer.

(c)    Each Assigned Agreement is valid and binding on Seller in accordance with its terms and is in full force and effect. None of Seller or, to Seller's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate, any Assigned Agreement. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Assigned Agreement or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. There are no material disputes pending or, to Seller's Knowledge, threatened under any Assigned Agreement.

Section 5.6    Intellectual Property.

(a)    Schedule 5.6(a) lists all (i) Intellectual Property Registrations and (ii) Intellectual Property Assets that are not registered but that are material to the operation of the Business. All required filings and fees related to the Intellectual Property Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Intellectual Property Registrations are otherwise in good standing. Seller has provided Buyer with true and complete copies of file histories, documents, certificates, office actions, correspondence and other materials related to all Intellectual Property Registrations.

13

(b)     Schedule 5.6(b) lists all Intellectual Property Agreements. Seller has provided Buyer with true and complete copies of all such Intellectual Property Agreements, including all modifications, amendments and supplements thereto and waivers thereunder. Each Intellectual Property Agreement is valid and binding on Seller in accordance with its terms and is in full force and effect. None of Seller or, to Seller's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of breach or default of or any intention to terminate, any Intellectual Property Agreement. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Intellectual Property Agreement or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder.

(c)     Seller is the sole and exclusive legal and beneficial, and with respect to the Intellectual Property Registrations, record, owner of all right, title and interest in and to the Intellectual Property Assets, and has the valid right to use all other Intellectual Property used in or necessary for the conduct of the Business as currently conducted, in each case, free and clear of Encumbrances.

(d)     The Intellectual Property Assets and Intellectual Property licensed under the Intellectual Property Agreements are all of the Intellectual Property necessary to operate the Business as presently conducted. The consummation of the transactions contemplated hereunder will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, the Buyer's right to own, use or hold for use any Intellectual Property as owned, used or held for use in the conduct of the Business as currently conducted.

(e)     Seller's rights in the Intellectual Property Assets are valid, subsisting and enforceable. Seller has taken all reasonable steps to maintain the Intellectual Property Assets and to protect and preserve the confidentiality of all trade secrets included in the Intellectual Property Assets, including requiring all Persons having access thereto to execute written non-disclosure agreements.

(f)     The conduct of the Business as currently and formerly conducted, and the Intellectual Property Assets and Intellectual Property licensed under the Intellectual Property Agreements as currently or formerly owned, licensed or used by Seller, have not infringed, misappropriated, diluted or otherwise violated, and have not, do not and will not infringe, dilute, misappropriate or otherwise violate, the Intellectual Property or other rights of any Person. To Seller's Knowledge, no Person has infringed, misappropriated, diluted or otherwise violated, or is currently infringing, misappropriating, diluting or otherwise violating, any Intellectual Property Assets.

(g)     There are no Proceedings (including any oppositions, interferences or re-examinations) settled, pending or, to Seller's Knowledge, threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person by Seller in connection with the Business; (ii) challenging the validity, enforceability, registrability or ownership of any Intellectual Property Assets or Seller's rights with respect to any Intellectual Property Assets; or (iii) by Seller or any other Person

14

WEST\295910467.8

alleging any infringement, misappropriation, dilution or violation by any Person of any Intellectual Property Assets. Seller is not subject to any outstanding or prospective Order (including any motion or petition therefor) that does or would restrict or impair the use of any Intellectual Property Assets.

Section 5.7    Legal Proceedings.  Other than the Bankruptcy Case, there is no Proceeding of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Acquired Assets; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Proceeding.

Section 5.8    Leased Premises.  Other than the Premises, there is no other real property leased by Seller or used in or necessary for the conduct of the Business as currently conducted. Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy the Premises or any person thereof.  Seller has not pledged, mortgaged or otherwise granted an Encumbrance on its leasehold interest in the Premises.  Seller has not received any notice of (i) violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Premises, (ii) existing, pending or threatened condemnation proceedings affecting the Premises, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to materially and adversely affect the ability to operate the Premises as currently operated. Neither the whole nor any material portion of the Premises has been damaged or destroyed by fire or other casualty.

Section 5.9    Compliance with Law; Permits.    Seller has complied, and is now complying, with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Acquired Assets.  All Permits required for Seller to conduct the Business as currently conducted or for the ownership and use of the Acquired Assets have been obtained by Seller and are valid and in full force and effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full.  Schedule 5.9 lists all current Permits issued to Seller which are related to the conduct of the Business as currently conducted or the ownership and use of the Acquired Assets, including the names of the Permits and their respective dates of issuance and expiration. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in Schedule 5.9.

Section 5.10    Employment Matters.

(a)    Schedule 5.10 contains a list of all persons who are employees, independent contractors or consultants of the Business as of the date hereof, including any employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized, and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full or part time); (iii) hire date; (iv) current annual base compensation rate; (v) commission, bonus or other incentive-based compensation; and (vi) a description of the fringe benefits provided to each such individual as of the date hereof. As of the date hereof, all compensation, including wages, commissions and bonuses payable to all employees, independent contractors or consultants of the Business for services performed on or prior to the date hereof have been paid in full and there are

15

no outstanding agreements, understandings or commitments of Seller with respect to any compensation, commissions or bonuses.

(b)     Seller is not, and has not been for the past four years, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "Union"), and there is not, and has not been for the past four years, any Union representing or purporting to represent any employee of Seller, and no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. Seller has no duty to bargain with any Union. There has never been, nor has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting Seller or any employees of the Business.

Section 5.11     Affiliate Transactions.  Except as set forth on Schedule 5.11, in the last three years, the Seller has not incurred any obligation or liability to, made any payment to, or entered into or agreed to enter into any transaction with or for the benefit of, any Affiliate of the Seller, or any employee, officer or director of the Seller or any Affiliate thereof.

Section 5.12     Brokers or Finders.   Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that the statements contained in this Article VI are true and correct as of the date hereof:

Section 6.1     Organization and Good Standing.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer has the requisite limited liability company power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

Section 6.2     Authority; Validity.  Buyer has the requisite limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite corporate actions in respect thereof.  This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

16

WEST\295910467.8

Section 6.3 **No Conflict; Consents**. The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of formation, limited liability company agreement or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Order applicable to Buyer; or (c) conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which Buyer is a party. Subject to requisite Bankruptcy Court approval, as applicable, Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby or thereby, in each case that that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.4 **Availability of Funds; Solvency**. Buyer has and will have at the Closing sufficient cash in immediately available funds to pay the Purchase Price and any other costs, fees and expenses required to be paid by it under this Agreement and the other Transaction Documents. As of the Closing and immediately after consummating the transactions contemplated by this Agreement and the other transactions contemplated by the Transaction Documents, Buyer will not (i) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the present fair value of its assets will be less than the amount required to pay its probable Liability on its debts as they become absolute and matured), (ii) have unreasonably small capital with which to engage in its business or (iii) have incurred or plan to incur debts beyond its ability to repay such debts as they become absolute and matured.

Section 6.5 **Litigation**. There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.6 **Brokers or Finders**. Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable.

## ARTICLE VII

## ACTIONS PRIOR TO THE CLOSING DATE

Section 7.1 **Operations Prior to the Closing Date**. Seller covenants and agrees that, except (i) as expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer, (iii) as required by the Bankruptcy Court, or (iv) as otherwise required by Law, after the Effective Date and prior to the Closing Date:

17

WEST\295910467.8

(a)     Seller shall use commercially reasonable efforts, taking into account Seller's status as debtor-in-possession in the Bankruptcy Case, to maintain and preserve the Acquired Assets in their present condition (including by using its commercially reasonable efforts to renew any Assigned Agreements that come up for renewal between the date hereof and the Closing Date); and without limiting the generality of the foregoing,

(b)     Seller shall not:

(i)     sell, lease (as lessor), transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed any Encumbrance (other than Assumed Liabilities) on, any Acquired Asset;

(ii)     amend, modify, terminate, waive any rights under or create any Encumbrance with respect to, any of the Assigned Agreements or otherwise take any actions not required by the terms of any Assigned Agreement that would result in any increase in any payments to be made under such Assigned Agreement;

(iii)     cancel or compromise any material claim or waive or release any material right, in each case, that is a claim or right related to an Acquired Asset;

(iv)     "reopen" or otherwise recommence operation of the Business; or

(v)     enter into any agreement or commitment to take any action prohibited by this Section 7.1.

Section 7.2     Bankruptcy Court Filings and Approval.

(a)     Seller shall use its commercially reasonable efforts to obtain entry of the Sale Order and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the transactions contemplated by this Agreement.  Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and, consistent with Section 2.6, a finding by the Bankruptcy Court of adequate assurance of future performance by Buyer.

(b)     Seller and Buyer acknowledge that this Agreement and the sale of the Acquired Assets and the assumption and assignment of the Assigned Agreements are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Acquired Assets under the circumstances and (ii) Buyer must provide adequate assurance of future performance under the Assigned Agreements to be assigned by Seller.

(c)     Seller shall give all notices required to be given by applicable Law, to all Persons entitled thereto of all motions (including the motions seeking entry of the Sale Order), orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.  Seller shall promptly provide Buyer with copies of all communications from the Bankruptcy Court relating to the motions seeking entry of the Sale Order.

18

(d)     In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, Seller shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from or stay request in respect of such order. Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal or stay request and obtain an expedited resolution of such appeal.

(e)     After entry of the Sale Order, Seller shall not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

Section 7.3    Access to Information. From the date hereof until the Closing, Seller shall afford Buyer and its Representatives full and free access to and the right to inspect all of the Acquired Assets and other documents and data related to the Business; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business.

Section 7.4    No Solicitation of Other Bids.

(a)     Seller shall not, and shall not authorize or permit any of its Affiliates or any of its or their Representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal. Seller shall immediately cease and cause to be terminated, and shall cause its Affiliates and all of its and their Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. For purposes hereof, "Acquisition Proposal" means any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) relating to the direct or indirect disposition, whether by sale, merger or otherwise, of all or any portion of the Business or the Acquired Assets.

(b)     In addition to the other obligations under this Section 7.4, Seller shall promptly (and in any event within two Business Days after receipt thereof by Seller or its Representatives) advise Buyer orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same.

(c)     Seller agrees that the rights and remedies for noncompliance with this Section 7.4 shall include having such provision specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

WEST\295910467.8

## ARTICLE VIII

## ADDITIONAL AGREEMENTS

Section 8.1    Taxes.

(a)    Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, for  certainty, goods and services tax, sales tax, use tax, and land transfer tax) payable in connection with the sale or transfer of the Acquired Assets ("Transfer Taxes") shall be borne and paid by Seller.  Seller and Buyer shall  use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes, such efforts not to include requiring Seller to file a plan of reorganization or liquidation for such purpose.  Seller shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer  Taxes; provided, however, that in the event any such Tax Return requires execution by Buyer, Seller shall prepare and  deliver to Buyer a copy of such Tax Return at least three (3) Business Days before the due date thereof, and Buyer shall  promptly execute such Tax Return and deliver it to Seller, which shall cause it to be filed.

(b)    Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable,  such information and assistance relating to the Acquired Assets (including access to Documents) as is reasonably necessary for the filing of all  Tax Returns, the making of any election relating to Taxes, the preparation for any  audit by any taxing authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax; provided,  however, that (other than as required pursuant to this Section 8.1(b)) neither Buyer nor Seller shall be required to disclose  the contents of its income tax returns to any Person.  Any expenses incurred in furnishing such information or assistance  pursuant to this Section 8.1(b) shall be borne by the Party requesting it.

(c)    Notwithstanding any other provisions in this Agreement, Buyer and Seller hereby waive compliance with all "bulk  sales," "bulk transfer" and similar laws that may be applicable with respect to the sale and transfer of any or all of the  Acquired Assets to Buyer.

Section 8.2    Payments Received.  Seller, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other and will account to the other for all such receipts.

Section 8.3    Confidentiality.  From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, the Acquired Assets or the terms and conditions of the transactions contemplated hereby, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing

20

such information by a legal, contractual or fiduciary obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, provided that Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.  Seller acknowledges that a breach or threatened breach of this Section 8.3 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

## ARTICLE IX

## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE

Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 9.1    Accuracy of Representations.  The representations and warranties of Seller contained in Article V shall be true and correct as of the date hereof and shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except that  those representations and warranties which address matters only as of a particular date need only be true and correct as of  such date).  Buyer shall have received a certificate of Seller acceptable to Buyer in its reasonable discretion, signed by a duly authorized officer of Seller, to that effect.

Section 9.2    Seller's Performance.  Seller shall have performed and complied with in all material respects the covenants and agreements that Seller is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof.

Section 9.3    No Order.  No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement (a "Closing Legal Impediment"); provided, however, that prior to asserting this condition Buyer shall have taken all actions required by Section 7.2 to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 9.4    Seller's Deliveries.  Each of the deliveries required to be made to Buyer pursuant to Section 4.3 shall have been so delivered.

21

Section 9.5   Sale Order.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to an appeal or a stay pending appeal.

Section 9.6   Closing of CDBI Acquisition.   The CDBI Acquisition shall close concurrently with the Closing.

## ARTICLE X

## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 10.1   Accuracy of Representations.  The representations and warranties of Buyer contained in Article VI shall be true and correct as of the date hereof and shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except that  those representations and warranties which address matters only as of a particular date need only be true and correct as of  such date).  Seller shall have received a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 10.2   Buyer's Performance.  Buyer shall have performed and complied with in all material respects the covenants and agreements that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 10.3   No Order.  No Closing Legal Impediment shall be in effect, provided, however, that prior to asserting this condition Seller shall have taken all actions required by Section 7.2 to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 10.4   Buyer's Deliveries.  Each of the deliveries required to be made to Seller pursuant to Section 4.2 shall have been so delivered.

Section 10.5   Sale Order in Effect.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to an appeal or a stay pending appeal.

## ARTICLE XI

## INDEMNIFICATION

Section 11.1   Survival.  Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein will survive the Closing for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof). All covenants of the parties contained herein will survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period

WEST\295910467.8

will not thereafter be barred by the expiration of the relevant representation or warranty and such claims will survive until finally resolved.

Section 11.2   Indemnification by Seller. Seller shall defend, indemnify and hold harmless Buyer, its Affiliates and their Representatives from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorneys' fees and disbursements ("Losses"), arising from or relating to:

(a)   any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement or any document to be delivered hereunder;

(b)   any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement or any document to be delivered hereunder;

(c)   any Excluded Liability; or

(d)   any claim by a Third Party based upon, resulting from, or arising out of the Business, operations, properties, assets, or obligations of Seller conducted, existing, or arising on or prior to the Closing Date.

Section 11.3   Indemnification by Buyer. Buyer shall defend, indemnify and hold harmless Seller, its Affiliates and their Representatives from and against all Losses arising from or relating to:

(a)   any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or any document to be delivered hereunder; or

(b)   any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement or any document to be delivered hereunder.

Section 11.4   Tax Treatment of Indemnification Payments. All indemnification payments made by Seller under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for tax purposes, unless otherwise required by law.

Section 11.5   Limitation. The maximum liability of Seller for claims for indemnification under this this Article XI may not exceed an amount equal to (x) the Purchase Price, less (y) the aggregate amount of all creditor claims allowed by the Bankruptcy Court in the Bankruptcy Case.

Section 11.6   Effect of Investigation. Buyer's right to indemnification or other remedy based on the representations, warranties, covenants and agreements of Seller contained herein will not be affected by any investigation conducted by Buyer with respect to, or any knowledge acquired by Buyer at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

Section 11.7   Cumulative Remedies. The rights and remedies provided in this Article XI are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

23

WEST\295910467.8

## ARTICLE XII

## TERMINATION

Section 12.1    Termination Events.  Anything contained in this Agreement to the contrary notwithstanding (other than as  provided in the last sentence of this Section 12.1), this Agreement may be terminated at any time prior to the Closing Date:

    (a)    by mutual written consent of Seller and Buyer; or

    (b)    by either Seller or Buyer:

    (i)    if the Bankruptcy Court rules that it does not approve this Agreement for any reason or if a Governmental  Authority issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated hereby, provided, however, that the right to terminate this Agreement pursuant to this Section 12.1(b)(i) shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained  herein results in such ruling or Order;

    (ii)    if the Closing shall not have occurred by the close of business on the date that is 180 days after the Effective Date (the "Outside Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 12.1(b)(ii) shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained herein results in the failure of the Closing to be consummated by such time; or

    (iii)    if the Sale Order is vacated.

    (c)    by Buyer:

    (i)    in the event of any breach by any Seller of any of its agreements, covenants, representations or warranties  contained herein that would result in the failure of a condition set forth in Article IX to be satisfied, and the failure of Seller to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after  receipt of the Buyer Termination Notice; provided, however, that (1) Buyer is not in breach of any of its  representations, warranties, covenants or agreements contained herein in a manner that would result in the failure of a condition set forth in Article X to be satisfied, (2) Buyer notifies Seller in writing (the "Buyer Termination  Notice") of its intention to exercise its rights under this Section 12.1(c)(i) as a result of the breach, and (3) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein of which Seller is allegedly in breach;

    (ii)    if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or if a trustee or examiner for the Seller is appointed by the Bankruptcy Court; or

24

(iii)    if the Bankruptcy Court has not entered the Sale Order on or before the date that is 60 days after the Effective Date; provided, that Buyer may extend such date from time to time; or

(iv)    if any conditions to the obligations of Buyer set forth in <u>Article IX</u> shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement; or

(d)    by Seller:

(i)    in the event of any breach by Buyer of any of its agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in <u>Article X</u> to be satisfied, and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after receipt of the Seller Termination Notice; provided, however, that Seller (1) is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, (2) notify Buyer in writing (the "<u>Seller Termination Notice</u>") of its intention to exercise its rights under this <u>Section 12.1(d)(i)</u> as a result of the breach, and (3) specifies in the Seller Termination Notice the representation, warranty, covenant or agreement contained herein of which Buyer is allegedly in breach; or

(ii)    if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and is not subject to any stay on enforcement and (A) Seller has provided Buyer with written notice that it is prepared to consummate the transactions contemplated by this Agreement, (B) the conditions to Closing in <u>Article IX</u> have been satisfied (or waived by Buyer), other than those conditions that by their nature can only be satisfied at Closing, and (C) the Closing Date does not occur within one (1) Business Day of Seller providing Buyer with such notice.

## ARTICLE XIII

### GENERAL PROVISIONS

Section 13.1    <u>Notices</u>. Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) by a nationally recognized courier for overnight delivery service, or (c) by email or other electronic means, confirmed by telephone or return email (including an automated return receipt), to the persons indicated below. A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if by nationally recognized courier, one Business Day after delivery to such courier, and (iii) if by email or other electronic means, when sent and confirmed by telephone or return email. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

If to Seller, then to:

25

Summit Family Restaurants Inc.
4340 E. Indian School Road, Ste. 21-305
Phoenix, AZ 85018

If to Buyer, then to:

The Beautiful Opco, LLC
2381 Rosecrans Ave., Suite 350
El Segundo, CA 90245
Attn: General Counsel
Email: pclegal@parkcounty.com

with a copy (which shall not constitute notice) to:

DLA Piper LLP (US)
2000 Avenue of the Stars
North Tower, Suite 400
Los Angeles, CA 90067
Attn: David Parsly
Email: david.parsly@us.dlapiper.com

Section 13.2   Amendment; Waiver.  No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought and such amendment, modification, discharge or waiver is delivered substantially contemporaneously to each other Party.  Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.  Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.  No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement.

Section 13.3   Entire Agreement.  This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the  subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter.

Section 13.4   No Presumption as to Drafting.  Each of the parties acknowledges that it has been represented by legal counsel in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby.  Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this

26

Agreement or the Transaction Documents against the drafting party has no application and is expressly waived.

Section 13.5   Assignment.   This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent maybe granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted, upon prior notice to Seller, to assign all or part of its rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of its obligations under this Agreement.

Section 13.6   Severability.   The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 13.7   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)   Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the  negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into  this Agreement) shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any  other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)   Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby (whether in contract, tort or otherwise) and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that, if the Bankruptcy Case is closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined either (i) by the Bankruptcy Court in the event that the Bankruptcy Case is reopened or (ii) in a Delaware state court or a federal court sitting in the State of Delaware, and the Parties hereby (a) irrevocably and unconditionally submit to the exclusive jurisdiction of such courts and any state appellate court therefrom within the State of Delaware with respect to all Proceedings arising out of or relating to this Agreement and the transaction contemplated hereby (whether based on contract, tort or other theory); (b) agree that all claims with respect to any such Proceeding shall be heard and determined in such courts and agrees not to commence any

27

Proceeding relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or other theory) except in such courts; (c) irrevocably and unconditionally waive any objection to the laying of venue of any Proceeding arising out of this Agreement or the transactions contemplated hereby and irrevocably and unconditionally waives the defense of an inconvenient forum; and (d) agree that a final judgment in any such Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. The Parties agree that any violation of this Section 13.7(b) shall constitute a material breach of this Agreement and shall constitute irreparable harm.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 13.7.

Section 13.8  Counterparts.  This Agreement may be executed in any number of counterparts (including by electronic transmission (e.g., DocuSign), via facsimile or other electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.  This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party.  Delivery of an executed counterpart hereof by electronic transmission (e.g, DocuSign) or by means of facsimile or electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 13.9  Parties in Interest; No Third Party Beneficiaries.  Except as set forth in Article XI, nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or a permitted assignee of a Party.

Section 13.10 Specific Performance.  The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this  Agreement are not performed by Seller in accordance with the specific terms hereof or are otherwise breached, and (b) the Buyer shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement.  If any Proceeding is brought by the  Buyer to enforce this Agreement, the Seller shall waive the defense that there is an adequate  remedy at law.  Seller remedies are limited to the monetary damages herein.

[Signature pages follow]

28

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

SUMMIT FAMILY RESTAURANTS INC.

By: _____
Name:
Title:

THE BEAUTIFUL OPCO, LLC

By: _____
Name: Keith Pizzi
Title: Authorized Signatory

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

SUMMIT FAMILY RESTAURANTS INC.

By:
Name: RONALD E. DOWDY
Title: TREASURER

THE BEAUTIFUL OPCO, LLC

By:
Name:
Title:

[Signature Page to Asset Purchase Agreement]

## EXHIBIT A
## Form of Sale Order

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                                              )
                                                    )          Case No. 19-15325-TBM
SUMMIT FAMILY RESTAURANTS, INC.)
                                                    )          Chapter 11
                                                    )
Debtor.                                             )

**ORDER GRANTING MOTION TO (A) APPROVE PURCHASE AND SALE
AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES PURSUANT
TO 11 U.S.C. §§ 363(b) AND (f); AND (B) TO ASSUME AND ASSIGN UNEXPIRED
LEASE PURSUANT TO 11 U.S.C. § 365(f)**

THIS MATTER is before the Court on the Motion to (A) Approve Purchase and Sale
Agreement for the Sale of Substantially All of Debtor's Assets Free and Clear of all Liens, Claims
and Encumbrances Pursuant to 11 U.S.C. §§ 363(b) and (f); and (B) To Assume and Assign
Unexpired Lease Pursuant to 11 U.S.C. § 365(f) ("Sale Motion") of debtor in possession Summit
Family Restaurants, Inc. ("Debtor") to sell substantially all of its assets free and clear of all liens,
claims and encumbrances pursuant to Bankruptcy Code Sections 363(b) and 363(f) to The
Beautiful Opco, LLC ("Buyer"). In connection with the Sale Motion, the Debtor sought Court
approval of that certain Asset Purchase Agreement dated September 23, 2021 between the Debtor,
as Seller, and the Buyer ("APA"), providing for the sale of substantially all of the Debtor's assets,
as set forth in the APA ("Purchased Assets").

Pursuant to the Sale Motion, the Debtor requests that the Court to enter an order, *inter alia*:

i.      Approving the Debtor's entry into and performance under the APA;

ii.     Approving the sale of the Purchased Assets to Buyer;

iii.    Authorizing such sale free and clear of all liens, claims, interests, and
        encumbrances;

iv.     Authorizing Debtor to assume the certain Shopping Center Lease by and
        between BSV Lamont JCRS LLC, a Delaware limited liability company
        (the "Landlord") and Debtor, dated September 12, 2014 and any
        amendments thereto (the "Lease"), and assign the same to Buyer;

1

v.   Authorizing Debtor to immediately distribute $900,000.00 of the Purchase Price, as that term is defined herein, to the Landlord as a full and final cure of Debtor's obligations to Landlord;

vi.   Providing for the liens against the Purchased Assets to be transferred to the net sale proceeds, with all such liens, claims and encumbrances to attach, in the same amount, validity, priority, enforceability, avoidability, and extent as existed prior to the sale, to the net sale proceeds;

vii.   Authorizing and directing the Debtor to promptly file an amended Chapter 11 Plan which will provide for payment of all allowed claims in full and to distribute the excess, if any, in accordance with applicable law;

viii.   Waiving the 14-day stay that would otherwise apply to this Order pursuant to Fed. R. Bankr. P. 6004(h); and

ix.   Granting such additional relief as the Court deems just and proper.

The Court has considered the Sale Motion, and based upon the Motion, the evidence presented in support of the Sale Motion, the record in this case, and the arguments and representations of counsel who appeared at the hearing on the Sale Motion,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

A.   The Court has jurisdiction to hear and determine the Sale Motion and to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. §§ 157(a) and 1334;

B.   Venue of this case and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N), and (O);

C.   The statutory predicates for the relief requested in the Sale Motion are 11 U.S.C. § 363 and Fed. R. Bankr. P. 6004;

D.   As set forth in the Certificate of Service filed with this Court in connection with the Sale Motion, notice of the hearing on the approval of the Sale Motion was duly served on all parties entitled to notice, including each entity known to the Debtor to assert a lien, claim, encumbrance, leasehold, or other interest in or against the Purchased Assets, which notice constitutes good and sufficient notice of the Sale Motion and the Sale Hearing, such that no other or further notice of the Sale Motion or the Sale Hearing or the entry of this Sale Order need be given;

2

E.      The legal and factual bases set forth in the Sale Motion and the record in this case establish a sufficient basis and a reasonable business purpose and judgment for the Debtor to enter into the APA, to sell the Purchased Assets to the Buyer, and to assume and assign any Assumed Contracts to the Buyer pursuant to Bankruptcy Code sections 363 and 365, and such actions are appropriate exercises of the Debtor's business judgment and in the best interests of the Debtor, its creditors and the Debtor's estate;

F.      The offer of the Buyer, upon the terms and conditions set forth in the APA , including the form and total consideration to be realized by the Debtor pursuant to the APA, (i) is in an amount sufficient to pay all claims against Debtor, whether disputed or otherwise, in full as represented in Exhibit ___ to the Motion; (ii) is fair and reasonable; (iii) is in the best interests of the Debtor's creditors and estate; (iv) constitutes full and adequate consideration and reasonably equivalent value for the Purchased Assets; and (v) will provide a greater recovery for the Debtor's creditors and other interested parties than would be provided by any other practically available alternative.

G.      The Buyer is unrelated to the Debtor, and the APA was negotiated and has been undertaken by the Debtor and the Buyer at arm's length without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m), and, as a result of the foregoing, the Debtor's estate and the Buyer are entitled to the protections of Bankruptcy Code section 363(m);

H.      The Debtor and the Buyer have, to the extent necessary, and subject to the terms and conditions set forth herein, satisfied the requirements of Bankruptcy Code section 365, including sections 365(b)(1) and 365(f)(2), in connection with the sale of the Purchased Assets and the assumption and assignment of any Assigned Agreement, including the Lease.   The Purchaser has demonstrated adequate assurance of future performance with respect to all Assigned Agreements, including the Lease.  The assumption and assignment of the Assigned Agreements pursuant to the terms of the APA and this Sale Order is integral to the APA and is in the best interests of the Debtor, its estate, the Debtor's creditors and other parties in interest, and represents the exercise of sound and prudent business judgment by the Debtor;

I.      The Assigned Agreements are assignable notwithstanding any provisions contained therein to the contrary.  The Debtor has provided for the cures and/or other payments or actions required to assume and assign the Assigned Agreements to the Buyer.  Specifically, and as

3

described in the Motion, Debtor and Landlord have agreed Debtor shall pay $900,000.00 of the sale proceeds to the Landlord which amount is the full and final cure amount due and payable to the Landlord. The Buyer has provided adequate assurance of its future performance under the Assigned Agreements within the meaning of Bankruptcy Code section 365;

     J.     With respect to each entity asserting a lien, lease, or other interest in the Purchased Assets, one or more of the standards set forth in Bankruptcy Code section 363(f) has been satisfied;

     K.     The transfer of the Purchased Assets to the Buyer will be a legal, valid and effective transfer of the Purchased Assets, and, except as may otherwise be provided in the APA, shall vest Buyer with all right, title and interest of the Debtor to the Purchased Assets free and clear of any and all claims, encumbrances and interests, other than Assumed Liabilities (as defined in the APA). Except as specifically provided in the APA or this Sale Order, the Buyer shall not assume or become liable for any claims, encumbrances and interests relating to the Purchased Assets;

     L.     In the absence of a stay pending appeal, the Buyer will be acting in good faith pursuant to Bankruptcy Code section 363(m) in closing the transactions contemplated by the APA at any time on or after entry of this Sale Order, and cause has been shown as to why this Sale Order should not be subject to the stay provided by Bankruptcy Rules 6004(h);

     M.     Pursuant to Bankruptcy Code section 365(k), the Debtor and its estate and their successors shall be relieved from any liability for any breach of the Assigned Agreements occurring after the Closing Date (as defined in the APA); and

     N.     The Buyer shall have no obligations with respect to any liabilities of the Debtor other than the Assumed Liabilities and its obligations under the APA.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

     1.     The Sale Motion is GRANTED in its entirety;

     2.     The purchase price of $3,100,000.00 is fair and reasonable under the circumstances and represents an amount sufficient to play all claims against Debtor, whether disputed or otherwise, in full as represented in Exhibit ___ to the Motion, and thus the sale of the Purchased Assets is approved according to the terms of the APA.

     3.     The Debtor is authorized to effectuate the transfer of the Purchased Assets to the Buyer pursuant to the APA. Such transfer shall be, and is hereby deemed to be, a legal, valid, and effective transfer of the Purchased Assets, and vests with the Buyer all right, title, and interest of

4

the Debtor and the Debtor's estate in the Purchased Assets. The Debtor is authorized to execute
any and all instruments and other documents necessary or appropriate to effectuate the transfer.

4.      The Debtor is authorized to assume the Lease and assign the same to Buyer.
Promptly after closing, Debtor shall pay the sum of $900,000.00 to Landlord which amount is the
full and final cure amount payable to the Landlord.

5.      Subject to closing of the sale and payment of the Purchase Price, the sale of the
Purchased Assets to the Buyer shall be free and clear of any and all liens claims, interests, and
encumbrances pursuant to 11 U.S.C. § 363(f), with such liens to attach to the net sale proceeds in
the same amount, validity, priority, enforceability, avoidability, and extent as existed prior to the
sale.

6.      If any person or entity that has filed financing statements or other documents or
agreements evidencing any claims, encumbrances or interests in or against the Purchased Assets
shall not have delivered to the Buyer prior to the Closing after request therefor, in proper form for
filing and executed by the appropriate parties, termination statements, instruments of satisfaction,
or releases of all such Claims, Encumbrances or Interests that the person or entity has with respect
to the Purchased Assets, the Buyer is hereby authorized to execute and file such statements,
instruments, releases and other documents on behalf of the person or entity with respect to such
Purchased Assets.

7.      All persons or entities, presently or on or after the Closing Date in possession of
any of the Purchased Assets are directed to surrender possession of the Purchased Assets to the
Buyer on the Closing Date or at such time thereafter as the Buyer may request.

8.      The sale of the Purchased Assets to the Buyer under the APA will constitute a
transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and the
laws of all applicable jurisdictions.

9.      The Buyer has not assumed or is otherwise not obligated for any of the Debtor's
liabilities other than the Assumed Liabilities as set forth in the APA, and the Purchaser has not
purchased any of the Excluded Assets. Consequently, pursuant to Bankruptcy Code sections
105(a) and 363, all Persons and Governmental Units (as defined in sections 101(27) and 101(41)
of the Bankruptcy Code) are hereby enjoined from asserting or prosecuting any Claims,
Encumbrances or Interests or cause of action against the Buyer or the Purchased Assets to recover

·5

on account of any liabilities of the Debtor other than Assumed Liabilities pursuant to the APA. All persons holding or asserting any interest in the Excluded Assets are hereby enjoined from asserting or prosecuting such claims, encumbrances or interests or cause of action against the Buyer or the Purchased Assets for any liability associated with the Excluded Assets.

10.     The Buyer has provided adequate assurance of its future performance under the Assigned Agreements and the proposed assumption and assignment of the Assigned Agreements satisfies the requirements of the Bankruptcy Code including, sections 365(b)(l) and (3) and 365(f) of the Bankruptcy Code to the extent applicable.

11.     The Assigned Agreements are valid and binding, in full force and effect, and enforceable in accordance with their terms.  Any provision in any Assigned Agreement that purports to declare a breach, default or payment right as a result of an assignment or a change of control in respect of the Debtor is unenforceable, and all Assigned Agreements shall remain in full force and effect, subject only to payment of the appropriate cure amount, if any.  No sections or provisions of any Assigned Agreement that purports to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor third party to the Assigned Agreements shall have any force and effect with respect to the sale transaction and assignments authorized by this Sale Order, and such provisions constitute unenforceable anti-assignment provisions under Bankruptcy Code section 365(f) and/or are otherwise unenforceable under Bankruptcy Code section 365(e) and no assignment of any Assigned Agreement pursuant to the terms of the APA shall in any respect constitute a default under any Assigned Agreement.  The non-Debtor party to each Assigned Agreement shall be deemed to have consented to such assignment under Bankruptcy Code section 365(c)(1)(B), and the Buyer shall enjoy all of the rights and benefits under each such Assigned Agreement as of the applicable date of assumption without the necessity of obtaining such non-Debtor party's written consent to the assumption or assignment thereof.

12.     Upon the assumption and assignment thereof, and except for allowed claims for cure amounts payable by the Debtor under an Assigned Agreement, each non-Debtor party to an Assigned Agreement shall be forever barred and enjoined from asserting against the Debtor, its bankruptcy estates or the Buyer: (a) any default, monetary or non-monetary, existing as of the

6

Closing Date; or (b) any objection to the assumption and assignment of such non-debtor party's Assigned Agreements, regardless of whether such non-debtor party filed a proof of claim

13.     Except as to the Assumed Liabilities, all claims, liens and encumbrances against Debtor or its assets shall attach to the proceeds of this sale. Debtor shall promptly file a proposed Plan to provide for payment of the proceeds of this sale to its creditors, and the proceeds of sale shall not be used for any other purpose until said Plan has been proposed and confirmed or as otherwise approved by the Court.

14.     The Buyer is not a "successor" to the Debtor or its bankruptcy estate by reason of any theory of law or equity, and the Buyer shall not assume, nor be deemed to assume, or in any way be responsible for, any liability or obligation of any of the Debtor and/or its estate including, any bulk sales law, successor liability or similar theory or law. Except to the extent the Buyer assumes the Assumed Liabilities pursuant to the APA, neither the purchase of the Purchased Assets by the Buyer, nor the fact that the Buyer is using any of the Purchased Assets previously operated by the Debtor, will cause the Buyer to be deemed a successor in any respect to the Debtor's businesses within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

15.     Consummation of the APA and the transactions contemplated therein do not effect a de facto merger or consolidation of the Debtor and the Buyer or result in the continuation of the Debtor's businesses under the Buyer's control. The Buyer is not the alter ego of, a successor in interest to, or a continuation of the Debtor, nor is the Buyer otherwise liable for any of the Debtor's debts and obligations, other than the Assumed Liabilities.

16.     Except to the extent expressly included in the Assumed Liabilities, pursuant to Bankruptcy Code sections 105 and 363, all persons and entities, including the Debtor, all creditors, equity security holders, the Debtor's employees or former employees, governmental, tax and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding a claim, encumbrance or interest of any kind or nature whatsoever

7

against, in or with respect the Debtor or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtor, the Purchased Assets, the operation of the Debtor's businesses prior to the Closing Date or the transfer of the Purchased Assets to the Buyer, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such claim, encumbrance or interest against the Buyer or any affiliate, successor or assign thereof and each of their respective current and former members, officers, directors, managed funds, investment advisors, attorneys, employees, partners, affiliates and representatives (each of the foregoing in its individual capacity), or the Purchased Assets.

17.     To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtor with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

18.     The Buyer under the APA is a buyer in good faith and subject to the provisions of 11 U.S.C. § 363(m).

19.     Every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA and this Sale Order.

20.     The Debtor is authorized to execute such documents and to undertake such other actions as are reasonably necessary or appropriate to complete the sale of the Purchased Assets.

21.     This Court shall and hereby does retain jurisdiction to (i) resolve any disputes, controversies, or claims arising out of or relating to the APA or the sale contemplated thereby, and (ii) interpret, implement, and enforce the provisions of this Order.

22.     The validity of the sale approved hereby shall not be affected by the appointment of a trustee, the dismissal of the above-captioned case, or its conversion to another chapter under the Bankruptcy Code.

23.     Pursuant to Fed.R.Bankr.P. 6004(h), the fourteen (14) day stay is hereby suspended, and this Order is effective immediately. Accordingly, notwithstanding any provision in the Bankruptcy Code or Federal Rules of Bankruptcy Procedure to the contrary: (i) the terms of

8

this Order shall be effective immediately and enforceable upon its entry; (ii) the Debtor is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (iii) the Debtor may, in its reasonable discretion and without further delay, take any action and perform any act authorized under this Order.

DONE and entered this _____ day of _____, 2021 at Denver, Colorado.

BY THE COURT:

_____
Honorable Michael E. Romero
United States Bankruptcy Court

9

# DISCLOSURE SCHEDULES

## TO

## ASSET PURCHASE AGREEMENT

## BY AND BETWEEN

## SUMMIT FAMILY RESTAURANTS INC.,
### as debtor in possession,

## AND

## THE BEAUTIFUL OPCO, LLC

### September 23, 2021

## Schedule 2.1(a)

### Assigned Agreements

1. The Lease

## Schedule 3.3

### Purchase Price Allocation

To be agreed upon in good faith before the Closing.

## Schedule 5.5

### Material Contracts

(i)

1. GuardianPlus Services Agreement, dated July 7, 2021, by and between Casa Bonita and Ecolab
2. Shopping Center Lease, dated September 12, 2014, by and between BSV Lamont JCRS LLC and Summit Family Restaurants Inc.
3. SBA PPP Loan
4. SBA EIDL Loan
5. A list of all other known entities who hold or may hold claims against Seller is attached to this Schedule 5.5.

(ii)

None

(iii)

None

(iv)

See Schedule 5.5(i)

(v)

None

(vi)

None

(vii)

None

(viii)

1. Seller has contracts with Sysco and Pepsi on food and drink distribution.
2. Seller utilizes Aloha-licensed restaurant management/POS systems and has purchased the license and all hardware in addition to a 24-hour help desk contract.

## Schedule 5.6

### Intellectual Property

(a)

None

(b)

Oral license to use Casa Bonita Intellectual Property in connection with the Restaurant.

**Schedule 5.9**

**Permits**

1. Colorado state License to Operate Retail Food Establishment, dated January 1, 2021.
2. Alcoholic Beverage License Number 07-50921-0000, which license expires on January 7, 2022.

## Schedule 5.10

### Employment Matters

See list of employees attached to this Schedule 5.10.

**Schedule 5.11**

**Affiliate Transactions**

1. Oral license to use Casa Bonita Intellectual Property in connection with the Restaurant.
2. Prior to the Seller's bankruptcy filing, it paid approximately $10,000.00 for the benefit of Bob Wheaton, an insider of Seller.  Said claim will be resolved in Seller's Chapter 11 Plan.

WEST\296142417.3